FILED by _____ B.C.
DKTG

DEC 3 1 2002

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

UNITED STATES DISTRICT COURT
SOUTHEASTERN DISTRICT OF FLORIDA

CASE NO. 02-14134-CIV-MOORE/LYNCH

LINDA M. ZINK,

        Plaintiff,

vs.

ALLSTATE INSURANCE COMPANY and
MICHAEL W. COLLETTE, individually,

        Defendants.

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ x

                250 Austrailan Avenue South
                West Palm Beach, Florida
                Wednesday, October 30, 2002
                10:25 A.M. - 5:07 P.M.
                PP. 1 - 299

        DEPOSITION OF LINDA M. ZINK

        Taken before Coan E. Dow, Registered
Professional Reporter and Notary Public for the
State of Florida at Large, pursuant to Notice of
Taking Deposition filed in the above cause.

2

1                    APPEARANCES

2

3          JOSEPH L. ACKERMAN, JR., ESQ., of the firm
           BOOSE, CASEY, CIKLIN, LUBITZ, MARTENS,
           McBANE & O'CONNELL
4          515 North Flagler Drive
           Northbridge Center, 19th Floor
5          West Palm Beach, Florida  33401
           (561) 832-5900
6          on behalf of the Plaintiff.

7

8          SHEILA M. CESARANO, ESQ., of the firm of
           SHUTTS & BOWEN
           201 S. Biscayne Boulevard
9          1500 Miami Center
           Miami, Florida  33131
10         (305) 358-6300
           on behalf of the Defendants.

11

12         JUDITH Y. GASTON, ESQ., of
           ALLSTATE INSURANCE COMPANY
13         2775 Sanders Road, Suite A6
           Northbrook, Illinois  60062
14         (847) 402-6646
           on behalf of the Defendants.

15

16
           ALSO PRESENT:
17
           Olga Otero, Human Resources Director
18         Allstate Insurance Company

19
                     I N D E X
20
     Witness:        Direct   Cross   Redirect   Recross
21
     LINDA M. ZINK
22
     BY MS. CESARANO:      5
23

24

25

```
 1                    E X H I B I T S

 2     Defendant's                          Page No.

 3     1                                        19

 4     2                                        22

 5     3                                        22

 6     4                                        25

 7     5                                        30

 8     6                                        35

 9     7                                        36

10     8                                        37

11     9                                        39

12     10                                       40

13     11                                       43

14     12                                       47

15     13A                                      50

16     13B                                      51

17     13C                                      54

18     14A                                      55

19     14B                                      57

20     15                                       58

21     16                                       60

22     17                                       61

23     18                                       78

24     19                                       86

25     20                                       90
```

4

|  |  |  |
|---|---|---|
| 1 | 21 | 92 |
| 2 | 22 | 98 |
| 3 | 23 | 98 |
| 4 | 24 | 99 |
| 5 | 25 | 100 |
| 6 | 26 | 101 |
| 7 | 27 | 102 |
| 8 | 28 | 161 |
| 9 | 29 | 169 |
| 10 | 30 | 170 |
| 11 | 31 | 174 |
| 12 | 32, 33, 34 | 177 |
| 13 | 35 | 185 |
| 14 | 36 | 188 |
| 15 | 37 | 190 |
| 16 | 38 | 192 |
| 17 | 39A, 39B, 39C | 202 |
| 18 | 40 | 202 |
| 19 | 41, 42 | 206 |
| 20 | 43 | 294 |
| 21 | 44 | 295 |
| 22 |  |  |
| 23 |  |  |
| 24 |  |  |
| 25 |  |  |

5

```
 1              P R O C E E D I N G S

 2                   -   -   -

 3         THE VIDEOGRAPHER:  This is Videotape

 4    No. 1.  We are here today October 30, 2002.  The

 5    time is approximately 10:24 for the videotape

 6    deposition of Linda M. Zink for the case

 7    Linda M. Zink versus Allstate Insurance Company

 8    and Michael W. Collette.

 9         Would counsel please state their

10    appearances for the record.

11         MR. ACKERMAN:  Joseph Ackerman for the

12    plaintiff Linda Zink.

13         MS. CESARANO:  And Sheila Cesarano

14    representing Allstate Insurance Company and

15    Michael Collette, defendants.

16         THE VIDEOGRAPHER:  The videographer is

17    Todd Badrian.  The Court Reporter is Coann Dow.

18         Would the witness please raise their right

19    hand to be sworn.

20    Thereupon,

21              LINDA M. ZINK,

22    being by the undersigned Notary Public first

23    duly sworn, responded as follows:

24              THE WITNESS:  I do.

25              DIRECT EXAMINATION
```

6

```
 1   BY MS. CESARANO:
 2       Q.   Please state your full name for the
 3   record.
 4       A.   Linda Zink.
 5           MR. ACKERMAN:  May I interrupt for an
 6       minute.
 7           MS. CESARANO:  Yes.
 8           MR. ACKERMAN:  I want to object to
 9       Ms. Otero being here as a corporate
10       representative if she is not going to be the
11       corporate representative throughout the
12       proceedings, because she is a witness, we
13       discussed that before.
14           MS. CESARANO:  Right.  Yes, Mr. Ackerman is
15       right.  We discussed the fact as to whether the
16       defendant is entitled to have a different
17       corporate representative at trial as opposed to
18       a corporate representative here at the
19       plaintiff's deposition.
20           And I'm going to reserve, you know, the
21       right to argue that we can, or I may concede the
22       point.  But I don't want to make up my mind
23       today.
24           But it is true that for this deposition
25       Ms. Olga Otero is sitting in on behalf of
```

7

```
 1        Allstate Insurance Corporation, company.
 2   BY MS. CESARANO:
 3        Q.   Have you ever been known by any other
 4   names?
 5        A.   Yes.
 6        Q.   What are those?
 7        A.   Linda McTigue.
 8        Q.   How do you spell that?
 9        A.   M C T I G U E.
10        Q.   And during what time period were you known
11   as Linda McTigue?
12        A.   1992 until 1999.
13        Q.   Was that your married name?
14        A.   Yes.
15        Q.   And during that time period who, what was
16   the name of your husband?
17        A.   John.
18        Q.   Same last name?
19        A.   McTigue, yes.
20        Q.   Okay.  And when were you born?
21        A.   11/15/61.
22        Q.   And what name were you given at birth?
23        A.   Linda Zink.
24        Q.   Do you have a middle name?
25        A.   Marie.
```

8

```
 1        Q.    What is your address?

 2        A.    Home?

 3        Q.    Yes.

 4        A.    8849 Southeast Hawksbill Way, Hobe Sound,

 5   Florida 33455.

 6        Q.    And your home phone number?

 7        A.    772 546-7910.

 8        Q.    And work address?

 9        A.    8920 Southeast Bridge Road, Hobe Sound,

10   Florida 33455.

11        Q.    And what is the name of your agency?

12        A.    Allstate.

13        Q.    You have an agency known as the Zink

14   Agency, isn't that correct?

15        A.    Yes.  Oh, that name.

16        Q.    Yes.

17        A.    Zink Insurance Agency.

18        Q.    And is that a corporation?

19        A.    Yes.

20        Q.    And what is the state of the incorporation

21   for your company?

22        A.    I don't know what you mean.

23        Q.    Is your company incorporated in the State

24   Of Florida?

25        A.    Yes.
```

9

```
 1        Q.   And who are the officers and directors of
 2   your corporation?
 3        A.   I am.
 4        Q.   What title or titles do you hold in your
 5   corporation?
 6        A.   It's me.
 7        Q.   Right.  I understand that.  But legally,
 8   for example, are you the president of the
 9   corporation?
10        A.   I guess so.
11        Q.   Okay.  Does the corporation have a
12   secretary?
13        A.   No.  Me.
14        Q.   Okay.  Treasurer?
15        A.   Me.
16        Q.   Okay.
17        A.   I guess.  I don't look at it that way, but
18   okay.
19        Q.   And maybe to put it a more global question,
20   is there any other director or officer of your
21   agency, corporation other than you?
22        A.   No.
23        Q.   Is there any person who holds any shares in
24   the corporation other than you?
25        A.   No.
```

10

1      Q.   And the name is Zink, I want to get it
2   correct, Agency, Inc.?
3      A.   No.  Zink Insurance Agency, Inc.
4      Q.   Okay.  And when was that corporation
5   incorporated?
6      A.   In 1999.
7      Q.   Okay.  Do you happen to remember the month?
8      A.   Not specifically.  But somewhere.
9      Q.   Okay.  And does your agency sell
10  exclusively Allstate Insurance products?
11     A.   No.
12     Q.   Okay.  What other products does your agency
13  sell?
14     A.   Allstate has a brokering agreement with an
15  agency called Braishfield that we can sell homeowners
16  for.
17     Q.   And can you spell that name for the Court
18  Reporter.
19     A.   B R A I S H F I E L D, I believe.
20     Q.   And are there any other products that you
21  sell that are not Allstate products?
22     A.   Yes.
23     Q.   Could you name them all?
24     A.   Northeast Agencies, and Allstate controls
25  what we sell with them.  Like Northeast Agencies and

11

1    Braishfield offer many products, but Allstate

2    controls only the ones we are allowed to sell for

3    them.  So they get a cut on the commission too.

4         Q.   Okay.  And then could you identify on these

5    Northeast Agencies that company, which products that

6    you are allowed to sell?

7         A.   Northeast Agencies, Workers' Compensation,

8    general liability, commercial liability, inland

9    marine coverages for commercial risks.

10        Q.   And inland marine, now, the word "marine",

11   does that involve boats?

12        A.   No.

13        Q.   Okay.

14        A.   Inland marine is equipment floaters for

15   contractors' equipment.

16        Q.   Any other companies whose products you sell

17   besides Allstate Insurance products other than the

18   two you have already named?

19        A.   No.  Allstate owns everything.

20        Q.   Well, it doesn't, does it own this first

21   company that you mentioned, does it own Northeast

22   Agencies?

23        A.   No.  But I know they have an interest in

24   it.  They get a cut of our commission that we make,

25   whatever we write.

12

1     Q.   But you don't know for a fact that Allstate

2  owns Northeast Agencies?

3     A.   No.  But like at one point, American

4  Heritage we were able to broker policies through

5  them, but now Allstate owns it.  So who knows what

6  they are going to do.

7     Q.   Okay.

8     A.   They will probably own it at some point.

9     Q.   But as far as you know today at the time

10  you were selling the product, you don't know that

11  Allstate owns them?

12     A.   Right.

13     Q.   And these two, say the first name again.

14     A.   Braishfield.

15     Q.   Braishfield.  As to Braishfield, it's a

16  separate corporation, is that correct?

17     A.   I guess so.

18     Q.   Okay.  Do you know whether Allstate owns

19  that company or not?

20     A.   No.

21     Q.   Okay.  And the same answer for Northeast

22  Agencies, you are not sure whether Allstate owns them

23  or not?

24     A.   Correct.

25     Q.   Okay.  Now, does your, does Zink Insurance

13

1    Agency, Inc. have some employees?

2        A.    One.

3        Q.    One.  And who is that?

4        A.    Patty Xuncax.

5        Q.    Spell that.

6        A.    X U N C A X.

7        Q.    Can you pronounce that again?

8        A.    Xuncax.

9        Q.    Okay.  And she is the only employee

10   currently?

11       A.    Yes.

12       Q.    Have you had other employees in the past?

13       A.    Yes.

14       Q.    Okay.  Can you name those people that you

15   have employed, that your agency has employed?

16       A.    From when to when?

17       Q.    Why don't you start from the beginning of

18   the agency and name the employees you employed?

19       A.    Okay.  Donna Van.

20       Q.    Okay.

21       A.    Lorraine Sturm.

22       Q.    That's, S T U R M?

23       A.    Yes.  And Christy Miller.

24       Q.    Any others that you can think of?

25       A.    No.

14

1      Q.   Okay.  Was there any time period where two

2   or more of these named employees worked together?

3      A.   Yes.

4      Q.   Okay.  What is the maximum number of

5   employees you have employed at any given time?

6      A.   All three of them together.

7      Q.   Okay.  So at onetime you had as many as

8   three employees, but now you just have one, is that

9   correct?

10      A.   Yes.  Oh, I did have another one.

11      Q.   Who was that?

12      A.   Jane, what was her last name, Jane, what's

13   her last name.  I don't know it.

14      Q.   Okay.  If you think of it later, which you

15   probably will, let me know.

16      A.   Jane Kampmeir.

17      Q.   Kampmeir, can you spell it?

18      A.   K A M P M E I R, maybe.

19      Q.   And I'm going to abbreviate just so I don't

20   have to say the long name every time.  So when I say

21   Zink Insurance Agency, Inc., I'm just going to say

22   Zink Agency, okay?

23          Was it the Zink Agency that paid the wages

24   and benefits for Christy Miller and Lorraine Sturm

25   and Donna Van and Jane Kampmeir and Patty Xuncax, if

1    I have that right?

2        A.    Yes.

3        Q.    That's true?

4        A.    Ah huh.

5        Q.    And these were employees directly for your

6    agency?  I mean you paid the Workers' Compensation

7    for them and the payroll taxes, correct?

8        A.    No, Allstate won't allow us to do that.

9        Q.    Okay.  Tell me what you did pay for them?

10   You paid their wages?

11       A.    I paid the payroll service.

12       Q.    Okay.  Who's the payroll service?

13       A.    Payroll Plus.

14       Q.    But the money for the wages came out of

15   your, of the Zink Agency, correct?

16       A.    Yes.

17       Q.    You were responsible to make sure that they

18   received their wages?

19       A.    Yes.

20       Q.    And were these employees paid overtime?

21       A.    Nobody, they didn't have to work overtime.

22       Q.    Okay.  So it didn't come up?

23       A.    No reason to.

24       Q.    Okay.  How about benefits, did these

25   employees have any health insurance benefits?

16

1     A.   I gave them the same benefits Allstate gave

2  me.

3     Q.   Okay.  And what were those?

4     A.   Health insurance, dental, paid vacation,

5  you know, like.

6     Q.   Okay.

7     A.   Vision, if they needed the vision.

8     Q.   All right.  And those benefits were paid by

9  Zink Agency, correct?

10    A.   Through Payroll Plus.

11    Q.   Right.  But Payroll Plus is just a service

12  that you used for your convenience, correct?

13    A.   Allstate only lets us use certain

14  companies.

15    Q.   Okay.

16    A.   And that's who I had to use.

17    Q.   Okay.  Was there more than one payroll

18  company that you could have chosen from?

19    A.   I think they give us like eight or nine to

20  choose from.

21    Q.   Okay.  So it could be ADT or any of these

22  payroll companies?

23    A.   Not necessarily.

24    Q.   Okay.  There is a list of approved ones --

25    A.   Yes.

17

1    Q.   -- is that correct?

2    A.   But they are limited in Martin County

3    because of the health insurance problem in Martin

4    County.

5    Q.   So there is some I guess restrictions on

6    which payroll service companies you can use, but

7    within the eight or nine you chose one?

8    A.   Yes.

9    Q.   Okay.  And do you pay the costs of the

10   payroll service company from the Zink Agency?

11   A.   Yes.

12   Q.   Do you know what they charge you?

13   A.   It goes by the hourly, how many hours they

14   work.

15   Q.   Okay.  Is it a percentage of the wages, if

16   you know?

17   A.   I would imagine.

18   Q.   Okay.

19   A.   That's how they do it.

20   Q.   Now, the employees that you just named, do

21   they submit W-4 forms to you, to your agency, do they

22   fill out W-4 forms?

23   A.   No.  They submit them to Payroll Plus.

24   Q.   Okay.  Their paychecks, what do their

25   paychecks say on them, are they from the Zink Agency?

18

1          A.    No.

2          Q.    What do they say?

3          A.    Payroll Plus.

4          Q.    Okay.  But the money, obviously Payroll

5     Plus doesn't pay them their entire wages without

6     reimbursement, correct?

7          A.    I don't know what you mean.

8          Q.    Okay.  Ultimately where does the buck stop

9     as far as the money for the wages and the benefits

10    that Payroll Plus issues, is that money out of the

11    Zink Agency?

12          MR. ACKERMAN:  I'm going to object to the

13          form of the question.  If you understand the

14          question, you can answer it.

15          THE WITNESS:  I don't understand it.

16    BY MS. CESARANO:

17          Q.    Okay.  Then let me try to rephrase it.

18          A.    Do you want me to just tell you how it

19    works, to help you --

20          MR. ACKERMAN:  Just answer the question.

21    BY MS. CESARANO:

22          Q.    Let me just ask the question, then that

23    would be helpful.  Where does Payroll Plus get the

24    money to pay the employees from the Zink Agency?

25          A.    From me.

19

```
 1        Q.    Okay.  From your agency, correct?

 2        A.    Yes.

 3        Q.    Okay.  Now, at some point in time going

 4   back in time you were an employee of Allstate

 5   Insurance Company, is that correct?

 6        A.    Yes.

 7              MR. ACKERMAN:  Object to the form of the

 8        question.

 9   BY MS. CESARANO:

10        Q.    When were you first hired by Allstate

11   Insurance Company?

12        A.    October, '86.

13        Q.    And did you sign an employment agreement at

14   the time that you were hired, yes or no?

15        A.    Yes.

16              (The document is marked as Defendant's

17        Exhibit No. 1 for identification.)

18   BY MS. CESARANO:

19        Q.    Okay.  Sorry.  I didn't hear.  I want to

20   show you what has been marked for identification as

21   Exhibit 1, and I ask you is that the agent employment

22   agreement that you signed on October 6, 1986?

23              (The witness reviews the document.)

24        A.    Yes.

25        Q.    And is that your signature on Exhibit 1?
```

20

1      A.    Yes.

2      Q.    And I see on the last page there is another

3  signature by a Brian Foley, do you see that?

4      A.    Yes.

5      Q.    Who is Brian Foley?

6      A.    He was a manager that was terminated by

7  Allstate a couple years ago.

8      Q.    At the time in 1986 what was his job title?

9      A.    MSM, market sales manager.

10     Q.    Okay.  Now, was he your direct supervisor

11 at that time?

12     A.    Yes.

13     Q.    And did you remain under an employment

14 contract until from this date, which is 1986, until

15 July 1, 2000?

16         MR. ACKERMAN:   Object to the form of the

17     question.

18 BY MS. CESARANO:

19     Q.    Do you understand the question?

20     A.    I still am an employee.

21     Q.    Well, that's a legal conclusion that we are

22 debating about.  But my question --

23     A.    Right now?

24     Q.    No, not on the record, no.  I'm just asking

25 you some facts.

21

1      A.    Okay.

2      Q.    This employment agreement that you signed,

3  correct, you signed that in 1986?

4      A.    Yes.

5      Q.    My question to you is did you remain under

6  some form of employment agreement until July 1, 2000?

7          MR. ACKERMAN:  Object to the form of the

8      question.  Do you understand?

9  BY MS. CESARANO:

10     Q.    You can still answer it.

11     A.    Well, it was an agreement but not a

12  contract.

13     Q.    Okay.  Did you, this Exhibit 1 that you

14  just saw, okay --

15     A.    Okay.

16     Q.    -- did you remain under this agent

17  employment agreement until --

18          MR. ACKERMAN:  Can I interrupt.  Can you

19      rephrase "remain under", that's my objection.  I

20      think perhaps --

21          MS. CESARANO:  I'll try.

22          MR. ACKERMAN:  -- it's unclear to the

23      extent it asks for her to give some sort of

24      legal conclusion.

25          MS. CESARANO:  I'm not asking for a legal

22

1          conclusion.

2    BY MS. CESARANO:

3          Q.   Okay.   You signed this agreement October 6,

4    1986, correct?

5          A.   Yes.

6          Q.   Did there come a time effective July 1,

7    2000 where Allstate told you that this employment

8    agreement was terminated?

9          A.   Yes.

10              (The document is marked as Defendant's

11         Exhibit No. 2 for identification.)

12   BY MS. CESARANO:

13         Q.   Okay.   I'm showing you what has been marked

14   for identification as Exhibit 2; is that your

15   signature on Exhibit 2?

16              (The witness reviews the document.)

17         A.   Yes.

18         Q.   And this agreement that's Exhibit 2 you

19   signed on April 20, 1989, correct?

20         A.   Yes.

21         Q.   And was that an amendment to your agent

22   employment agreement?

23         A.   Yes, it says amendment.

24              (The document is marked as Defendant's

25         Exhibit No. 3 for identification.)

23

```
 1   BY MS. CESARANO:
 2       Q.   Okay.  I have another document to show
 3   you.
 4            (The witness reviews the document.)
 5       Q.   This has been marked for identification as
 6   Exhibit 3; is that your signature on Exhibit 3?
 7       A.   Yes.
 8       Q.   Did you sign that document Exhibit 3 on or
 9   about November 9, 1998?
10       A.   Yes.
11       Q.   And did you read this agreement before you
12   signed it?
13       A.   No.
14       Q.   You didn't read this agreement?
15       A.   (Witness shakes head.)  I never do.
16       Q.   This is a one-page document, correct?
17       A.   Yes.
18       Q.   But you didn't read this one-page document
19   at the time you signed it?
20       A.   I was told, You sign it or you have no job,
21   just like it says, Allstate controls or you will be
22   terminated.
23       Q.   Okay.  But to my question, so you did not
24   read this agreement at the time you signed it?
25       A.   Huh huh.
```

24

```
1        Q.   You say you never do?

2        A.   I did now after the fact.

3        Q.   At the time you signed the agreement though

4   you say you don't read them?

5             MR. ACKERMAN:   Object to the form.

6   BY MS. CESARANO:

7        Q.   Isn't that what you just said?

8        A.   No, I didn't say that.

9        Q.   Okay.

10       A.   I know this, I remember this.

11       Q.   You remember not reading it?

12       A.   Right.   There was no real choice in reading

13  anything.

14       Q.   Well, that's --

15       A.   It was either sign here or you don't have a

16  job.

17       Q.   That's not the question.   It is a simple

18  question.   Did you read it or didn't you?

19       A.   Now I did, yes.

20       Q.   You did read it?

21       A.   Not at that time.

22       Q.   Okay.   I'm asking you.

23       A.   After the fact, yes.

24       Q.   Okay.   But at the time you did not read it?

25       A.   Correct.
```

25

1          (The document is marked as Defendant's

2     Exhibit No. 4 for identification.)

3  BY MS. CESARANO:

4     Q.   I'm going to show you what has been marked

5  as Exhibit No. 4; is that your signature on Exhibit

6  No. 4?

7          (The witness reviews the document.)

8     A.   Yes.

9     Q.   And Exhibit 4 purports to be a 1999

10  Employees Withholding Allowance Certificate, is that

11  correct?

12    A.   Yes.

13    Q.   And you signed that on October 20, 1999?

14    A.   Yes.

15    Q.   Now, did there come a time before, just

16  before July 1, 2000 where Allstate informed you that

17  it was going to convert your status from that of an

18  employee to that of an independent contractor?

19    A.   They called it terminate.  They didn't say

20  convert.

21    Q.   Okay.  So let me rephrase it.  Did there

22  come a time shortly before July 1, two, well,

23  effective July 1, 2000 where Allstate informed you

24  that you would be terminated as an employee and have

25  the option to become an independent contractor --

1       A.    Or lose your job, yes.

2       Q.    -- for Allstate, that's correct?

3       A.    Yes.

4       Q.    Just to shorten all that, I'm going to call

5    that the conversion just for reference, all right?

6       A.    All right.

7       Q.    Did that conversion --

8             MR. ACKERMAN:  Can I just, she didn't call

9       it that, so I have an objection that that's not

10      what she is calling it.

11            MS. CESARANO:  Yes.

12   BY MS. CESARANO:

13      Q.    I'm calling it that for shorthand.  But you

14   understand that by that what I'm referring to when I

15   ask you the question is the July 1, 2000 effective

16   date where your status changed, okay?

17            MR. ACKERMAN:  Do you understand what she

18      said?

19            THE WITNESS:  Yes.  I don't agree with the

20      word "conversion", but they call it termination.

21   BY MS. CESARANO:

22      Q.    I will ask you what would you like to call

23   it?

24      A.    Termination.

25      Q.    Okay.  So on July 1, 2000 you were

1   terminated as an employee of Allstate, you would

2   agree with that?

3       A.   Yes.

4       Q.   And isn't it true that you did decide to

5   work for Allstate as an independent agent effective

6   July 1, 2000?

7            MR. ACKERMAN:  Objection to form.

8            THE WITNESS:  I had no choice.

9   BY MS. CESARANO:

10      Q.   Okay.  My question was did you decide to

11  continue working for Allstate as an independent agent

12  effective July 1, 2000?

13           MR. ACKERMAN:  Object to the form.

14  BY MS. CESARANO:

15      Q.   When he objects to the form you understand

16  you are still supposed to answer the question.

17      A.   But I was forced to.  I still have a

18  mortgage to pay.

19      Q.   I understand.  You are arguing with me.

20      A.   No.

21      Q.   All right.  Let me ask it a different way.

22      A.   Say it again.

23      Q.   Isn't it true, this is a free country,

24  right?

25           MR. ACKERMAN:  Object to the form.

28

```
 1    BY MS. CESARANO:

 2         Q.    Is that true?

 3         A.    It depends on who you are.

 4         Q.    Okay.  Isn't it true that it, you have the

 5    option, the choice to decide after you were

 6    terminated as an employee not to continue any

 7    relationship with Allstate?

 8         A.    I didn't see it that way.

 9         Q.    Is that a true, isn't that a true

10    statement?

11         A.    But if I don't see it that way, then it's

12    not true for me, it's not valid for me.

13         Q.    Okay.  So you are saying you had no choice?

14         A.    Correct.

15         Q.    Did Allstate take your hand and physically

16    force you to sign all the many documents that you

17    signed in order to become an independent agent

18    working for Allstate?

19              MR. ACKERMAN:  Object to the form.

20    BY MS. CESARANO:

21         Q.    That's a simple question, yes or no?

22         A.    But the fear was invoked in me, 16 years,

23    what was I going to do?

24         Q.    You are arguing.  It is a simple question.

25    Did anyone at Allstate physically force you to put
```

1    pen to paper to sign these some 15 documents you

2    signed?

3        A.   No.

4        Q.   Okay.  Isn't it true you could have chosen

5    not to do that, to not sign anything?

6        A.   Yes.

7        Q.   Okay.  Now, these are just, we are going to

8    go through a lot of documents that have been marked

9    and that you have seen previously.

10           MS. CESARANO:  By the way, I just want to

11       put for the record that before we went on the

12       record opposing counsel and I, I gave opposing

13       counsel the documents so that he, because there

14       were so many, so he had a chance to look through

15       them just for authenticity and to make sure,

16       most of which these documents I got from

17       opposing counsel, so and that Ms. Zink also had

18       a chance to look at them prior to going on the

19       record, is that correct?

20           MR. ACKERMAN:  That's essentially correct.

21       But also you made changes while we were here to

22       some of the exhibits.

23           MS. CESARANO:  Right.  Well, one document I

24       added a front page, in fact it's this very

25       document, correct; other than that were there

30

```
 1        any other changes?
 2            MR. ACKERMAN:  No.  But I don't understand
 3        authenticity.  I mean I don't know that we are
 4        challenging that.  But I mean to the extent, I
 5        mean they are complete documents.
 6            MS. CESARANO:  Yes, complete documents.
 7        And also I think most of these I marked that I
 8        received from Ms. Zink, is that correct, these
 9        are her documents?
10            MR. ACKERMAN:  Well, there is no way we can
11        tell.  I mean we produced documents that are
12        similar in that form.
13            MS. CESARANO:  I'm not trying to argue.
14            MR. ACKERMAN:  Yes.
15            MS. CESARANO:  I just want it clear on the
16        record that Ms. Zink has seen these prior --
17            MR. ACKERMAN:  We would agree with that.
18            MS. CESARANO:  -- so she doesn't have to
19        sit here for ten minutes looking at them.
20            MR. ACKERMAN:  That's fine.
21            (The document is marked as Defendant's
22        Exhibit No. 5 for identification.)
23   BY MS. CESARANO:
24        Q.   I'm showing you what has been marked for
25   identification as Exhibit 5, and I would ask you to
```

1   turn to the last page; is that your signature?

2           (The witness reviews the document.)

3       A.   Yes.

4       Q.   And this agreement is dated May 20, 2000,

5   correct?

6       A.   Yes.

7       Q.   And the document is labeled Final Approval

8   Request, is that correct?

9       A.   Yes.

10      Q.   Okay.  The document starts at the

11  beginning, "I have", that is you, Linda Zink, "have

12  completed all the steps necessary to be considered

13  for R3001 independent contractor status.  And by way

14  of this letter I'm requesting approval to become an

15  R3001 independent contractor through execution of the

16  R3001S agreement, the R3001C agreement or the R3001

17  transitional service agreement."

18          Okay.  And it has a long list of various

19  final documentation that has been completed and

20  signed, correct?

21          MR. ACKERMAN:  Object to the form.

22  BY MS. CESARANO:

23      Q.   Is that correct?

24      A.   Say that last part.

25          MR. ACKERMAN:  You read a lot.  And I guess

1          what you are asking her --

2     BY MS. CESARANO:

3          Q.    Follow with me.  I read the first

4     paragraph, right, I read it accurately, is that

5     right?

6          A.    Correct.

7          Q.    Then rather than read the whole document --

8          A.    Right.

9          Q.    -- which I don't want to do, basically is

10    it fair to say that this document lists various forms

11    that you were given and asked to complete, is that

12    true?

13         A.    Yes.

14         Q.    Okay.  And in fact did you complete those

15    forms?

16         A.    Yes.

17         Q.    And the purpose of the forms were to carry

18    out Allstate's entering into a relationship with you

19    and your agency as an independent contractor,

20    correct?

21              MR. ACKERMAN:  Object to the form.

22              THE WITNESS:  No.

23    BY MS. CESARANO:

24         Q.    You don't think that was the purpose of the

25    forms?

33

1    A.   No, not totally.

2    Q.   What do you mean by that?

3    A.   There was like a checkoff list where they

4  took away like our vacation pay and our benefits and

5  froze our pension, and then that's how you knew,

6  okay, no more health insurance, no more dental.

7         We are responsible for our own Social

8  Security now.  They took away our vacation pay,

9  smoking, our maternity leave.

10    Q.   All benefits?

11    A.   All benefits.  They took aware our Social

12  Security, 401K, and they froze our pension money.  It

13  was more like a checklist to know what was done that

14  you now had to get.

15    Q.   So in other words, Allstate as you said

16  terminated you as an employee, correct?

17    A.   Yes.

18    Q.   And that was effective July 1, 2000,

19  correct?

20    A.   Yes.

21    Q.   Okay.

22    A.   I have said that.

23    Q.   And therefore because they were terminating

24  you, they froze all the benefits that you had already

25  earned like your pension, correct?

34

1        A.    Correct.

2        Q.    And they took away all the rest of the

3    benefits that you had such as vacation --

4        A.    Yes.

5        Q.    -- et cetera.  And they also told you that

6    you yourself, your agency, that is the Zink Agency

7    which you created, correct, for this purpose?

8            MR. ACKERMAN:  Object to the form.

9            THE WITNESS:  I was told we had to create a

10        corporation to keep the job.

11   BY MS. CESARANO:

12       Q.    And you did, correct?

13       A.    Yes, I did what I had to do.

14       Q.    Okay.  And from July 1, 2000 on the Zink

15   Agency was responsible to provide the wages and all

16   the benefits and everything basically as an employer,

17   correct, going forward from July 1, 2000?

18           MR. ACKERMAN:  Object to the form.  Do you

19       understand?  Can you rephrase that?

20           MS. CESARANO:  Yes.

21   BY MS. CESARANO:

22       Q.    Effective July 1, 2000 --

23       A.    You said that.

24       Q.    -- the Zink Agency became responsible to

25   provide the wages and benefits to you, in other

35

1    words, the agency paid you as its employee from that

2    day forward, is that correct?

3        A.    Yes.

4            MS. CESARANO:  Okay.

5            (The document is marked as Defendant's

6        Exhibit No. 6 for identification.)

7    BY MS. CESARANO:

8        Q.    I want to show you what has been marked for

9    identification as Exhibit 6.

10           (The witness reviews the document.)

11       Q.    And it's three pages, so, you know, just

12   look at all three pages.  Is that your signature on

13   Page 1 of this document?

14       A.    Yes.

15       Q.    And did you sign on May 2, 2000?

16       A.    Yes.

17       Q.    Okay.  And obviously the document speaks

18   for itself.  I'm not going to read the whole

19   document.  But among other things there is a little

20   check like an X mark on Page 1 just above your

21   signature, do you see that?

22       A.    Yeah.

23       Q.    And it says that, "I accept the offer to

24   transfer ownership of all the furniture and equipment

25   listed on the attached inventory form and to have the

36

1   fair market value included in my compensation with

2   the appropriate taxes withheld.  This amount will not

3   be included for benefit purposes."

4           And is that an accurate reading of that

5   little portion of the agreement?

6       A.   Yes.

7       Q.   Okay.  And the Xerox is not really good,

8   but what was the fair market value that you were

9   given pursuant to this document for the furniture and

10  equipment?

11      A.   $317.59.  It was junk.  I donated it.

12      Q.   You donated it to charity?

13      A.   Yeah.

14      Q.   But it became your furniture, correct?

15      A.   Yes.  The time was either they were going

16  to come and take it, and no one had anything to sit

17  on, so I just said just buy it for now until I had

18  time to buy furniture.

19      Q.   Okay.  So it was just very temporary

20  transition furniture?

21      A.   Yes.

22      Q.   And this three-page document just covers

23  that transaction, is that right?

24      A.   Yes.

25           (The document is marked as Defendant's

37

1          Exhibit No. 7 for identification.).

2     BY MS. CESARANO:

3          Q.   Showing you what has been marked as

4     Exhibit 7 purporting to be a medical enrollment form,

5     is that correct?

6          A.   Yes.

7          Q.   And is that your signature on the bottom of

8     that exhibit?

9          A.   Yes.

10         Q.   Okay.  And it states on the top of the

11    exhibit that the coverage was effective date of

12    7/1/2000, is that correct?

13         A.   Yes.

14         Q.   Okay.

15              (The document is marked as Defendant's

16         Exhibit No. 8 for identification.)

17    BY MS. CESARANO:

18         Q.   Showing you what has been marked for

19    identification as Exhibit 8, which is a document

20    purporting to be a Florida Department Of State

21    Articles Of Incorporation document, is that correct?

22              (The witness reviews the document.)

23         A.   Yes.

24         Q.   Okay.  And are these, is this Exhibit No. 8

25    a copy of the Articles Of Incorporation in the State

1   Of Florida for the Zink Insurance Agency, Inc.?

2       A.   Yes.

3       Q.   And it looks like if you go to Page 2 that

4   the Articles Of Incorporation are dated April 25,

5   2000 under seal here?

6       A.   Oh, okay.  Yes.

7       Q.   Okay.  And again just finishing up this

8   form, you certified that you filed the Articles Of

9   Incorporation on, excuse me, that the department of,

10  the State Of Florida is certifying that the Articles

11  Of Incorporation for Zink Insurance Agency, Inc. a

12  Florida corporation was filed on April 21, 2000 with

13  the State Of Florida?

14          MR. ACKERMAN:  Object to the form.

15  BY MS. CESARANO:

16      Q.   Is that correct?

17      A.   This girl here, she did it for me

18  (Indicating).

19      Q.   You had an attorney do it or, I'm sorry,

20  someone with Allstate?

21      A.   She works for an attorney.

22      Q.   She works for an attorney?

23      A.   (Witness nods head.)

24      Q.   Jennifer Dubin?

25      A.   Yes.

39

1     Q.    Okay.

2     A.    The name showed up here.

3     Q.    But you, these are your Articles Of

4 Incorporation for your Zink Agency, correct?

5     A.    Yes.

6         (The document is marked as Defendant's

7     Exhibit No. 9 for identification.)

8 BY MS. CESARANO:

9     Q.    I'm going to show you what has been marked

10 for identification as Exhibit 9 which purports to be

11 a request for a taxpayer identification number and

12 certification.  Is that your signature on Exhibit 9?

13         (The witness reviews the document.)

14     A.    Yes.

15     Q.    And you signed that on May 27, 2000?

16     A.    Yes.

17     Q.    Okay.  And again was this to get a tax

18 number for the Zink Agency?

19     A.    Yes.

20     Q.    Okay.  And this is required by law,

21 correct?

22         MR. ACKERMAN:  Object to the form to the

23     extent she has --

24 BY MS. CESARANO:

25     Q.    As far as you know?

40

1          A.    I guess so.

2          Q.    Okay.

3                (The document is marked as Defendant's

4          Exhibit No. 10 for identification.)

5    BY MS. CESARANO:

6          Q.    Let me show you what has been marked for

7    identification as Exhibit 10 which purports to be

8    Exclusive Agent Program Letter Of Understanding; is

9    that your signature on Exhibit 10?

10               (The witness reviews the document.)

11         A.    Yes.

12         Q.    And you signed it on May 20, 2000?

13         A.    Yes.

14         Q.    Okay.  Did you read this before you signed

15   it?

16         A.    Read this (Indicating)?

17         Q.    This, Exhibit No. 10, this one-page

18   document.

19         A.    I don't remember.

20         Q.    Okay.  Now, it states in here that you

21   discussed your benefits with human resources, and you

22   understand that the changes that will take place in

23   my benefits by electing to convert to R3001

24   independent contractor status, is that right?

25               MR. ACKERMAN:  Object to the form.

41

```
 1            THE WITNESS:  Say that again.  I'm sorry.
 2   BY MS. CESARANO:
 3       Q.   I'm just reading from the document.  If you
 4   want to read with me.
 5       A.   Oh.
 6       Q.   I'm sorry.  It is the third paragraph.
 7       A.   The third bullet point here?
 8       Q.   Yes.  You understand --
 9       A.   What happened was --
10       Q.   Let me just, did you understand that your
11   benefits would be changing?
12       A.   Yes.
13       Q.   Okay.  And did someone discuss the
14   changeover with you?
15       A.   Sort of.
16       Q.   Okay.  Who did you talk to about that?
17       A.   Chip Cruise.
18       Q.   And who is that?
19       A.   He was the human resources guy that did all
20   this, and he took me to lunch that day.  And that's
21   when he told me, he said, After this is done I'm
22   leaving the company.
23       Q.   Okay.
24       A.   And that's when I knew something wasn't
25   right.
```

42

1    Q.   Okay.

2    A.   And he helped me make sure I got the health

3    insurance, I didn't miss out on that.

4    Q.   Okay.  In other words, so that your health

5    insurance that you got through Zink Agency, there

6    would be no gap with the old insurance?

7    A.   And Allstate taking away those benefits.

8    He took me to lunch, and he said, I want to make sure

9    you do this, I liked working with you.  So we went to

10   lunch, he goes, I just want you to know I'm going to

11   leave the company after that.  I said, Okay.

12   Q.   Okay.  But he assisted you with making sure

13   that your health insurance, there would be no gap in

14   coverage, is that right?

15   A.   Right.

16   Q.   And so effective July 1, 2000 the benefits

17   on health insurance from Allstate as an employee

18   stopped because you were terminated, correct?

19   A.   Yes, we went through that.

20   Q.   Okay.  Yes.  But I have to be clear for the

21   record.  And the Zink Agency began to provide the

22   health insurance benefits so that you would be

23   covered --

24   A.   Right.

25   Q.   -- under a health insurance plan, correct?

43

```
 1        A.    Yes.

 2        Q.    Okay.

 3              (The document is marked as Defendant's

 4        Exhibit No. 11 for identification.)

 5   BY MS. CESARANO:

 6        Q.    Showing you what has been marked as

 7   Exhibit 11, it is a five-page document, is that

 8   correct?

 9              (The witness reviews the document.)

10        A.    Yes.

11        Q.    Okay.  And --

12        A.    Okay.

13        Q.    -- it is Exhibit 11, is that correct?

14        A.    Yes.

15        Q.    Okay.  And Exhibit 11 purports to be what

16   is entitled Allstate R3001C Exclusive Agency

17   Agreement, correct?

18        A.    Yes.

19        Q.    And is that your signature on this

20   agreement on Page 3?

21        A.    Yes.

22        Q.    And you signed that on May 20, 2000?

23        A.    Yes.

24        Q.    And on the last page, it's Page 5 of the

25   exhibit, but it is actually --
```

44

1      A.    Two.

2      Q.    -- two pages.  It's an Appendix A; is that

3   your signature on Appendix A?

4      A.    Yes.

5      Q.    And you signed that also on May 20, 2000?

6      A.    Yes.

7      Q.    And you understood that Appendix A was a

8   confidentiality and noncompetition agreement,

9   correct?

10     A.    Yes.

11     Q.    Okay.  And did you understand that by

12  signing this agreement, agreement that Allstate

13  offered you that Allstate would be treating you as an

14  independent contractor?

15         MR. ACKERMAN:  Object to the form of the

16     question.

17  BY MS. CESARANO:

18     Q.    From the effective date of July 1, 2000?

19     A.    No, no.

20     Q.    Okay.  You understood that by your

21  signature you were agreeing to the terms on the

22  agreement, correct?

23     A.    No.

24     Q.    You didn't think that by signing this

25  agreement --

45

```
 1       A.   No, because --
 2       Q.   -- that you were agreeing to this?
 3            MR. ACKERMAN:  Object to the form of the
 4       question.
 5            THE WITNESS:  They always changed these.
 6       So what you sign one day was going to be
 7       different another day.
 8  BY MS. CESARANO:
 9       Q.   If it's changed don't they ask you to sign
10  a new and different agreement?
11       A.   Yes.
12       Q.   Is that correct, okay.  So now going to
13  this agreement --
14       A.   Yes.
15       Q.   -- Exhibit 11.
16       A.   Okay.
17       Q.   It's fair to say that as of the date that
18  you signed it, which was May 20, 2000, those were the
19  terms that would be in effect as of that date,
20  correct?
21       A.   Yes.  But you have two different things
22  here you know.
23       Q.   Correct.  Well, let's just go the first
24  three pages.  The first document that you signed
25  which was the Exclusive Agency Agreement --
```

46

1      A.    Yes.

2      Q.    Okay.  You see there that the effective

3   date is filled in on Page 1, correct?

4      A.    Correct.

5      Q.    So effective on July 1, 2000 you understood

6   that these three pages that you signed would be the

7   terms and conditions that would be effective that

8   date, correct?

9      A.    Yes.

10     Q.    Okay.

11     A.    This was, I was told this is basically the

12  box that we received with the shrink wrap manuals in

13  it.

14     Q.    Right.

15     A.    This was separate, this is a noncompete.

16     Q.    Right.  Well, and you have clarified that

17  on the record.  Okay.

18         MR. ACKERMAN:  Referring to Exhibit A.

19         MS. CESARANO:  Right.

20         MR. ACKERMAN:  Appendix.

21         THE WITNESS:  Like maybe this should be 11

22     and this should be 12.

23         MS. CESARANO:  Correct, but since they are

24     already marked.

25  BY MR. CESARANO:

47

1          Q.   You have clarified though that these were

2     actually two different documents?

3          A.   Correct.

4          Q.   So the first three pages that you signed

5     was one document, the Exclusive Agency Agreement,

6     correct?

7          A.   Ah huh.

8          Q.   And the last two pages of this exhibit,

9     it's labeled Appendix A, but it is a separate

10    document, correct, in your view?

11         A.   Yes.

12         Q.   Okay.   And that second document that's

13    Appendix A is an agreement between you and Allstate

14    that you will maintain confidentiality and not

15    compete, correct?

16         A.   Correct.

17              (The document is marked as Defendant's

18         Exhibit No. 12 for identification.)

19    BY MS. CESARANO:

20         Q.   Okay.   Showing you what has been marked for

21    identification as Exhibit 12 which is entitled Agency

22    Ownership Disclosure Form; is that your signature on

23    this document?

24              (The witness reviews the document.)

25         A.   Yes.

48

1      Q.   And did you sign it again May 20, 2000?

2      A.   Yes.

3      Q.   And again same effective date, July 1,

4   2000, correct, you signed it before the effective

5   date, is that right?

6      A.   With Chip Cruise, the HR representative.

7      Q.   Right, you signed all these in his

8   presence?

9      A.   Yes.

10          MR. ACKERMAN:   I'm going to object to the

11      form when you say "all these".

12   BY MS. CESARANO:

13      Q.   Okay.  You signed certain documents that

14   had to do with the, with your agreeing to become an

15   independent contractor for Allstate at that time?

16          MR. ACKERMAN:   Object to the form.

17   BY MS. CESARANO:

18      Q.   You can still answer.

19      A.   Wait.  Say that one more time.

20      Q.   Sure.  When you were with Chip --

21      A.   Yes.

22      Q.   -- okay, you signed several documents,

23   correct?

24      A.   Correct.

25      Q.   And isn't it true that all of those

49

1   documents were being provided to you by Allstate to

2   enter into a relationship with you as its independent

3   contractor?

4        A.   Yes.

5             MR. ACKERMAN:  Object to the form.

6             MS. CESARANO:  I'm going to clarify for the

7        record.  I'm going to show you what was marked

8        as Exhibit 13; but you were correct, it was a

9        separate document that I had labeled

10       separately.  What I'm going to do, Joe, if you

11       have no objection --

12            MR. ACKERMAN:  Take the appendix off 11?

13            MS. CESARANO:  Yes, right.

14   BY MS. CESARANO:

15       Q.   But the questions I have asked you for the

16   record, the record will make clear that, I think it

17   is the same document, let's take a look.

18            MS. CESARANO:   Let's go off the record.

19            THE VIDEOGRAPHER:  The time is

20       approximately 11:13 A.M.  We are now going off

21       the video record.

22            (Off-the-record discussion.)

23            THE VIDEOGRAPHER:  The time is

24       approximately 11:26 A.M.  We are back on the

25       video record.

50

1          MS. CESARANO:  Okay.  And while we were off

2      the record I actually clarified that, I'm going

3      to retract everything I said about Exhibit 11

4      being a duplicate of Exhibit 13, it's not.

5          And so basically we have already gone

6      through Exhibit 11, and it is a two-part, the

7      first three pages are one document and the

8      second, the last two pages are the noncompete

9      confidentiality agreement.  And I think Ms. Zink

10     has clarified that for the record.  So I am,

11     there is no other document that's duplicative of

12     Exhibit 11.

13          (The document is marked as Defendant's

14     Exhibit No. 13A for identification.)

15 BY MS. CESARANO:

16     Q.    Moving on to what has been marked for

17 identification as 13A, which purports to be a

18 confidentiality and noncompetition agreement for

19 Donna Van, is that correct?

20          (The witness reviews the document.)

21     A.    Yes.

22     Q.    Okay.  And is that your signature on Page 2

23 of Exhibit 13A?

24     A.    Yes.

25     Q.    And this is a noncompete agreement that

51

1   Donna Van entered into with Zink Insurance Agency,

2   Inc., is that correct?  It says May, 2000.

3        A.   Yes.

4        Q.   Excuse me.  I should correct, May 19, 2000,

5   correct?

6        A.   Yes.

7             (The document is marked as Defendant's

8        Exhibit No. 13B for identification.)

9   BY MS. CESARANO:

10       Q.   And showing you a similar document marked

11  13B, is that a confidentiality and noncompetition

12  agreement entered into between Zink Insurance Agency,

13  Inc. and Lorraine Strum effective May 18, 2000?

14            MR. ACKERMAN:  Object to the form.

15            (The witness reviews the document.)

16  BY MS. CESARANO:

17       Q.   You can answer the question.

18       A.   Say that one more time.

19       Q.   Okay.  With reference to Exhibit 13B, is

20  that a confidentiality and noncompetition agreement

21  entered into between Lorraine Strum and Zink

22  Insurance Agency, Inc.?

23            MR. ACKERMAN:  I'm just going to object

24       because, I'm going to object to the form to the

25       extent she has got to give a legal conclusion as

```
 1        to who the parties are to that agreement because

 2        it looks like Allstate is also a party.

 3   BY MS. CESARANO:

 4        Q.   Okay.  The agreement is going to speak for

 5   itself.  But at least one of their, there are at

 6   least two parties to this agreement, is that correct,

 7   at least?

 8        A.   Three.

 9        Q.   Okay.  But it says Allstate Insurance

10   Company is a direct party beneficiary of this

11   agreement, okay, that's a third-party beneficiary

12   which is a legal term.

13        MR. ACKERMAN:  Well, I'm going to object to

14        any questions that ask her to give legal

15        opinions.  We can stipulate this is a

16        noncompetition agreement.

17        But I don't want her answering questions

18        that will suggest who the parties are to the

19        agreement; to the extent your question did that

20        I thought it limited --

21   BY MS. CESARANO:

22        Q.   Okay.  Let me just ask you a simpler

23   questions.  Go to Page 2 of Exhibit 13B, the

24   confidentiality and noncompetition agreement; is that

25   your signature on Page 2?
```

53

```
 1              (The witness reviews the document.)

 2     A.    Yes.

 3     Q.    Did you sign that on May 19, 2000?

 4     A.    Yes.

 5     Q.    And is that the signature of

 6  Lorraine Strum --

 7     A.    Strum.

 8     Q.    -- on that agreement?

 9     A.    Yes.

10     Q.    Okay.  And you previously identified

11  Ms. Sturm on the record, you discussed her already,

12  correct?

13     A.    Yes.

14     Q.    And that's the same person, correct?

15     A.    Yes.

16     Q.    And Allstate Insurance Company also signed

17  this agreement, correct?

18     A.    Yes.

19     Q.    And whose signature is that for Allstate?

20     A.    John Armellino.

21     Q.    And what was his position at the time with

22  Allstate if you recall?

23     A.    The manager.

24     Q.    Okay.  And do you know for what geographic

25  area he was the manager?
```

1      A.   Like South Florida.

2           (The document is marked as Defendant's

3      Exhibit No. 13C for identification.)

4  BY MS. CESARANO:

5      Q.   And turning your attention to Exhibit 13C

6  which purports to be a confidentiality and

7  noncompetition agreement for Christy Miller, is that

8  correct?

9      A.   Yes.

10     Q.   Is that your signature on Page 2 of

11 Exhibit 13C?

12     A.   Yes.

13     Q.   And is that Christy Miller's signature on

14 Page 2 of 13C?

15     A.   Yes.

16     Q.   And also John Armellino's signature for

17 Allstate, correct?

18     A.   Yes.

19     Q.   And the same question.  Christy Miller you

20 previously discussed her or listed her as one of the

21 employees of the Zink Agency, is that correct?

22     A.   Yes.

23     Q.   And the same thing for Lorraine Sturm and

24 Donna Van, correct?

25     A.   Yes.

55

1        (The document is marked as Defendant's

2        Exhibit No. 14 for identification.)

3  BY MS. CESARANO:

4     Q.   Okay.  I'm showing you what has been marked

5  for identification as Exhibit 14, which purports to

6  be a request for taxpayer identification number and

7  certification; is that your signature on Exhibit 14?

8        (The witness reviews the document.)

9     A.   Yes.

10     Q.   And did you sign that on January 27, 2000?

11     A.   The date is off there but...

12     Q.   Oh, is it?

13     A.   On mine it's off.  I don't have the same

14  thing that you have.

15     Q.   Oh, it's, oh, yes, the card is in the way.

16     A.   No, this was just to change the address.

17     Q.   Oh, that's a different, oh, that's a

18  different --

19     A.   That's all I have, see, new address.  You

20  have to put the reason why you are doing that.

21     Q.   I don't have a Xerox of this.

22     A.   That was moving the office location.

23     Q.   Okay.  Let's start over on Exhibit 14.

24     A.   Okay.

25     Q.   I want to delete the questions because the

56

1   copy I was working off of was not I think -- wait.

2   No, I take it back.  Let's go back to this.

3           There is, it looks like there was a

4   photocopy made of your Florida Department Of

5   Insurance Card, correct, and on your copy it appears

6   in the middle of the exhibit and it blocks the date,

7   correct?

8       A.   Okay.

9       Q.   Okay.  So what I'm going to do is I'm going

10   to substitute this, okay?

11           MR. ACKERMAN:  Why don't you just attach

12       it.

13           MS. CESARANO:  Yes, I could attach it.

14   BY MS. CESARANO:

15       Q.   So that you can see when it got Xeroxed the

16   card was on top, but this is, I'm going to do it A

17   and B.

18       A.   Okay.

19       Q.   Okay.  So 14A which is the copy that you

20   were looking at has your new address on it, correct?

21       A.   Right.  And so that's all it was for, see.

22       Q.   Yes, to do the new address, correct?

23       A.   New address.

24       Q.   Right.

25           MS. CESARANO:  And then can I get this

57

1          marked as 14B.

2                (The document is marked as Defendant's

3          Exhibit No. 14B for identification.)

4      BY MS. CESARANO:

5          Q.   Okay.  It looks like 14B purports to be a

6      request for taxpayer identification number and

7      certification, correct?

8          A.   Yes.

9          Q.   Okay.  And is that your signature on 14B

10     dated January 27, 2000?

11         A.   Yes.

12         Q.   Okay.  And this is simply to get a tax

13     number for the agency, is that correct?

14         A.   No.

15         Q.   Okay.  What was it for?

16         A.   To change, I had a different office

17     location.

18         Q.   Okay.

19         A.   I moved in January, January 1.

20         Q.   Okay.

21         A.   So this states that send this, so my

22     address matched and to prove it that was me,

23     Linda Marie Zink, instead of just somebody sending

24     them this piece of paper stating this is my new

25     address, that's all.

58

1          Q.    Okay.  Were they completed at about the

2   same time?

3          A.    It looks like the exact same thing.

4          Q.    Okay.

5          A.    This one I may have faxed it, and they

6   said, no, we need your license, and I just put right

7   on there send it right back.

8          Q.    Okay.

9          A.    See how it is.  And it was for new address.

10         Q.    Okay.  Understood.

11         A.    It is not for anything else, just that I

12  moved, the address.

13         Q.    And this tax, this number here that's

14  listed in the box on the form, it says Taxpayer

15  Identification No. 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 number, that's your

16  Social Security number, correct --

17         A.    Yes.

18         Q.    -- for you as an individual?  Did you have

19  a separate taxpayer identification number for your

20  agency separate and apart from your Social Security

21  number?  I mean not from this document.  But at some

22  point in time did your agency get its own taxpayer

23  identification number?

24         A.    Yes.

25              (The document is marked as Defendant's

1      Exhibit No. 15 for identification.)

2  BY MS. CESARANO:

3      Q.    Okay.  Showing you what has been marked for

4  identification as Exhibit 15, it is an unsigned copy,

5  but do you remember receiving this letter around the

6  time period of July 5, 2000 from Debbie Simon from

7  human resources?

8           (The witness reviews the document.)

9      A.    No.  What did it come with?

10     Q.    No.  I'm asking you.  I don't know.

11     A.    Oh, I don't know.

12     Q.    Do you remember receiving this letter?

13     A.    No.

14     Q.    Okay.  Do you remember receiving anything

15  similar?

16     A.    No.

17     Q.    Okay.  Do you remember receiving any letter

18  that basically confirmed that effective July 1, 2000

19  you would be an exclusive agent independent

20  contractor under the R3001 agreement?

21     A.    No.

22     Q.    Okay.

23     A.    It just happened.

24     Q.    Okay.  So this, you, as far as you are

25  concerned you can't remember getting this letter,

60

1    correct?

2        A.    Right.

3              (The document is marked as Defendant's

4        Exhibit No. 16 for identification.)

5    BY MS. CESARANO:

6        Q.    Another document marked for identification

7    as Exhibit 16, is that correct?

8              (The witness reviews the document.)

9        A.    Yes.

10       Q.    Okay.  Do you remember seeing this document

11   before?  This is signed by it looks like Chip, what

12   was his name?

13       A.    Chip Cruise.

14       Q.    Cruise.

15       A.    Yes.

16       Q.    Okay.  Now, did Chip Cruise, if you recall,

17   do you remember when he filled this out, was that

18   also on May 20, 2000?  It is not dated.

19       A.    I don't know.  Probably.

20       Q.    Okay.  All right.  That was what, 16?

21             MR. ACKERMAN:  Are you keeping all the

22       marked exhibits there?

23             MS. CESARANO:  Yes, we will make copies.

24             MR. ACKERMAN:  Because I saw some of --

25             MS. CESARANO:  These are copies, this is a

61

1          copy.  All of the marked ones are there.  This

2          is just a copy.

3               MR. ACKERMAN:  Yes, but 14 and 15 went back

4          in there.

5               MS. CESARANO:  Oh, I'm sorry.  I didn't

6          mean to.

7               MR. ACKERMAN:  I understand.  But it is

8          easier to keep track of them as we go.

9               MS. CESARANO:  You're right, 14.

10              MR. ACKERMAN:  We need 14B too.

11              MS. CESARANO:  I think that's B, take a

12         look.

13              MR. ACKERMAN:  15.

14              MS. CESARANO:  15 and 16.  We can

15         double-check those later.

16              (The document is marked as Defendant's

17         Exhibit No. 17 for identification.)

18    BY MS. CESARANO:

19         Q.   I'm going to show you what has been marked

20    for identification as Exhibit 17.  And if you will

21    look on Page 3, and is that your signature on Page 3?

22              (The witness reviews the document.)

23         A.   Yes.

24         Q.   And it is dated February 7, 2001, correct?

25         A.   Yes.

62

1      Q.    Now, there are some other signatures on

2   that page.  Could you tell us who else signed this

3   document?

4      A.    Helen Sylvester.

5      Q.    And her title was market business

6   consultant?

7      A.    Yes.

8      Q.    Okay.  What, what was her job in

9   relationship to you, what did she do?

10      A.    I don't know what her job is.

11      Q.    Okay.  Well, what interaction did you have

12   with her?

13      A.    Only onetime she said she was going to mail

14   this to me.  And she said I had an excellent year, I

15   was her best agent.  I said, Well, I said, If I'm the

16   best agent I had won some promotions and never

17   received any of the awards.

18         And she goes, No problem, I will take care

19   of it, I will get them to you; she never did.

20      Q.    When was that?

21      A.    Probably right about this date when she

22   said she was mailing that to me.  So maybe like a

23   couple days before the 7th of February, 2001.

24      Q.    Okay.  Did you receive this document in the

25   mail then?

63

1      A.   Yes.

2      Q.   Okay.  Had she already signed it at the

3  time you received it?

4      A.   Yes.

5      Q.   Okay.  It looks like she signed it the day

6  before you signed it?

7      A.   Yes.

8      Q.   Okay.  So did you, did you ever meet with

9  her in person?

10     A.   No.

11     Q.   And then it says, Reviewed by territorial

12  manager; whose signature is that?

13     A.   Maybe it looks like it might be Hopson's.

14     Q.   Okay.  Was he in fact at the time the

15  territorial manager?

16     A.   Oh, that's not Hopson.  It's Lott.  I

17  thought that H was Hopson, H.

18     Q.   Lott, and what's?

19     A.   Richard Lott.

20     Q.   Richard Lott, that's what the signature is,

21  okay.  Did you meet with Mr. Lott in person at about

22  this time period to go over this document?

23     A.   No.

24     Q.   Now, it looks like Mr. Lott signed it later

25  than you did?

64

1      A.    Correct.

2      Q.    Okay.  Did you see him sign it?

3      A.    No.

4      Q.    Okay.  How did he come to get the agreement

5 after you signed it if you know?  Did you mail --

6      A.    I mailed this to Helen, Helen then gave it

7 to him.

8      Q.    Okay.  And human resource manager, I guess

9 same question, who is the, it looks like Tina, but I

10 can't read the last name.

11     A.    I have no clue.  I don't know who it is at

12 all.

13     Q.    Okay.  And obviously you didn't meet with

14 Tina?

15     A.    Correct.

16     Q.    And she also signed it later than you did,

17 correct?

18     A.    Yes.

19     Q.    Okay.  Did you discuss this review with

20 anyone either on the phone or otherwise?

21     A.    Just Helen.

22     Q.    She is the only one?

23     A.    Ah huh.

24     Q.    Okay.  But you had a telephone --

25     A.    Yes, Helen.

1    Q.   Okay.  And you had a telephone conversation

2  with her?

3    A.   Yes.

4    Q.   Was there just one telephone conversation?

5    A.   I don't recall.

6    Q.   Okay.  To the best you could recall what

7  did she say to you and what did you say to her?

8    A.   She said to me, oh, she said to me, It's

9  time for your agency review, I'm going to come by

10  your office.  I said, Well, rather at this time I

11  would rather you not.  She said, Okay, she was quiet

12  and she says, Well, I will mail it to you.  I said,

13  Okay, please do mail it to me.  So she did.

14    Q.   Was that, was there anything else said in

15  the conversation that you can recall?

16    A.   I was her best agent, I had an excellent

17  year, that I won everything.  And that's when I said

18  to her, I said, Well, I never received any of my

19  awards, my plaques, you know, my honor ring, they

20  never took my honor ring and updated it for me

21  because of this whole investigation.  And --

22    Q.   Well, because of what investigation?

23    A.   The one that's Sandra Sellers asked me to

24  do.

25    Q.   Okay.  So you are saying that you had

1    already made a complaint to human resources, is that

2    why you are saying that?

3         A.    Yes.

4         Q.    Did you tell her that?

5         A.    No.

6         Q.    Okay.  Did she indicate to you as to --

7    well, let me back up.

8         A.    Nothing at this time.

9         Q.    Let's go --

10        A.    That was the end of this conversation.

11        Q.    Okay.  So sticking to this conversation on

12   the telephone that you are talking about with Helen,

13   okay, did Helen say any, well, did Helen agree to

14   follow up on what you were complaining about with

15   your awards and --

16        A.    Oh, yeah.

17        Q.    -- she said she would look into it?

18        A.    Yeah, no problem.  She said she was going

19   to see Richard later, and I will get everything for

20   you.

21        Q.    Okay.  So she said she would take care of.

22   Now, you said, well, what did she do about it, if

23   anything, did you ever get those, whatever the issues

24   were that you brought up to Helen?

25        A.    Nothing, never heard about it again.

1    Q.    Okay.  List for me again what the things

2    were that you told Helen to look into?

3    A.    The fall life insurance promotion I was

4    No. 1.

5    Q.    And if that were true, if you were No. 1,

6    what would you have got as a result of that?

7    A.    Well, the previous year I was No. 1, and I

8    was given a globe that has different stones in it

9    like jade and ivory on a little base that says I'm

10   No. 1.

11   Q.    Okay.

12   A.    And I know I won something for commercial.

13   Q.    And that would have been in 1999, you said

14   the year before that you got, you did get the globe,

15   what year would that have been?

16   A.    That would have been -- I have to figure

17   this out, I have to remember.  It's two years in a

18   row, it was like '99 and 2000.

19   Q.    Now, this review is for the year 2000 it

20   says on the top?

21   A.    Yes.

22   Q.    And but you say you didn't get anything as

23   a result of being No. 1 on 2000, right?

24   A.    Okay.  I see what you are saying.  What I'm

25   talking about is the previous year, that fall life

68

1   promotion, because remember this is in the beginning

2   of the year I'm having this contact with her.

3       Q.   Okay.

4       A.   So it would have been for 1999 I was asking

5   for my awards for that year.  Okay.  I asked in 2000

6   for 1999.

7       Q.   Okay.  I see.  Well, now these are date

8   dated 2001.

9       A.   So then it has to be for 2000.

10      Q.   Okay.  So for the year 2000 you felt I was

11  No. 1, and I didn't get --

12      A.   Not I felt.  I was.

13      Q.   Do you get statistics in writing --

14      A.   Yes.

15      Q.   -- that show you you were No. 1?

16      A.   Yes, they track it and send, you know,

17  reports.

18      Q.   Did Helen know that you were No. 1, or did

19  she say anything to indicate that?

20      A.   Yes.

21      Q.   That she agreed?

22      A.   Yes.

23      Q.   Okay.  Now, did Helen state whether there

24  was in fact some award --

25      A.   Yes.

69

1    Q.    -- that year?

2    A.    Ah huh.

3    Q.    Did she say what it was?

4    A.    No.  But she said I should have gotten it.

5    Q.    Okay.  Now, when you say No. 1, is that

6  within a certain geographic region or area?

7    A.    For the district.

8    Q.    Okay.  For the district.  And what did your

9  district encompass, what was in the district?

10   A.    You mean geography?

11   Q.    Yes.

12   A.    Oh, God, I can name some of the towns.

13   Q.    Was it like Palm Beach County or --

14   A.    No.  It was Martin County.

15   Q.    Okay.

16   A.    And Palm Beach County.

17   Q.    Okay.  Those two counties?

18   A.    Yes.

19   Q.    Okay.  And, okay, so that was one complaint

20  to her on that conversation, you said, I didn't get

21  the award that I should have gotten, and she said,

22  Okay, she agreed with you?

23   A.    And my honor ring, they never asked for my

24  honor ring.

25   Q.    And what's an Honor ring?

70

1      A.   Like you meet the sales goals and quotas

2   that Allstate gives you; when you do they give you a

3   stone to put in a ring.

4      Q.   And did you already have the actual ring?

5      A.   Yes.

6      Q.   And then you add the stones to the ring, is

7   that what happens?

8      A.   Yes.

9      Q.   Okay.  And the sales goals that you

10  describe that you can earn to get a stone in the

11  ring, is that for a year period?

12     A.   Yes.

13     Q.   Okay.  And you had met that too?

14     A.   Yes.

15     Q.   What did Helen say about, you know, the

16  honor ring issue?

17     A.   She was going to get back to me on it.

18     Q.   Did she agree you should have got it?

19     A.   Oh, yeah.

20     Q.   Anything else that you listed to her?

21     A.   No.

22     Q.   Okay.  Now, if you can explain to me on

23  Page 1 of this Agency Status Review, maybe you can

24  just walk me through, you know, what it shows here on

25  Page 1.  It says, you know, expected result, cash

1    flow market average, improvement amount, actual.

2            So what do these numbers show to me, can

3    you explain it?

4        A.   Okay.  It doesn't say it, here (Indicating)

5    I think it is supposed to say for your entire

6    district expected result.

7        Q.   Okay.  And it says negative three, minus

8    three; what does minus three mean?

9        A.   They expect your agency in that district to

10   lose three policies.

11       Q.   Okay.

12       A.   And the average for the market is losing

13   82, 82 policies; and in fact mine grew 51.

14       Q.   Okay.  So you showed a positive growth

15   rate, 51?

16       A.   Yes.

17       Q.   Okay.  And then the next line here it says,

18   Allstate financial Services new, business issued

19   production credit.  So if you go across that, it says

20   there is a, you know, there is a number for expected

21   result, there is a number for cash flow, then

22   improvement amount; what does this improvement amount

23   show, this 23,897?

24       A.   That that's how much, I believe that that's

25   how much growth that you are supposed to improve by

1    maybe.  That one I'm not really sure on.

2         Q.    Okay.  And it says actual 38,893 under

3    actual.  And then my question is so what would that

4    mean, what does that mean?

5         A.    I think that made me No. 3 in the whole

6    territory, No. 1 in the district.

7         Q.    Okay.  And what does the territory cover,

8    what counties do you know?

9         A.    I don't know.

10        Q.    Okay.  That's fine.  And just skipping to

11   the second page at the top it says, 24 or 48 MM

12   adjusted; what's MM mean?

13        A.    Where are you?

14        Q.    Right here, 24 or 48 MM.

15        A.    48 month moving adjusted capped paid loss

16   ratio.

17        Q.    Okay.  What does all that mean, can you

18   explain it in like laymen's --

19        A.    What do these numbers mean (Indicating)?

20        Q.    What are they measuring there, what are we

21   talking about there?

22        A.    Like Allstate, whatever policy you write

23   they don't want you to have any losses or claims

24   against those policies, which obviously you can't

25   control someone's car accident.  But they count it

73

1    against you if they have an accident.

2           And then they tell you this is what you

3    should have (Indicating), 65 percent, they want you

4    to stay at 65 percent.  I guess the market is doing

5    50 in the district.

6       Q.   And that would be, if I understand

7    correctly, it means that if we take say the

8    65 percent number, that is 65 percent of the policies

9    have claims made against them, is that what that is

10   supposed to mean?

11      A.   I'm not really sure.

12      Q.   Okay.

13      A.   That part I don't know.

14      Q.   And then cash flow market average, the

15   No. 50?

16      A.   Maybe that's supposed to read 50 percent.

17      Q.   Okay.  But you are not sure what it means?

18      A.   No, no.

19      Q.   Okay.  What about improvement amount, it

20   shows 65 percent.

21      A.   It means they don't want you to, that 65

22   you cannot go higher, you can't have 66, 67.

23      Q.   Your actual was 40 percent?

24      A.   Yes, I was told it was excellent.

25      Q.   So that's a very good number?

74

1      A.    Excellent.

2      Q.    And what is your understanding of what

3  40 percent means, I mean 40 percent of what?

4      A.    That means 40 percent of what you write,

5  the premium paid out I think it is.

6      Q.    You think that's what that number means?

7      A.    Yes.

8      Q.    So would you say it again?  I'm not quite

9  sure I understand.

10      A.    It is the paid out, what you take in on

11  premium versus what is paid out on that dollar.

12      Q.    Okay.  So this --

13      A.    My understanding, you know, I never paid

14  too much attention because I was told I was always so

15  good.

16      Q.    Okay.  All right.  And is there anything

17  else that's, it looks like most of this is not filled

18  in, correct?

19      A.    I do this because you don't trust anybody.

20      Q.    So did you make those lines yourself?

21      A.    Yes.  No one can fill in anything else

22  after you send it off.

23      Q.    I see.  Okay.  Right.  So before you sent

24  it, mailed it to Helen --

25      A.    It's blank.

75

1      Q.    -- you filled in all the blanks?

2      A.    Yes.

3      Q.    Okay.  Now, the last page there is an

4  attachment, it looks like some --

5      A.    It does.

6      Q.    -- statistics.  And this is for this

7  statistical document I guess you would call it, it

8  says it's for the Zink Insurance Agency, Inc., is

9  that correct?

10     A.    Yes.

11     Q.    Okay.  And it's entitled Customer

12 Satisfaction Retention Profitability Report?

13     A.    Yes.

14     Q.    Okay.  Exclusive Agent Combined Business,

15 so this sheet of paper pertains to your agency,

16 correct?

17     A.    Yes.

18     Q.    And then it looks like the computer run

19 date was January 22, 2001, is that correct?

20     A.    Yes.

21     Q.    And the data is at the end of year of 2000,

22 12/2000, so it's year-end numbers, correct?

23     A.    Yes.

24     Q.    Okay.  There is a little box that you can

25 see around just a few of the numbers.  One box is

76

1   around the No. 51; did you make that box?

2       A.   I don't recall.

3       Q.   Okay.  But let's go to that line, it says,

4   it looks like, Growth over, and then it's --

5       A.   Over prior year, that's what that means.

6       Q.   Okay.

7       A.   So it is a good box.

8       Q.   51 is a good number?

9       A.   Very good.

10      Q.   Okay.  So like 51 percent growth rate?

11      A.   No.  51 policies over what I did the year

12  before which was excellent, because people were

13  dropping like flies, so it was like excellent.

14      Q.   Okay.  So let's go down to the bottom of

15  the page, you see there are two other numbers boxed;

16  do you know why those are boxed?

17      A.   Probably because those are good numbers

18  again for the loss ratio.

19      Q.   Okay.  Can you tell me what the No. 39.79

20  means that's in the box?

21      A.   Okay.  It looks like that's going with the

22  24 month moving adjusted paid, I don't know, LR.  I

23  don't know that one.

24      Q.   So you are not sure what that means?

25      A.   No.  But I know it has to do, oh, loss

77

1    ratio probably, loss ratio.

2        Q.    Okay.   Loss ratio.   So what would 39.79

3    mean in terms of --

4        A.    Probably the 40 that they wrote on the

5    previous page.

6        Q.    Okay.   That's where they got that number?

7        A.    (Witness nods head.)

8        Q.    Okay.   And then the same thing for that

9    second number?

10       A.    Yes.

11       Q.    So these are cross-referencing to your

12   actual review?

13       A.    Yes, it looks like it.

14       Q.    And in your view all of these numbers that

15   are boxed are all very good numbers?

16       A.    Yes.

17       Q.    Okay.   Now, when you spoke with Helen on

18   the phone did she say anything to describe your

19   review; in other words, did she say you have an

20   excellent review or a very good review, did she enter

21   into a conversation with you about your review?

22       A.    No.   She just said, like I said before, I'm

23   her best agent, I had an excellent year.

24       Q.    Okay.   And she just mailed you the review?

25       A.    Ah huh.

78

1        Q.   Okay.

2        A.   That's it.

3        Q.   That's it.  Okay.  That's fine.

4             (The document is marked as Defendant's

5        Exhibit No. 18 for identification.)

6   BY MS. CESARANO:

7        Q.   Okay.  Showing you what's been marked as

8   Exhibit 18, and it purports to be, it says, Focus on

9   performance, agent performance summary, Allstate

10  employee agent, okay.

11            Now, this review period is from January 1,

12  1999 to December 31, 1999, correct?

13            (The witness reviews the document.)

14       A.   Yes.

15       Q.   And this would have been while you were an

16  employee of Allstate, correct, in '99?

17       A.   Well, in your view.

18       Q.   Well, I'm asking.

19       A.   I still considered myself an employee so.

20       Q.   Right.  But now we're going to 1999, so

21  let's focus on that year.  My question to you is were

22  you an employee of Allstate in 1999?

23       A.   Yes.

24       Q.   Okay.  So this is before you were

25  terminated as an employee, correct?  I'm using your

1    words.

2         A.    Yes.

3         Q.    Okay.  Can you, let's go to this form and

4    just go to the last page.

5         A.    Okay.

6         Q.    Is that your signature on Page 6 which

7    says, under the line that says, Agent, is that your

8    signature?

9         A.    Yes, that's me.

10        Q.    Okay.  And you signed that document that is

11   Exhibit 18 on February 22, 2000, is that correct?

12        A.    Correct.

13        Q.    Okay.  Is that your handwriting in the box

14   marked, Agent Comments?

15        A.    Yes.

16        Q.    Okay.  Just because sometimes it is a

17   little hard to read handwriting, can you read that

18   into the record so the Court Reporter can know what

19   this says.  No, you read it.  It's your handwriting?

20        A.    You want me to read it?

21        Q.    Yes.

22        A.    "I feel my agency goals and ability to

23   reach conference honoring the fall life promotion and

24   over 60,000 in commercial is due to the fact that I

25   finally have a manager that is showing agents, me,

80

1    how to run a business.  Also, it is finally nice to

2    have a manager that appreciates what I do in my

3    community for my agency as well as the Allstate brand

4    name."

5            And then I wrote, "John Armellino is an

6    asset to this agency and company.  I hope not to lose

7    him as my agency manager."

8        Q.    Okay.  Now, under, Agency Manager, is it,

9    that is John Armellino's signature on this form?

10       A.    Yes.

11       Q.    And this is the person you are speaking

12   about?

13       A.    Yes.

14       Q.    Okay.  You considered him an excellent

15   manager?

16       A.    Yes.

17       Q.    And again the territorial agency manager

18   who signed this form is who?

19       A.    Richard Lott.

20       Q.    Okay.  And when you filled out your

21   comments I notice that John Armellino's signature is

22   dated the same date as your comments, correct?

23       A.    Yes.

24       Q.    Did he sign this in your presence or did

25   you make comments in --

1    A.    That part I don't remember.

2    Q.    Okay.  Now, it says, Overall Performance

3 Rating, at the top of the last page, yes, at the top

4 there is a little box.  It says, Meets, requires

5 assistance, and there is a little box checked.

6 Okay.

7         What did this, well, first of all who

8 filled out the overall performance rating, who

9 checked that box?

10    A.    I don't know.

11    Q.    Okay.  Would that normally be the agency

12 manager?

13    A.    I guess so.  I never thought about that.

14    Q.    Okay.  Well, let me put it a different

15 way.  When you filled out your comments you read the

16 whole form, right; in other words, your comments

17 were, you read the form, and then you filled out your

18 comments, correct?

19    A.    Correct.

20    Q.    The form was already filled out with the

21 time you made your comments, is that right?

22    A.    Yes.

23    Q.    And that box was already checked, correct?

24    A.    Yes.

25    Q.    Okay.  So it couldn't have been the

1    territorial agency manager because he didn't sign

2    until March 9, isn't that right?

3         A.    I guess.

4         Q.    Because --

5         A.    It looks like a preprinted thing, somebody

6    punched in the numbers.

7         Q.    Right.  But my point is it must have been

8    John Armellino who checked the box because the box

9    was already checked at the time you made your

10   comments, correct?

11            MR. ACKERMAN:  Object to the form.  If you

12       know.

13            THE WITNESS:  Say that again one more time.

14   BY MS. CESARANO:

15        Q.    Okay.  I'm just going by the dates, okay.

16   So I'm saying you weren't sure who checked the box,

17   Meets, requires assistance.  And I'm just suggesting

18   that --

19        A.    I don't even know why it was checked.

20        Q.    Well, I guess you have to check a box?

21        A.    I guess so.

22        Q.    Okay.  Well, somebody checked the box,

23   okay.  And my question to you is I'm suggesting that

24   it must have been John Armellino because it, because

25   he signed it on 2/22, the same date you did?

83

1          A.   Okay.

2          Q.   Okay.  Let me finish the question.

3    Whereas, the person, Mr. Lott, who signed as the

4    territorial manager, didn't sign it until March 9,

5    which is after you made your comments, correct?

6          A.   Right.  That's how it always works.

7               MR. ACKERMAN:  I have an objection to the

8          form.  You have a couple of questions in there.

9               MS. CESARANO:  Okay.

10              MR. ACKERMAN:  If you understand, you can

11         answer.  And I'm going to ask you not to guess.

12         If you know, you can answer.

13   BY MS. CESARANO:

14         Q.   Did John, this agency manager typically do

15   your review?

16         A.   I don't know.

17         Q.   You don't know who reviewed you when you

18   were an employee?

19         A.   No.  Usually what they do is they give you

20   like this, this preprinted thing.  So who knows who

21   did that.  I thought it came from human resources.

22         Q.   Okay.

23         A.   And then it was just implemented by the

24   manager.

25         Q.   Do you remember John --

84

```
 1        A.    Because it is not his choice to tell you
 2   where you go.
 3        Q.    John would not have had the authority --
 4        A.    I don't think so.
 5        Q.    -- or the responsibility to check the box,
 6   Meets, requires assistance?
 7        A.    I don't think so.
 8        Q.    I'm asking you.  I don't know.  Let me ask
 9   you another question, okay.
10              Did John Armellino sit down with you, you
11   know, and discuss this form at any point?
12        A.    Probably.  But I don't recall.
13        Q.    Okay.
14        A.    You know.
15        Q.    And then my other question is again with
16   reference to this review for the year 1999, this
17   Exhibit 18, do you recall if anyone sat down with you
18   and talked about it or telephoned you and talked
19   about it?
20        A.    No.
21        Q.    Anyone at all?
22        A.    No.  Nobody does that.
23        Q.    No?
24        A.    (Witness shakes head.)
25        Q.    So you can't remember anybody talking to
```

85

1   you about it?

2        A.   No.

3        Q.   What kind of rating or ranking is this,

4   Meets, requires assistance?

5        A.   I have no idea.

6        Q.   You don't know if it's good, bad or

7   indifferent?

8        A.   Well, all I know is you cannot get that

9   (Indicating).

10       Q.   Okay.  If you get, Does not meet, in that

11  box checked that's very bad, right?

12       A.   Yes.  But they go by the overall rating,

13  see where it says, Overall rating, meets, so I'm

14  fine.  That's all that matters.

15       Q.   Okay.  So the, Meets, requires assistance

16  is basically an acceptable rating?

17       A.   Yes.

18       Q.   Now, Exhibit 18 obviously is just for

19  one year, correct?

20       A.   Yes.

21       Q.   It covers one year.  Did you get this same

22  kind of agent performance summary the year before in

23  1998 and 1997?

24       A.   Supposedly every year we are supposed to

25  have these reviews, but as you can see they are

1   different, this one is different from that one.

2   There are different formats that they used.

3       Q.   Did you get reviewed every year?

4       A.   I believe so.

5       Q.   Okay.  Now, when you became, let me see,

6   when you have your agency, was the form that we just

7   did, I guess was exhibit, Exhibit 17 was for the year

8   2000, correct?  Let's go back --

9       A.   Yes.

10      Q.   -- to Exhibit 17.  And it says on the top

11  R3001, correct?

12      A.   Yes.

13      Q.   Okay.  Was that reference this R3301

14  referencing the documents that you signed effective

15  July 1, 2000?

16      A.   Yes, the agreement.

17      Q.   Okay.  So they, also within internal

18  Allstate they refer to those type of documents you

19  signed July 1, 2000 as being R3001, correct?

20      A.   Yes.

21      Q.   All right.  18, okay, we will put 18 in the

22  stack.  Hopefully we can go through these fairly

23  quickly.  I'm going to have to get this one copy.

24          (The document is marked as Defendant's

25      Exhibit No. 19 for identification.)

1    BY MS. CESARANO:

2        Q.   I'm showing you what has been marked for

3    identification as Exhibit 19.  And it purports to be

4    Important Documents, Please Read, okay.  Will you

5    just look through those documents real quickly, just,

6    you know, page through them and tell me what they

7    are?

8             (The witness reviews the document.)

9        A.   Okay.  This one here says, Impact Of

10   Conversion To R3001 Exclusive Agent Independent

11   Contractor Status on your Allstate Benefits.

12       Q.   Okay.  You can just do titles.  I mean the

13   document will be in the record, and anybody can read

14   it.

15       A.   Okay.  This is where it says Allstate

16   Benefits and where they took away your dental,

17   vision, flexible spending, long-term disability.

18       Q.   Okay.

19       A.   Dependent life insurance, pension plan,

20   profit sharing, long-term care group, legal care,

21   accidental death and dismemberment.  They had to

22   change our direct deposit.

23            Time off, it says normally we could have

24   had time off for vacation, company holidays, personal

25   time, illness, that was all taken away.

88

1          Other benefits, then it says something

2    about Social Security, Workers' Comp.

3          MR. ACKERMAN:  Just identify basically.

4          THE WITNESS:  Oh, okay

5    BY MS. CESARANO:

6      Q.   But you read through these documents at the

7    time you received them, correct?

8      A.   No.

9      Q.   You didn't?

10     A.   No.

11     Q.   You did receive them though, correct?

12     A.   It was in the box, and it was received.

13     Q.   Correct.  Now, I'm curious.  Did Chip bring

14   the box, or had you already received this box before

15   hand?  You keep talking about a shrink-wrap box?

16     A.   The box is the new job in the box that

17   Allstate gave us.

18     Q.   Did you receive it in the mail?

19     A.   I believe it was delivered by mail to our

20   homes.

21     Q.   Okay.  That's how you received all these

22   documents?

23     A.   I believe so.

24     Q.   Okay.  Let's finish up with this one.

25     A.   Okay.  Then it says you are not eligible to

89

1   receive pension, your medical enrollment form which

2   we already went over, the dental enrollment, the new

3   cost.  Before we used to pay like $17; now you have

4   to pay $187.

5       Q.   Okay.  And your agency pays that, correct,

6   out of the agency budget, is that right?

7       A.   Yes.  And then direct deposit

8   authorization, and then authorization to continue

9   personal life deductions, certificate of group health

10  insurance plan coverage.

11      Q.   Okay.  You don't have to go through the

12  whole thing.  But you, these were all the materials

13  that Allstate sent you in conjunction with

14  terminating your employment around July 1, 2000,

15  correct?

16      A.   Yes.

17      Q.   And you received these documents what,

18  prior to May 20, because that's when you signed a lot

19  of the documents?

20      A.   Ah huh.

21      Q.   Correct?

22      A.   Yes.

23      Q.   Of 2000, yes?

24      A.   Ah huh.

25      Q.   Okay.  You have to say it out loud.

1    A.    Yeah.

2    Q.    Okay.  Let's just go to the last page.

3    A.    Of this?

4    Q.    Yes, right.  And that's all having to do

5  with again all the things that would change as a

6  result of the conversion, correct?

7    A.    Yes.

8    Q.    Okay.  And we're done with this.

9          (The document is marked as Defendant's

10    Exhibit No. 20 for identification.)

11  BY MS. CESARANO:

12    Q.    And again I don't expect you to have to

13  read any of this in the record.  I just want you to

14  identify that exhibit, what is it, No. 20?

15          MR. ACKERMAN:   20.

16          (The witness reviews the document.)

17  BY MS. CESARANO:

18    Q.    Okay.

19    A.    Exclusive Agency Conversion Guide.

20    Q.    Okay.  For the record, okay.  And is this

21  part of the document you received around the time of,

22  prior to May 20 of 2000 that you received from

23  Allstate?

24    A.    Maybe not.  This might, because it says

25  here, This guide is a replacement of the conversion

1    guide.  This might have come later.

2        Q.    Okay, okay.  But you did receive the

3    document, is that correct?

4        A.    Yes.

5        Q.    Okay.

6        A.    Because remember they keep sending you

7    different supplements, they changing it.

8        Q.    Okay.  But this is labeled, Conversion

9    Guide.  So I take it this --

10       A.    It is a replacement on another one.

11       Q.    Yes, correct.

12       A.    Replacement.

13       Q.    And it says, Effective for conversions

14   after December, 1999, correct?

15       A.    Yes.

16       Q.    Okay.  Now, this one, this one says,

17   Revised 12/99, down here at the bottom, okay?

18       A.    Okay.

19       Q.    And it says for R830 and R1500 agents,

20   okay?

21       A.    Yes.

22       Q.    Were you at anytime either one of those

23   kind of agents?

24       A.    Yes.

25       Q.    What kind of agent were you?

92

1        A.    An R1500.

2        Q.    And during, was that what you were when you

3   were hired?

4        A.    Yes.

5        Q.    Okay.  And this would be starting in 1986,

6   correct?

7        A.    Correct.

8        Q.    Okay.  And you are not sure when you

9   received this document, correct?

10       A.    Correct.

11             (The document is marked as Defendant's

12       Exhibit No. 21 for identification.)

13  BY MS. CESARANO:

14       Q.    Okay.  This is a very big packet.  I just

15  want you to just take, I'm showing you what has been

16  marked for identification as Exhibit 21.  And would

17  it be fair to say that these documents all pertain to

18  new benefits that you had the option to receive

19  after, once you, the Zink Agency starts, is that

20  correct?

21       A.    What they did is they made this little

22  booklet.  When they took away all our benefits they

23  gave us these numbers to call to continue each plan,

24  all care, dental assistance, healthcare lines.

25       Q.    Okay.

1      A.   And that just tells the plan, each, like

2    the all care plan, the Allstate assistance dental

3    plan, our Allstate agents pension plan, and how to

4    call people if you need help with that.

5      Q.   Okay.  And these were all benefit

6    information that you as the head of the Zink Agency

7    would, you know, could basically sign up for,

8    correct?

9      A.   If I wanted to keep my health insurance

10   going.

11     Q.   Right.

12     A.   That's what I had to do.

13     Q.   Yes.  And they gave you instructions on how

14   to do that?

15     A.   Yes.

16     Q.   And that was in the directory, correct?

17     A.   Yes.

18     Q.   Okay.  And did you in fact call these

19   numbers as indicated on the directory?

20     A.   I didn't have to.

21     Q.   Okay.  Why is that?

22     A.   Because Chip filled out those papers for

23   me.

24     Q.   So Chip helped facilitate that whole

25   process, made it easy?

94

1      A.   Yes.

2      Q.   But it was with your authority, you told

3  him what you would like to continue, correct?

4           MR. ACKERMAN:  Object to the form.

5           THE WITNESS:  No.  You had, that's what you

6      had a choice of.

7  BY MS. CESARANO:

8      Q.   Your choice?

9      A.   No.  That was it.  You had the choice, you

10  take it or you don't have coverage.

11     Q.   No, I understand.  But for example, let me

12  give you an example, could you have said to Chip, I

13  want to continue health coverage, but I don't need

14  dental, could you --

15     A.   I don't know about that.

16     Q.   Well, I mean was that an option?

17     A.   It may have been if it's like a cafeteria

18  plan.  I'm not sure.

19     Q.   Okay.  But --

20     A.   I don't know that.

21     Q.   -- would it be fair to say that in this

22  process there were, that is prior to July 1, 2000

23  there were certain options and decisions you had to

24  make?

25          MR. ACKERMAN:  Object to the form.

1           THE WITNESS:  Wait.  Say that again.

2    BY MS. CESARANO:

3        Q.   Okay.  At the time that they were

4    terminating your employment, okay --

5        A.   Yeah.

6        Q.   -- around let's say May, 2000, when Chip

7    discussed with you did he tell you that there were

8    certain options that you had as far as benefits or

9    other choices in conjunction with this conversion

10   process?

11       A.   No.  He just took what I had and just kept

12   it.

13       Q.   Okay.  So your choice was I want the same

14   thing as I had before?

15       A.   Right.

16       Q.   Is that right?

17       A.   Yes.

18       Q.   Okay.  So that made it easy for him, he

19   just --

20       A.   I guess so.

21       Q.   -- did what you said?

22       A.   Yeah.

23       Q.   And let me ask you something else.  Again

24   we are going to that same time period with Chip,

25   okay.  Did, were you aware of the fact that you had

96

```
 1   three options as to how you wanted to start the Zink
 2   Agency?
 3            And let me list the three choices.  One,
 4   you could be like a sole proprietorship; another was
 5   that you could be a Subchapter S Corporation; or the
 6   third choice was that you could form a Florida
 7   corporation and be a corporation?
 8        A.   No.
 9        Q.   Did you understand you had some choices
10   there?
11        A.   No.
12        Q.   You didn't know that?
13        A.   No.
14        Q.   Okay.  How did the, obviously your Zink
15   Agency is in fact a Florida corporation, correct?
16        A.   Yes.
17        Q.   Okay.  How did that come about, I mean how
18   did you --
19        A.   I was talking to an agent, and he said,
20   When you have paperwork filled out don't be an LLC,
21   that's what I remember.
22        Q.   He said don't do that?
23        A.   Right.
24        Q.   Did he tell you what LLC was?
25        A.   I know it is a limited corporation but --
```

97

1      Q.   Limited liability company, is that LLC?

2      A.   Yes.

3      Q.   Okay.  And so who told you that?

4      A.   I can't think of his name.  He sat next to

5   me.  Tom Brown.

6      Q.   Okay.  So based on that you said the

7   corporation would be the way to go?

8      A.   I guess so.  He is the one that told me you

9   don't have to read anything.  If you don't sign you

10  just don't have a job.  So that's when he told me

11  when you do your paperwork go as a corporation, not

12  LLC.

13     Q.   Another agent advised you of that?

14     A.   Yes.

15     Q.   And that's what you decided to do?

16     A.   Yes.

17     MS. CESARANO:  Okay.  Where is, this is

18     everything.

19     MR. ACKERMAN:  Those are all the exhibits

20     there.

21     MS. CESARANO:  Just one second.  I'm going

22     to go off the record a minute.

23     THE VIDEOGRAPHER:  The time is

24     approximately 12:20 P.M.  Going off the video

25     record.

```
 1              (Off-the-record discussion.)

 2              THE VIDEOGRAPHER:  The time is

 3      approximately 12:22 P.M.  We are back on the

 4      video record.

 5              (The document is marked as Defendant's

 6      Exhibit No. 22 for identification.)

 7   BY MS. CESARANO:

 8      Q.   Okay.  Showing you what has been marked for

 9   identification as Exhibit 22, which purports to be an

10   Independent Contractor Manual, was that the manual

11   that was in effect at the time of July 1, 2000?

12              (The witness reviews the document.)

13      A.   Yes.

14      Q.   Okay.  That's it.  That's the only

15   question.

16      A.   Okay.

17      Q.   Thank you.

18              (The document is marked as Defendant's

19      Exhibit No. 23 for identification.)

20   BY MS. CESARANO:

21      Q.   And I'm showing you what has been marked

22   for identification as Exhibit No. 23; is that the

23   revised manual?

24              (The witness reviews the document.)

25      A.   Yes.  This is one of the supplements,
```

1   remember how I told you they keep changing it.

2        Q.   Yes.

3        A.   This is that.

4        Q.   Okay.  So it would be fair to say

5   Exhibit 23 revises Exhibit 22, correct?

6        A.   Yes.  This exhibit changes where now

7   Allstate changed the wording to say they can

8   terminate you for any cause that they choose.

9        Q.   Terminate your agency?

10       A.   Yeah, or you.

11       Q.   Okay.

12       A.   Okay.

13       Q.   But back to my question just to clarify

14   then, so Exhibit 22 was in fact in effect for your

15   agency as of July 1, 2000; and then later Exhibit 23

16   were the revisions that became effective January 1,

17   2002 --

18       A.   Yes.

19       Q.   -- applicable to your agency?

20       A.   Yes.

21       Q.   The Zink Agency, okay.  We will take a

22   break for lunch soon.

23            (The document is marked as Defendant's

24       Exhibit No. 24 for identification.)

25   BY MS. CESARANO:

100

1    Q.   Showing you what has been marked as

2  Exhibit 24, was this the R3001 Supplement Exclusive

3  Agency Agreement that was in effect as of July 1,

4  2000 when you began the Zink Agency?

5         (The witness reviews the document.)

6    A.   Yes.

7         MS. CESARANO:  Okay.  Add that to that

8    stack.

9         (The document is marked as Defendant's

10   Exhibit No. 25 for identification.)

11 BY MS. CESARANO:

12   Q.   And then showing you what has been marked

13 for identification as Exhibit 25, were these the

14 revisions effective January, 2001 to the R3001

15 agreement?

16        (The witness reviews the document.)

17   A.   Well, that's what it says.

18   Q.   Okay.  So you agree with that, right?

19   A.   (Witness nods head.)

20   Q.   Okay.  We are just doing this for the

21 record, getting these into the record.

22   A.   Okay.

23   Q.   Okay.  And so such that as far as this

24 Exhibit 25, is that the current one that's in effect

25 as of today for the R --

101

1       A.   I'm not sure.  I think there is something

2  that came out in September, just last month.

3       Q.   Okay.  So there may have been later

4  revisions to the R3001 agreement?

5       A.   Yes.

6       Q.   Okay.

7       A.   I'm pretty sure.

8            (The document is marked as Defendant's

9       Exhibit No. 26 for identification.)

10 BY MS. CESARANO:

11      Q.   Showing you what has been marked as

12 Exhibit 26, okay --

13      A.   Yeah, this is the one.

14      Q.   -- is that the, maybe the supplement you

15 were talking about the R3001 agreement, October 1,

16 2001?

17      A.   Okay.  That's the supplement.  But I

18 believe there is still something that came out August

19 or September, just a month or two ago.

20      Q.   Okay.  Then that's fine.  But as to this

21 document, did that go into effect as of, to

22 supplement the R3001 agreement effective October 1,

23 2001?

24      A.   Yes.

25      Q.   Okay.  And again Exhibit 26 would have

102

1   applied to your, to the Zink Agency at the time it

2   went into effect, correct?

3          MR. ACKERMAN:  Object to the form.

4   BY MS. CESARANO:

5      Q.   That is as of October 1, 2001?

6      A.   Say that one more time.

7      Q.   Okay.  What I'm trying to understand is the

8   revisions that are dated October 1, 2001 that are set

9   forth in Exhibit 26 would have applied to the Zink

10  Agency as of that date?

11     A.   Right.

12          (The document is marked as Defendant's

13      Exhibit No. 27 for identification.)

14  BY MS. CESARANO:

15     Q.   And the last one here.  Showing you what

16  has been marked for identification as Exhibit 27, is

17  that the Exclusive Agency Independent Contractor

18  Reference Guide that would have been in effect at, as

19  of July 1, 2000?

20          (The witness reviews the document.)

21     A.   Yes.

22     Q.   Okay.  When you started the Zink Agency,

23  correct?

24     A.   Actually what it really, it's the same

25  thing that they really have had, always had, tells

1    you how to make a business card, you have to do it

2    their way, that's all it is telling you.

3        Q.   But it is all there?

4        A.   It's a control thing.

5        Q.   But it's all set forth in the document,

6    correct?

7        A.   Yeah.

8            MS. CESARANO:  Okay.  All right.  Why don't

9        we take, that's the bulk of the documents, and

10       why don't we take a lunch break.  How long do

11       you want to take?

12           MR. ACKERMAN:  1:00 o'clock.

13           THE VIDEOGRAPHER:  It is approximately

14       12:28 P.M.  We are going off the video record.

15           (A luncheon recess is taken.)

16

17

18

19

20

21

22

23

24

25

104

1          A F T E R N O O N    S E S S I O N

2          THE VIDEOGRAPHER:  The time is

3     approximately 1:26 P.M.  We are back on the

4     video record.

5                    DIRECT EXAMINATION, Continued

6     BY MS. CESARANO:

7          Q.    Okay.  Ms. Zink, I have some questions to

8     ask you.  You mentioned that a lot of these, that at

9     least several of the exhibits that we have already

10    identified came to you in a box mailed to your house,

11    is that correct?

12         A.    Yes.

13         Q.    Do you remember when that was?

14         A.    No.

15         Q.    Okay.  Was it, was it in November of 1999?

16         A.    I don't remember.

17         Q.    Okay.  Then, I know you don't remember.  Do

18    you remember if it was before the end of the year in

19    1999?

20         A.    No, I don't remember that.

21         Q.    You don't remember that either.  Okay.  In

22    terms of how much time before you signed the

23    documents in May of 2000, do you remember how many

24    months before you got the documents, you know, was it

25    one month, two months, three months, can you

105

1   estimate?

2       A.   Wait.   What about May?

3       Q.   Well, in May, 2000 you signed --

4       A.   Okay.

5       Q.   -- a lot of these exhibits, okay, that's

6   true, right?

7       A.   Yes.

8       Q.   Okay.  So now my question is in terms of

9   trying to fix a date when you might have received the

10  boxes, do you remember if it was, you know,

11  three days before you signed or a month before or

12  four months before, I mean in terms of the time frame

13  can you estimate how much time it was when you

14  received the box between --

15      A.   Maybe two months.

16      Q.   Okay.

17      A.   Okay.

18      Q.   Now, do you recall attending a meeting that

19  human resources held that was called, the meeting was

20  called "Preparing For The Future", and it concerned

21  the, you know, termination of the employee status and

22  the conversion to the other status?

23      A.   When was it?

24      Q.   I think it was in approximately November or

25  December of 1999.

1     A.   Did I sign in?

2     Q.   No.  I don't know, I don't know.  I'm

3 just --

4     A.   Because we signed in for meetings, because

5 if I was there I would have had to sign in for

6 something.

7     Q.   That may be.  I don't know.  My question is

8 do you recall attending a meeting conducted by say

9 Olga Otero?

10    A.   Nothing conducted by her.

11    Q.   Nothing by her, okay.  What about someone

12 else with human resources, someone conducting a

13 meeting that was called, the topic was "Preparing For

14 The Future" and it concerned this changeover that was

15 going to happen in July of 2000?

16    A.   I don't know.

17    Q.   Okay.  The meeting might have been in

18 Fort Pierce, but it could have been somewhere else?

19    A.   Well, you tell me.  Where was the meeting,

20 and I will tell you if I was there.

21    Q.   It's my understanding the meetings were

22 held at various locations, and most people went to

23 the one closest to them.  So I don't know if you, I'm

24 asking you --

25    A.   I don't know.  If you tell me what did we

1   talk about?

2       Q.   The subject of the meeting I'm talking

3   about was it was definitely run by someone in human

4   resources.  And the discussion was all these numerous

5   documents that people were going to have to look at

6   and review and sign later --

7       A.   When they received them?

8       Q.   Yes, yes.  I believe it was after the boxes

9   were sent to people, it might have been after the

10  boxes came, because I'm asking, this is just a

11  question to see if this refreshes your memory because

12  in the written invitation to come to this meeting was

13  bring your boxes.

14      A.   I don't know.  I didn't have to go to all

15  the meetings, so I don't know.

16      Q.   This was just like one meeting.  It was

17  like, Hey, if you want to have us explain what is in

18  the boxes, bring your boxes to the meeting, and we

19  will go through all the documents?

20      A.   No, nothing like that ever happened.

21      Q.   So you didn't attend anything like that?

22      A.   Right.

23      Q.   Okay.  Did you ever remember seeing any

24  information about these meetings that were called

25  "Preparing For The Future" that were at various

108

1   locations in Florida?

2       A.    No.

3       Q.    Okay.   You mentioned Tom Brown before in

4   your testimony that you know you had a short

5   discussion with him?

6       A.    Yes.

7       Q.    Did you have that discussion with him at a

8   meeting, an Allstate meeting?

9       A.    Yes.

10      Q.    Okay.   What was the --

11      A.    But I don't remember what the meeting was

12  for.

13      Q.    -- subject of the meeting?

14      A.    I don't remember.   Probably something with

15  underwriting.

16      Q.    Okay.   But you don't think Tom Brown would

17  have, because you were discussing about the

18  corporation and not doing an LLC, you don't think

19  that meeting could have been the type of meeting I'm

20  talking about?

21      A.    No.   I know what you're talking about.

22  That wasn't the meeting.

23      Q.    Okay.

24      A.    That was something different.

25      Q.    Again the meeting I'm talking about with

1    the human resources folks lasted about two hours.

2         A.   No.  This was a short meeting.

3         Q.   Okay.  Fine.  So it looks like you didn't

4    go to the "Preparing For The Future" meeting?

5         A.   I don't think I did.

6         Q.   Okay.  That's fine.  One other follow-up

7    question.  You mentioned that currently you have this

8    one employee named Patty, I can't pronounce her,

9    Xuncax?

10        A.   Yes.

11        Q.   How do you pay her?

12        A.   Through Payroll Plus.

13        Q.   You still use them --

14        A.   Yes.

15        Q.   -- to pay her, fine.  Do you know if there

16   was ever a, that currently you can use any payroll

17   you want, do you know that to be the case?

18        A.   No.  They have like nine, I think it's like

19   nine, seven or nine different companies you choose

20   from.

21        Q.   Okay.  And that never changed as far as you

22   know?

23        A.   As far as I know it's never changed.

24        Q.   Okay.  Now, I want to ask you about the

25   licenses that you have to sell insurance.  What, can

110

```
1    you tell me the various licenses that you have?
2         A.   A 220.
3         Q.   Can you tell me what that means?
4         A.   Property and casualty, life insurance and
5    variable life insurance.
6         Q.   Any others?
7         A.   That's all I need.
8         Q.   The three, okay.  You don't have the
9    license, and I forgot the proper name, that you need
10   to sell financial products?
11        A.   No.  I'm unable to attend any of those
12   classes.
13        Q.   Okay.  And why are you unable to attend?
14        A.   Because Mike goes to them.
15        Q.   Mike Collette?
16        A.   Yes.
17        Q.   Okay.  And why is he going to them?
18        A.   Well, he failed the class three times.  So
19   each time that he has taken exam prep courses for it,
20   that's when he has always solicited sex from me to go
21   to the classes and stay with him.
22        Q.   Okay.
23        A.   So obviously I cannot go.
24        Q.   Okay.  We'll get to all that.  I just want
25   to finish up on your licensing.  So you are saying
```

111

1   that there are classes that you could attend that

2   have to do with getting your license for financial

3   products?

4           MR. ACKERMAN:  Object to the form.

5           THE WITNESS:  Well, what happened, Allstate

6       offers like a 663, not the 63 any longer though,

7       six, I guess exam prep, but he is in charge of

8       it.

9   BY MS. CESARANO:

10      Q.   He's the trainer?

11      A.   Yeah.

12      Q.   For all the licensing?

13      A.   Yeah.  When you get your Series 6 and then

14  you have to go to the training, he's the trainer.

15      Q.   Okay.  And the Series 6 pertains to what?

16      A.   Selling securities.

17      Q.   Okay.  Now, does Mike Collette have his

18  Series 6 license?

19      A.   He finally got it, yes.

20      Q.   Okay.  And you are saying he actually

21  conducts the class now?

22      A.   Yes.

23      Q.   Okay.  Now, what's preventing you from

24  going to that class?

25      A.   I also have Elias Smith who is supposed to

112

1   be assigned to me for financial, my financial manager

2   I guess you could call it.  But when he first

3   introduced himself to me he immediately sent an email

4   to me saying, Use Mike Collette.  So that pretty much

5   said it all.

6       Q.   And who is this Elias, I mean, you know,

7   who does he work for?

8       A.   I don't know who he is.  I never met him

9   before in my life.

10      Q.   He sent you an email?

11      A.   Yes.

12      Q.   Okay.  Back to these classes.  Are there

13  other alternative classes you could go to if you

14  wanted to get your Series 6 license?

15      A.   No.

16      Q.   Okay.  Do schools offer classes or other,

17  you know, any other groups of, you know, that would

18  teach you what you need to know to get a Series 6

19  license?

20      A.   Like what kind of school?

21      Q.   I'm asking you.  Do you know of any

22  business schools or any --

23      A.   No.  Allstate usually controls where we go,

24  who holds our license, who does our training.

25      Q.   Okay.  So I guess my question is if you

113

1   don't want to go to the class that Mike Collette is

2   running, is there any other alternative for you --

3        A.   No.

4        Q.   -- in terms of a class?

5        A.   No.

6        Q.   He is the only one that teaches the

7   Series 6?

8        A.   Yeah.

9        Q.   And then --

10       A.   And then what happens too, then he is in

11  control of -- once I'm Series 6 licensed then

12  Allstate is allowed to come into my office, Allstate

13  being Mike, and check all my records for compliance;

14  and that's where the trouble is.

15       Q.   Well, I have a question.  Is there somebody

16  at Allstate who has the title compliance officer --

17       A.   Yes.

18       Q.   -- on the financial services side?

19       A.   Yes.

20       Q.   Okay.  Now, is that Hugh Hopson?

21       A.   Yes, it's Hugh Hopson.

22       Q.   So wouldn't he be the one that would do the

23  auditing for financial?

24       A.   He could be.  Doesn't have to be.

25       Q.   He doesn't have to be.  Okay.  But couldn't

114

1    you have him do the auditing instead of

2    Mike Collette?

3          MR. ACKERMAN:  Objection to form.

4          THE WITNESS:  I don't know.

5    BY MS. CESARANO:

6          Q.   But it's possible?

7          A.   I have no idea.

8          Q.   It's --

9          A.   I don't even know where he is.

10         Q.   But his title is compliance officer, and he

11   works for financial, correct?

12         A.   Yes.  But it is my understanding that they

13   are not, the managers are doing the compliance

14   checks, not just the compliance officers.

15         Q.   Now, who is your current manager, I mean is

16   that Helen Sylvester?

17         A.   Helen.

18         Q.   What is her title again?

19         A.   It is called an MBC, a market business

20   consultant.

21         Q.   Okay.  Now, in terms of who, well, let me

22   scratch that.  Is Helen your contact person with

23   Allstate, is she the one you are supposed to be in

24   touch with with things having to do with your agency?

25         A.   Like for what?  There is different --

115

1      Q.   If you have a question or --

2      A.   No.  You just go to an underwriter if you

3  have a question.

4      Q.   But what about monitoring like how

5  profitable your agency is, or maybe whether you are

6  getting the proper commissions, is that Helen, would

7  she be in that role?

8      A.   Some other girl does that.  She emails me

9  once a month with measurements.  I don't know who it

10  is though.

11      Q.   But in terms of I think one of those

12  documents, exhibits we had, like an evaluation of how

13  well your agency was doing and you said it was doing

14  very well.

15      A.   Oh, she does the once a year summary survey

16  or whatever.

17      Q.   So that would be Helen?

18      A.   Yes.

19      Q.   That's her job?

20      A.   I guess so.  They changed her title.  So we

21  were never given a job description of what we were

22  supposed to get from them.

23      Q.   How many times has Helen physically visited

24  your agency since July 1 of 2000?

25      A.   Zero.

116

1      Q.    Okay.  Now, has she always been the

2   marketing business, what is the rest of the title?

3      A.    Consultant.

4      Q.    Consultant for your agency since the

5   beginning?

6      A.    No.

7      Q.    Was there another person in that title?

8      A.    Well, before that was John Armellino.

9      Q.    Okay.  And he was your marketing business

10  consultant?

11     A.    Yeah.  But they didn't call it that then.

12     Q.    Was it the same type of job?

13     A.    Yes.

14     Q.    Okay.  He just changed the title?

15     A.    Yes.

16     Q.    And so when, as of July 1 of 2000 that role

17  was performed by John Armellino?

18     A.    Yes.

19     Q.    Okay.  And how many times did he visit your

20  agency after July 1 of 2000?

21     A.    Probably once a week.

22     Q.    Okay.  And how long would he stay when he

23  came?

24     A.    Just enough to cover all the underwriting

25  questions on like commercial policies, go over the

117

```
 1    goals of the office.

 2         Q.   That's like to do with profitability?

 3         A.   Yes.

 4         Q.   And how long would that normally take?

 5         A.   About an hour.

 6         Q.   Okay.  And then going from the date of

 7    July 1, 2000, how long was John in that role?

 8         A.   July, 2001 did you say?

 9         Q.   No.  I'm sorry.  July 1, 2000.

10         A.   2000.

11         Q.   In other words, when your agency started

12    how long did John stay in that role?

13         A.   As the manager he was there until pretty

14    much the end of the year.  I think he left in like

15    November --

16         Q.   Okay.

17         A.   -- sometime.

18         Q.   About five months?

19         A.   I guess so.

20         Q.   And then has it been Helen in that role

21    since that time?

22         A.   Yes.

23         Q.   Did she take over from John?

24         A.   Yes.

25         Q.   So you just had two people really --
```

118

```
 1      A.   Yes.

 2      Q.   -- to deal with at Allstate?

 3      A.   Yes.

 4      Q.   And if you have those same kind of

 5 underwriting questions while Helen in is in that

 6 role, do you call her up and ask her those questions?

 7      A.   No.  I don't have anybody to call.

 8      Q.   Well, isn't she your assigned person?

 9      A.   Yes.

10      Q.   But why don't you call her?

11      A.   Because she is friends with Mike, and she

12 is also friends with Olga.  And Olga called Helen and

13 told Helen to call me and tell me that I'm not

14 allowed to call anybody or speak to any agents

15 because of this investigation so...

16      Q.   Wait.  There was too many he told, she

17 said.

18      A.   Okay.  Helen Sylvester is my manager.

19      Q.   Right.

20      A.   She called me up one day and said I am not

21 allowed to call and talk to any agents at all.

22      Q.   She told you not to talk to any agents?

23      A.   Yes.

24      Q.   Okay.  And --

25      A.   And I said, Why?
```

119

1      Q.    When was that?

2      A.    You have that.  Probably June of last year.

3      Q.    Okay.  So June of 2001?

4      A.    Yes.

5      Q.    And so she calls you, and she doesn't want

6    you to talk to other agents?

7      A.    Right.  Or anybody, or anybody that's what

8    she said.  So okay.  And then that's when I called my

9    friend at the EEOC, and he said, Document it.

10   Because I had made a complaint that I did not want

11   Olga Otero because of her involvement with

12   Mike Collette to be in the investigation that

13   Sandra Sellers and I were working on.

14     Q.    And you made that request?

15     A.    Yes.  And when Helen did that I had found

16   out that Olga had gone into another office of an

17   agent, a female agent in another county and through

18   the agent off guard.  And when the agent said, Why

19   are you here?  This is supposed to be remain

20   confidential which is in the Allstate guidelines of

21   conducting interviews such of this, Olga came out and

22   said, Because of Linda Zink.  So then it went around

23   like wildfire.

24     Q.    Who was the agent?

25     A.    Chris McIntyre.

120

1      Q.   Okay.  What office?

2      A.   Fort Pierce.

3      Q.   Okay.  So after Helen I guess made this

4  call to you, then you haven't really wanted to deal

5  with her after that, is that what happened?

6      A.   Exactly.  And she told me, Helen told me it

7  is because of the investigation.

8      Q.   And tell me exactly what Helen said to you

9  as much as you can remember, how did she put it?

10     A.   Helen said that Olga Otero called her and

11 said, Call Linda Zink and tell her that she is not

12 allowed to talk to any agents.

13          And I said, And why are you calling me?

14 She says, I am calling you as a your market business

15 consultant to not call or talk to any other agents.

16 I said, About what?

17          Well, she said, Olga Otero told me that

18 there is an ongoing investigation about you.  And I

19 said, Okay.  Then that's when what had happened was

20 is I guess Olga knew, found out somehow that I knew

21 that she had gone into Chris McIntyre's office and

22 said the reason why she was there for the

23 investigation was because of me, and it was supposed

24 to be confidential.

25          I was told by Sandra Sellers it would

121

 1    remain confidential.  That's why when I first got the

 2    restraining order against him and I called Sandra and

 3    told her, I'm going to court, please do not have

 4    Olga Otero on this investigation.

 5           I also emailed that to Ed Liddy and I also

 6    emailed this to Tamra Brown, the human resources

 7    senior manager up in Chicago.  They were all well

 8    aware of how I did not want her involved in this

 9    investigation because of her involvement with

10    Mike Collette.

11       Q.   Okay.  And while I certainty, you made it

12    clear that was your request --

13       A.   Many times.

14       Q.   Right.  But the company, obviously you

15    would agree, Ms. Otero is in human resources,

16    correct?

17       A.   Yes.

18       Q.   That's her job.  And human resources does

19    do investigations of sexual harassment claims,

20    correct?

21       A.   It's supposed to be confidential though.

22       Q.   Right, I understand.  But they do the

23    investigation, correct?

24       A.   Yes.

25       Q.   Okay.  And Sandra Sellers was in charge of

122

1   the investigation, is that right?

2       A.   Correct.

3       Q.   And Olga Otero's job is to assist

4   Sandra Sellers, is that correct?

5       A.   Right.  But I was told, I didn't know this,

6   but every time once the investigation was over, I

7   didn't even know Olga was on it until I got the

8   letter from her signed by her saying that she denied

9   my claim.  I was shocked.  I thought Sandra Sellers

10  had removed her, and Tamra Brown had removed her.

11      Q.   Okay.  But --

12      A.   I mean her laughing right now is very, you

13  know, disruptive to me.  If she could turn and look

14  the other way maybe.  That's one of the reasons why I

15  had asked that, you know, she not be on this, in this

16  investigation because of her involvement with

17  Mike Collette.

18      Q.   Right.  But, you know, it is policy of

19  human resources to conduct the investigation --

20      A.   In a fair manner.

21      Q.   Yes.

22      A.   That's their words.

23      Q.   But you understand that they --

24      A.   No, I do not understand.

25           MR. ACKERMAN:  Wait.  Let her ask the

1        question, and then you answer it.

2            THE WITNESS:  I understand.

3   BY MS. CESARANO:

4        Q.   I understand you don't agree with how they

5   did it, you think it was wrong, okay, I understand

6   that.

7            But human resources uses their employees as

8   they see fit, and so, you know, they would

9   investigate it.  Sandra Sellers is entitled to use

10  her assistant to investigate your claim, and that's

11  what happened here.

12           But for the record you made it clear that

13  you didn't agree at all with how that occurred?

14       A.   Right.  Because what happened then --

15           MR. ACKERMAN:  Wait a second.  I'm going to

16       object to the form.  There is not a question

17       pending.  Just wait until she asks the question.

18  BY MS. CESARANO:

19       Q.   Let me see.  We got a little off track.

20  Because I think we started this off with your

21  licenses.  And I want to make sure that you have

22  listed all of the licenses that you have?

23       A.   Yes.

24       Q.   Right.  And that was a complete list.  So

25  tell me then what about your current employment, what

124

1   licenses does she have?

2       A.   440.

3       Q.   And that entitles her to --

4       A.   Customer service.

5       Q.   So can she write any kind of insurance?

6       A.   No.

7       Q.   Okay.  So --

8       A.   She can legally.  But I won't let her.

9       Q.   A 440 can write insurance?

10      A.   Ah huh, in the office.

11      Q.   Okay.

12      A.   But I will not let her write a policy at

13  all.

14      Q.   So she doesn't --

15      A.   No.  Because Mike is known to manipulate

16  support staff to go against the agent.  And I cannot

17  afford to have that happen to me.  So I do all the

18  writing of everything.

19      Q.   Okay.  And so what, she is just what?

20      A.   She can do service, add cars, take cars off

21  a policy, change name holders, change mortgage

22  holders, do vehicle inspections, take payments, and

23  do the remittance reports, answer telephones and

24  filing, that's it.

25      Q.   Okay.  In laymen's terms we wouldn't call

125

1    her my insurance agent?

2        A.    Correct.

3        Q.    That would be you?

4        A.    Yes.

5        Q.    Now, let me ask you a question.  This isn't

6    really about your agency, but is it true there are

7    some individuals who own their own agency, but they

8    hire enough licensed people where they personally

9    don't always, they don't even go to the office

10   themselves, does that ever happen?

11       A.    Yes.  Because I have to service all their

12   customers.

13       Q.    Okay.  So what I'm saying is it would be in

14   theory possible to have the Linda Zink Agency, but

15   you have licensed people who are eligible to write

16   the insurance, and if you are lucky enough you get to

17   stay home and put your feet up, that's a possibility,

18   correct?

19           MR. ACKERMAN:  I'm going to object to the

20       form of the question.

21           THE WITNESS:  Yes, but not with me.

22   BY MS. CESARANO:

23       Q.    No, not with you.  But I'm just, I guess I

24   shouldn't have used you as an example.  It is

25   possible to say have Tom Brown --

126

```
 1      A.   They do --
 2           MR. ACKERMAN:  Let her finish the question.
 3           THE WITNESS:  Okay.
 4   BY MS. CESARANO:
 5      Q.   So it is possible say Tom Brown can have
 6   the Tom Brown Agency, insurance agency, it is a
 7   corporation, employ enough people, assuming he could
 8   afford to do that, to run the agency, and he
 9   personally is at home watching television, that's a
10   possibility?
11           MR. ACKERMAN:  Object to the form.
12   BY MS. CESARANO:
13      Q.   Is that true?
14      A.   Yeah.
15      Q.   Because it is like a corporation, it is a
16   business, correct?
17           MR. ACKERMAN:  Object to the form.
18           THE WITNESS:  But that's not the reason why
19      it's happening.
20   BY MS. CESARANO:
21      Q.   No, no, this has nothing to do with you.
22   This is just in theory.
23      A.   No.  I'm saying that is not the reason it's
24   happening with the agents.  They hate it.
25      Q.   Okay.
```

127

```
 1        A.   So they just let their girls run it.  And
 2   then when they can't do anything, they send them down
 3   to me.
 4        Q.   Okay.  So there are people like that --
 5        A.   Oh, yeah.
 6             MR. ACKERMAN:  Object to the form.
 7   BY MS. CESARANO:
 8        Q.   -- that I am describing?  I want to do the
 9   complete question.
10             So there are people who are licensed to
11   sell the insurance and they own the agency, but they
12   choose because maybe they don't like insurance to
13   stay home and have their employees run the agency?
14        A.   Yes.
15             MR. ACKERMAN:  Object to the form.
16   BY MS. CESARANO:
17        Q.   And assuming the agency were profitable,
18   there was nothing in the Allstate policies or
19   procedures that forbids that from happening, isn't
20   that right?
21        A.   Oh, no, that's not true.  You have to, I
22   forgot the exact wording, but you have to maintain a
23   working relationship within the company and within
24   your agency.  They don't want you just disappearing
25   off the face of the earth.
```

128

1    Q.   Okay.  But isn't it true it's their --

2    A.   They are doing it.

3         MR. ACKERMAN:  Wait, wait.  She needs to

4    ask the question.

5         THE WITNESS:  Okay.

6         MR. ACKERMAN:  So you need to wait to

7    answer.

8  BY MS. CESARANO:

9    Q.   Back to your point.  So there are in fact

10 people that are doing it, and they still are allowed

11 to continue with their agency?

12        MR. ACKERMAN:  Object to the form.

13 BY MS. CESARANO:

14   Q.   "Doing it" meaning, let me define that,

15 that they essentially have staff that are licensed

16 that are capable of selling the insurance, and they

17 don't have to be there all the time, is that true?

18        MR. ACKERMAN:  Object to the form.

19        THE WITNESS:  It's really not true.

20 BY MS. CESARANO:

21   Q.   Well, does it happen?

22        MR. ACKERMAN:  Object to the form.

23        THE WITNESS:  In my area it is happening.

24   Where ever else in the state I don't keep up

25   with those people.

129

BY MS. CESARANO:

1

2      Q.   Name me where it is happening when you have

3  something in mind?

4      A.   It will go right back to those people now.

5      Q.   You are under oath.  You have to answer the

6  question.

7           MR. ACKERMAN:  Just answer it.

8           THE WITNESS:  Tim McGlynn and Roy Childs.

9  BY MS. CESARANO:

10     Q.   And are those two separate agencies?

11     A.   No.  They are agents together.  And the

12  other one is Kevin Walker, he was hired in Stuart by

13  Mike Collette.

14     Q.   Okay.  But they have their own agencies?

15     A.   Up the street from me, the location is up

16  the street from my office.

17     Q.   So the answer is, yes, they have their own

18  agencies?

19     A.   Yes.

20     Q.   Each one of those individuals?

21     A.   Yes.

22     Q.   Okay.  And they are, they run the agency

23  basically by using their staff to run it, is that

24  correct?

25           MR. ACKERMAN:  Object to the form.

130

```
 1            THE WITNESS:  I guess.
 2            MR. ACKERMAN:  Don't guess.  If you know,
 3       you know; if you don't, you don't.  I don't want
 4       you guessing.
 5            THE WITNESS:  I know Roy and Tim do, they
 6       are never there.
 7  BY MS. CESARANO:
 8       Q.   Okay.  Now, in terms of going back to your
 9  agency, the Zink Agency, do you basically run the
10  agency as best you can?
11            MR. ACKERMAN:  Object to the form.
12            THE WITNESS:  Well, not as best as I can.
13  BY MS. CESARANO:
14       Q.   Well, let me put it a different way.
15       A.   I could be better under the circumstances,
16  you know.
17       Q.   Let me make it simpler.  At Linda Zink
18  Agency does Linda Zink run the agency?
19       A.   Yes.
20       Q.   Do you have a supervisor there at the
21  agency that supervises what you do?
22       A.   No.
23       Q.   Would it be fair to say that selling
24  insurance is a specialized type of job in that you
25  need licenses to do it?
```

131

1    A.   Yes.

2    Q.   And those licenses require that you pass a

3  test given by the State Of Florida, Department Of

4  Insurance?

5    A.   Correct.

6    Q.   And I know that you started for Allstate in

7  1986.  Did you have prior insurance experience?

8    A.   No.

9    Q.   Okay.  How did you get the training in how

10 to sell insurance?

11   A.   There was this girl that worked at the

12 North Palm Beach store, her name was Laura Jackson,

13 and she trained me.

14   Q.   Okay.  And then when did you get your first

15 license to sell insurance?

16   A.   I started with Allstate in October of '86,

17 so that summer.

18   Q.   The summer before?

19   A.   The summer of '86.

20   Q.   And what license did you get at that time?

21   A.   Property and casualty and my life insurance

22 license.

23   Q.   Okay.  So two different licenses?

24   A.   Yes.

25   Q.   Okay.  In terms of describing what you do,

132

1    you know, at your agency as far as selling insurance,

2    tell me, just tell me a little bit about your

3    day-to-day job?

4         A.   Well, we open up in the morning, set

5    appointments, sell insurance.

6         Q.   What time do you open?

7         A.   8:00 o'clock.

8         Q.   Okay.  Do you set the time you open?

9         A.   Yes.

10        Q.   Okay.  Could you if you wanted to close the

11   office on a given day if you had --

12        A.   No.  Allstate controls all our hours that

13   we're open, days off --

14        Q.   You are supposed to be open --

15        A.   -- everything.

16        Q.   -- certain days of the week?

17        A.   Yeah, certain days, certain hours.

18        Q.   In terms of hours could you, could your

19   agency open at 9:00 o'clock instead of 8:00 o'clock?

20        A.   They only give us two choices, and we have

21   to stick with those.

22        Q.   Which are what?

23        A.   8:00 to 5:00 or 9:00 to 5:00 and you work

24   Saturdays, that's it.

25        Q.   Okay.  Do you have to work Saturdays?

133

1      A.    Not anymore.

2      Q.    Okay.  It's up to you?

3      A.    Yes.

4      Q.    And just so I'm clear, if you wanted to you

5  could be open on a Saturday say 9:00 to 12:00 if you

6  wanted to?

7            MR. ACKERMAN:  Object to the form.  Are you

8        talking about now as opposed to --

9  BY MS. CESARANO:

10     Q.    Now.

11     A.    I'm in there anyway.

12     Q.    Well, that's not the answer to the

13  question.  My question is if you decided to do it,

14  you could open --

15     A.    Okay.  You have to have, their rules state

16  you have to be there for their core hours, and their

17  core hours being 9:00 to 5:00.  So you can either

18  work 9:00 to 5:00 and work that Saturday, or 8:00 to

19  5:00 and not work the Saturday because you are making

20  up those four hours during the week.

21     Q.    Okay.  So there is a minimum hour

22  requirement?

23     A.    44 hours a week.

24     Q.    Okay.  Can you be open more than 44 hours

25  if you wanted to?

134

1          A.    We usually are.

2          Q.    You usually are.  Is that up to you?

3          A.    No.  It is because I have so much work to

4     do.

5          Q.    Okay.  That's fine.  You could decide not

6     to do that, so much work too, couldn't you?

7          A.    And then what, lose my agency?  I have to

8     do it.

9          Q.    Let me go back to the question.  You are

10    open the required 44 hours per week, okay?

11         A.    Yes.

12         Q.    My question to you is if you wanted to

13    could you open the office for say two extra hours on

14    Saturday?  These are extra hours.

15         A.    Yes.

16         Q.    Okay.  Do you do that, sometimes work more

17    than 44 hours?

18         A.    Sure do.

19         Q.    Okay.  Is the decision to work more than

20    the minimum 44 hours up to you, your decision?

21         A.    Not really.

22         Q.    Why --

23         A.    Someone has to complete this work.  There

24    is a lot of service work.

25         Q.    Yes.  But whose decision is it if it's not

135

1    your decision?

2         A.   Well, if I don't do it, they will have a

3    customer complaint, and that's just what Mike is

4    waiting for; he uses the system against me.  That's

5    why they are sending all of those customers to me to

6    service.

7         Q.   Isn't having customers good?

8         A.   Not when it's just for service.

9         Q.   That's bad, tell me why that's bad?

10        A.   Not when it is just to have someone

11   translate Spanish to English or English to Spanish.

12        Q.   Well --

13        A.   Because I have my clients too, and I would

14   like to increase my client basis.  And I don't mind

15   writing their insurance policies.

16             But what he is doing is he's having those

17   agents send the customers to me that they don't want

18   to answer the questions.  Like, for example, last

19   week they sent a lady to me because they --

20        Q.   Who is "they"?

21        A.   Kevin Walker and his support staff, sent a

22   customer to me because she had a rate increase on her

23   homeowners, and he didn't want to explain it to her.

24   When she said what should she do, the support staff

25   said to her, Go see Linda Zink at Hobe Sound, she

136

1    will explain it to you.

2        Q.   Okay.  And is there a reason why you, was

3    there a language issue?

4        A.   No, not at that, not with that customer.

5        Q.   Okay.  Do you speak Spanish?

6        A.   No.  But Patty does.

7        Q.   Patty speaks, your staff member speaks

8    Spanish?

9        A.   Yes.

10       Q.   Okay.  Are there some offices where there

11   are employees, are there some offices where there is

12   no one who can speak Spanish?

13       A.   I believe so.

14       Q.   Okay.

15       A.   Obviously they are sending them to me.

16       Q.   Okay.  So the offices where there is no one

17   to speak Spanish might send you, might send the

18   customer to your office because Patty knows how to

19   speak Spanish, is that correct?

20           MR. ACKERMAN:  Object to the form.

21           THE WITNESS:  Say that again.

22   BY MS. CESARANO:

23       Q.   An office that has no one who speaks

24   Spanish sends a Spanish-speaking customer to your

25   office so that Patty can translate, is that correct?

137

1      A.    That's correct.

2      Q.    Okay.  And you have a problem with that?

3      A.    Yes, I do.

4      Q.    Okay.  But if I'm an Allstate customer and

5  I only speak Spanish, aren't I entitled to have

6  Allstate help me?

7      A.    I am more than happy to help Allstate, but

8  when I know it is generated from Mike Collette to

9  interfere with my job, then it's very disheartening.

10     Q.    Okay.  What evidence do you base that on?

11     A.    We have documentation, we ask the customer

12 straight out, Why are you here, or, Why did you come

13 here?

14     Q.    Okay.  What does the customer say?

15     A.    The customer says, The man in the office,

16 or, Kevin Walker, or, The man that was in

17 Kevin Walker's office, we were told that, and the

18 girl, the lady whose name is Jane said to come to

19 your office.

20     Q.    Now, Kevin Walker, if he sent the person,

21 why is that Mike Collette's fault?

22     A.    Because Mike Collette is the one that hired

23 him, and he works with Kevin Walker.

24     Q.    Mike Collette --

25     A.    Mike uses the system to get to me.

138

 1      Q.   Okay.  Mike Collette works with

 2   Kevin Walker?

 3      A.   Yes.  Mike Collette hired him out of

 4   district.

 5      Q.   Are they in the same office?

 6      A.   I don't think Mike has an office.  He just

 7   goes from office to office and works out of the

 8   agents' offices.

 9      Q.   Okay.  So Kevin Walker is in his own

10   office?

11      A.   Yes.

12      Q.   But if Kevin Walker sends a customer to

13   you, you attribute it to Mike Collette?

14      A.   When we ask them and we are told so.

15      Q.   Okay.  But what if the customer says, as

16   you said, Kevin Walker sent me?

17      A.   We come right out and ask, Was anybody else

18   in that office with you?  And there has been a couple

19   times, Yes, there was another man there.  See, they

20   don't know what that is, because now, we're --

21      Q.   Before you go on, how do you know the man

22   is Mike Collette?

23      A.   Who else is in the office with him?

24      Q.   They didn't say it was Mike Collette,

25   right?

139

```
 1        A.    I can't go up there.  I'm in my office
 2   working.  I can't go do my own investigation.
 3        Q.    Right.  So you can't prove it was
 4   Mike Collette?
 5        A.    No.  But when Kevin Walker is subpoenaed
 6   and he has to sit there and tell the truth.
 7        Q.    That's what you think, but you can't prove
 8   it, correct?
 9             MR. ACKERMAN:  Object to the form.
10             THE WITNESS:  I think it can be proved.
11   BY MS. CESARANO:
12        Q.    But do you have the evidence as you sit
13   here today to prove that it was Mike Collette?
14        A.    I may very well.
15        Q.    Well, we're just at one specific instance.
16        A.    Right.
17        Q.    You said the customer didn't name
18   Mike Collette because --
19        A.    No, he didn't name him.  Who else would it
20   be?
21        Q.    Okay.
22        A.    See.
23        Q.    Okay.  I'm going to finish up these.  These
24   are about visiting your agency, your office, some
25   more questions.  And then before we get to the sexual
```

140

1    harassment I want to finish this up.

2         Okay.  Who owned, does the Zink Agency own

3    its own office equipment and furniture?

4         A.   Like my filing cabinets and the desk and

5    stuff, yeah, I had to buy that.

6         Q.   Does the Zink Agency own the computers it

7    uses?

8         A.   Yes.

9         Q.   Does the Zink Agency own, own or lease its

10   telephones?

11        A.   I don't know about the phones.  One of the

12   computers in the office is mine, two of them are

13   Allstate's computers.

14        Q.   Okay.  And why are there two, do they

15   belong to Allstate?

16        A.   Yes.

17        Q.   I thought when the Zink Agency took over it

18   purchased all the equipment in the office?

19        A.   The chairs, the desks and the filing

20   cabinets.

21        Q.   Is a, yes, right?

22        A.   Yes.  That's all they offered.  They didn't

23   offer the computers.

24        Q.   Okay.  What about, well, do you pay

25   anything to Allstate to use the computers or to lease

141

1   the computers?

2        A.    I used to.  But I gave it back.

3        Q.    But you used to when your agency started?

4        A.    I needed an extra computer.  And I, they

5   charge me for it.

6        Q.    Okay.  So you paid Allstate for the use of

7   the computer?

8        A.    Right.

9        Q.    And when I say "you" I meant your agency,

10  correct?

11       A.    Yes.

12       Q.    Does your agency pay to either own or lease

13  the Xerox machines?

14       A.    No.

15       Q.    Do you have any Xerox machines?

16       A.    Like a little one from Staples.

17       Q.    Okay.  Did you buy that?

18       A.    Yeah.

19       Q.    And your agency purchased it?

20       A.    I bought it.

21       Q.    Okay.  Did you buy it after you started the

22  agency?

23       A.    This one I'm on.

24       Q.    This particular copier?

25       A.    A year.

142

1      Q.    The answer is, yes?

2      A.    Yes.

3      Q.    And what about the fax machine or machine,

4   do you have a fax machine?

5      A.    The fax machine is probably ten years old.

6      Q.    Okay.  Does the agency own the fax machine,

7   your agency?

8      A.    I don't know.

9      Q.    Okay.  What about supplies, when you

10   purchase paper or pens or whatever supplies you need

11   to run the agency, does the agency pay for that?

12      A.    Yes.

13      Q.    Okay.  So as a general I guess --

14      A.    It's the same as before.  I have always

15   bought the pens and paper, whatever.  The only thing

16   that Allstate gives us is the Allstate computer

17   paper.

18      Q.    They supply that to you?

19      A.    Yes, because it has their Allstate logo on

20   it.

21      Q.    Do you pay them for it?

22      A.    No.

23      Q.    They don't invoice you for it?

24      A.    I have never gotten one yet.

25      Q.    Okay.  So that's free from Allstate?

1      A.   I hope so.

2      Q.   But are the rest of the equipment and

3   supplies that you need to run the office paid for by

4   the Zink Agency?

5      A.   Yes.

6      Q.   Now, the employees that we talked about

7   before that you named three or four people that have

8   worked for the Zink Agency, did you hire those people

9   yourself?

10     A.   Yes.

11     Q.   Did you interview them?

12     A.   Yes.

13     Q.   And did you, how did they come to you, for

14   example, did you place an ad in the newspaper?

15     A.   We weren't allowed to place ads in the

16   newspaper.

17     Q.   So how did you --

18     A.   Christy came to me because she called for a

19   quote one day as she was moving to Hobe Sound from

20   Alabama.   I said, Oh, do you have your Allstate

21   policy number?

22          And she goes, Yeah, I can look it up on the

23   computer.   I said, what do mean?   She said, I work

24   for Allstate now.   I said, No kidding.   What are you

25   going to do when you get here?   She goes, I don't

1    know, I didn't think about it.

2            And so she came on a weekend to find a

3    place to live with her husband, and I hired her.

4        Q.   Okay.  Did you do that solely on your own

5    without consulting with anybody else?

6        A.   As far as I know.  I mean you still have to

7    fill out the papers for Allstate to approve them.

8        Q.   Right.  And I assume Allstate would want to

9    make sure that they have their license, correct?

10           MR. ACKERMAN:  Object to the form.

11           THE WITNESS:  Actually I don't think

12       Allstate does check to see if they have their

13       license or not to be honest with you.

14   BY MS. CESARANO:

15       Q.   Do you check to make sure they have their

16   license?

17       A.   Yeah, because I have to sign her

18   appointment.

19       Q.   What's an appointment?

20       A.   That her license is, it's like a request to

21   get her license transferred from Alabama to Florida.

22       Q.   And you did that?

23       A.   Well, after we did it all it turned out

24   that they would not accept Alabama as a border

25   state.  So she had to go sit for a quick class, and

145

1   they gave it to her, that was her situation.

2        Q.   Okay.  But you filled out the paperwork to

3   request Alabama --

4        A.   She has to, she had to do it.

5        Q.   Okay.  You didn't have to sign it?

6        A.   I signed something that went to human

7   resources and sent it with her license.  And then,

8   maybe they do the last of the signing for the

9   appointment.

10       Q.   Okay.

11       A.   There is a process.

12       Q.   But my question is assuming that the person

13  that you hire has all the appropriate licenses --

14       A.   Right.

15       Q.   -- and a good background check, then it is

16  up to you to choose who you want to work at your

17  office?

18            MR. ACKERMAN:  Object to the form.

19            THE WITNESS:  Well, that's the whole

20       thing.  Initially it's up to me.  But remember

21       Allstate has that final say.

22  BY MS. CESARANO:

23       Q.   They can veto?

24       A.   Oh, yeah, somebody's background check.

25  Like bad credit is the criteria.  There are a couple

146

1    of things.  I haven't run into it, so I have heard of

2    it running into other people.

3         Q.   Maybe a criminal background would make it

4    so they couldn't get hired, is that right?

5              MR. ACKERMAN:  Object to the form.

6              THE WITNESS:  There is a list of a couple

7         of different things.  But like I said, I never

8         had that problem anyway.

9    BY MS. CESARANO:

10        Q.   So of these say four or five people that

11   you hired, everybody was approved, there was no

12   problem?

13        A.   Yes.

14        Q.   Did anyone from Allstate participate in the

15   interviews of these employees that you hired?

16        A.   No.

17        Q.   And in terms of a receptionist, do you have

18   anyone like that, an assistant or receptionist who is

19   unlicensed?

20        A.   No.

21        Q.   Not currently?  Did you have in the past?

22        A.   Just Lorraine, but she worked in the back.

23        Q.   When you say "in the back" what do you

24   mean?

25        A.   The filing, the copying, stuffing the bags

147

1    that, you know, promotional items, things like that,

2    getting things ready for seminars that I gave.  She

3    was just part-time.

4        Q.   Okay.  And again you made the decision to

5    hire someone part-time?

6        A.   Oh, yeah.

7        Q.   And I assume that was pretty much a minimum

8    wage employee?

9        A.   What's minimum wage?

10       Q.   Let me ask it a different way.  I will take

11   that question back.

12            Do you remember what you paid her per hour?

13       A.   No.  But it wasn't minimum.

14       Q.   Okay.  Was it under $10 an hour?

15       A.   Yes.

16       Q.   And in terms of having that kind of

17   part-time help, filing and, you know, stuffing

18   things, you, that's a decision that's up to you,

19   right, whether to have that person or not have that

20   person?

21       A.   Yes.

22       Q.   Now, going back to 19 -- well, scratch

23   that.  In terms of the commission checks that you get

24   from Allstate beginning in July of 2000 when your

25   agency started, tell me how you get those checks?

1       A.   I don't get a check.  They put it in my
2   account.
3       Q.   It is a direct deposit?
4       A.   Yes.
5       Q.   Okay.  Are those commissions calculated on
6   a monthly basis?
7       A.   Yes.
8       Q.   And when you say they deposit it into your
9   account, is the account that the Zink Agency has with
10  the bank?
11      A.   Yes.  Allstate made us set it up that way.
12      Q.   So what bank is it that the deposit goes
13  to?
14      A.   Bank Atlantic.
15      Q.   Okay.  And at Bank Atlantic you have an
16  account for the Zink Agency, correct?
17      A.   Yes.
18      Q.   And so the commission money is paid by
19  Allstate to the agency, correct, your agency?
20      A.   Yes.
21      Q.   Not to you personally?
22      A.   Correct.
23      Q.   And in terms of your wages, your personal
24  wages, does the Zink Agency pay you as Linda Zink, an
25  individual, the wages?

149

1      A.    Yes.

2      Q.    Now, in terms of what you personally get

3  from the agency, how do you set that, how is that

4  determined?

5      A.    I just get the same check every two weeks.

6      Q.    Okay.  And what is that, you mean it

7  doesn't matter how many policies you sell?

8      A.    Like what do you mean?

9      Q.    Let me back up.  You said you get the same

10  check every two weeks?

11     A.    Yes.

12     Q.    Okay.  And what is that amount?

13     A.    $1500.

14     Q.    And that's the gross amount?

15     A.    I think so.

16     Q.    Okay.  Are taxes taken out from that?

17     A.    Yes.

18     Q.    Just like a regular paycheck?

19     A.    Ah huh.  Maybe it is only 1200.

20          MR. ACKERMAN:  Object to the form.

21          THE WITNESS:  No.  It's 1500.

22  BY MS. CESARANO:

23     Q.    It's 1500 every two weeks.

24     A.    Ah huh.

25     Q.    In terms of that amount, let's say it's

150

1  1500, did you set that amount for the agency to pay

2  you?

3      A.   Well, the girl at ADP kind of helped me

4  with that.

5      Q.   Okay.  And ADP is what, a payroll agency?

6      A.   The payroll company.

7      Q.   Okay.  But the ultimate decision that a

8  good amount was $1500 was yours, is that correct?

9      A.   Yes.

10      Q.   Now, is the $1500 every two week amount,

11  let's say you go to the end of the year, okay, let's

12  say it was a wonderful, profitable year; are you able

13  to pay yourself more at the end of the year out of

14  the profitability of the agency?

15      A.   Yes.

16      Q.   Okay.  Have you ever done that?

17      A.   Twice.

18      Q.   You have done it twice, okay.  Let's go to

19  the end of the year of 2000.

20      A.   Well, I don't think I did it last year.

21  Maybe I did.  I don't think was it it was the end of the

22  year though.

23      Q.   Let's take one at a time.  Let's take the

24  end of the year if you recall.  So now we are at the

25  end of the year of 2000.  Did you decide at the end

151

1    of that year that the agency could afford to give you

2    some extra money as wages?

3              MR. ACKERMAN:  Object to the form.

4              THE WITNESS:  Well, I don't think I made

5         that decision.  I think maybe that's when I

6         changed from 12 to 1500.

7    BY MS. CESARANO:

8         Q.   Okay.  So you raised the amount you would

9    get every two weeks?

10        A.   Yes.

11        Q.   And that would be effective for the year

12   2001?

13        A.   Yes.

14        Q.   Okay.  And you made that decision?

15        A.   Well, my accountant made it.

16        Q.   Okay.  But you hired the accountant,

17   correct?

18        A.   Yes.

19        Q.   And I take it the two of you discussed it

20   before, I mean he didn't unilaterally make that

21   decision, correct?

22             MR. ACKERMAN:  I'm going to object.  Excuse

23        me.  I'm going to object on accountant-client

24        privilege.

25             MS. CESARANO:  Well, the only one that

152

1          applies to this is attorney client.  I mean the

2          setting of the wages directly is relevant to

3          this lawsuit.

4                THE WITNESS:  Wait.  Say that again.

5    BY MS. CESARANO:

6          Q.   I said the wages and everything are

7    directly relevant if nothing else to damages.

8                MR. ACKERMAN:  You can ask her if she said

9          it or not.  I don't think you can ask her what

10         her communications were with her accountant,

11         that's privileged.

12   BY MS. CESARANO:

13         Q.   Okay.  After consulting with your client

14   did you then decide at the end of 2000 to raise the

15   amount from $1200 to $1500 per week for your wages?

16         A.   Every two weeks.

17         Q.   Every two weeks, yes, with that

18   correction.  Did you decide to do that?

19         A.   That wasn't my decision.  It was her

20   decision.

21         Q.   "Her" meaning the accountant's --

22         A.   Yes.

23         Q.   -- decision?

24         A.   She said it would give me more money to

25   spend, more cash flow.

153

```
 1        Q.   Okay.  But this is your agency's money?
 2        A.   Correct.
 3        Q.   Your accountant has no right to spend your
 4   agency's money unless you authorize it, correct?
 5        A.   I guess so.
 6        Q.   And in terms of the paychecks that are
 7   issued to your employees, does that money come from
 8   the agency's funds, the Zink Agency's funds?
 9        A.   To pay Patty?
10        Q.   Yes.
11        A.   Yes.  You asked me that.
12        Q.   Now, currently you are under the, or what's
13   called the R3001 agreement, is that correct?
14        A.   Yes.
15        Q.   And isn't it true that if you decided, for
16   whatever reason, to terminate that agreement, you
17   would have to give 90-days notice to Allstate, is
18   that right?
19        A.   From what I understand it's correct.
20        Q.   Okay.  And isn't it also the case that if
21   Allstate wanted to terminate the agreement, they
22   would be required under the agreement to give you
23   90-days notice also?
24             MR. ACKERMAN:  Object to the form.
25             THE WITNESS:  I think that's how it is.
```

154

1   BY MS. CESARANO:

2       Q.   Okay.  It's in the agreement whatever it

3   is, correct?

4       A.   I would hope so.

5       Q.   Is your understanding the agreement does

6   cover the idea of termination?

7       A.   I know there is something about termination

8   pay.

9       Q.   Okay.  Now, in terms of vacation, for

10  example, let's say you decide you want to go on a,

11  take a week off, well, make it happen?

12      A.   It doesn't happen.

13      Q.   Let me make it easier.  You decide you want

14  to take one day off for some reason; that's your

15  decision, isn't it, to be able to take that one day

16  off?

17      A.   Yes.

18      Q.   Okay.  You don't have to ask someone's

19  permission at Allstate and get approval to take a day

20  off?

21      A.   Right.

22      Q.   And, similarly, if you decide to work extra

23  hard and work extra hours, that's also your decision,

24  correct?

25      A.   Yes.

155

1      Q.    And if you did make the decision to work

2  extra hard and extra hours, it would be with the idea

3  that your agency would be more profitable, and then

4  eventually you would earn more money, correct?

5      A.    Well, that was my ultimate goal.  But now

6  I'm doing it just to defend myself.

7      Q.    Well --

8      A.    That's what I'm doing now.

9      Q.    Why do you say that?

10     A.    Because of all the things that are

11  happening.

12     Q.    Okay.  Maybe you can explain.

13     A.    Such as the different agents always coming

14  into my office trying to buy my agency from me, you

15  know, trying to buy me out, trying to buy me out

16  early.

17     Q.    Let's talk a little bit about that.  You

18  obviously think that's a bad thing, correct?

19     A.    Yes.  Because the reason why it's happening

20  Mike Collette is sending the people, actually

21  Richard Lott sent one too, and so did Jeff Kaufman,

22  that's so Mike can get a promotion and become a

23  territorial agency manager.  And he can't get that

24  position if I'm still here.

25     Q.    Why do you say that?

156

1        A.    Because I have a sexual harassment suit

2   against him.

3        Q.    Okay.

4        A.    And you can't be over somebody's super, you

5   can't be a supervisor over someone if you have a case

6   against them.

7        Q.    Okay.  Now, let's just assume someone did

8   buy your agency, okay; you would still have the

9   sexual harassment suit if you wanted to continue

10  pursuing that, wouldn't you?

11       A.    I guess so.

12       Q.    Okay.

13            MR. ACKERMAN:  I'm going to object to the

14       extent that she has to give a legal opinion on

15       that.

16            MS. CESARANO:  That's not a legal opinion.

17  BY MS. CESARANO:

18       Q.    I'm asking her if you wanted to pursue this

19  claim selling of an agency or even buying another

20  agency has nothing to do with that, isn't that right?

21            THE WITNESS:  Well, why should I let him

22       push me out?  This is my job.

23            MR. ACKERMAN:  I object to the form.

24            MS. CESARANO:  Let me rephrase it.

25  BY MS. CESARANO:

157

```
 1        Q.    Isn't it true that you don't have to sell
 2   your agency?
 3        A.    Well, yeah, I don't have to.
 4        Q.    Okay.  It's your decision whether to --
 5        A.    Yeah.  And I'm not going to.
 6        Q.    Okay.  And you can say that to the
 7   potential buyer, can't you?
 8        A.    And I do.
 9        Q.    Okay.
10        A.    I keep telling them.
11        Q.    Okay.  So they want to buy, but you don't
12   want to sell?
13        A.    Exactly.
14        Q.    But again that's completely up to you?
15        A.    Correct.
16        Q.    Okay.  Allstate has never told you you must
17   sell your agency, have they?
18        A.    No.
19        Q.    Okay.  Now, you mentioned retirement
20   benefits.  The ones that you had earned up until
21   July 1, 2000, those are frozen you called it I think?
22        A.    Yeah, retirement like frozen.
23        Q.    Pension?
24        A.    Pension.
25        Q.    Is that true?
```

158

1      A.    As far as I know it's sitting up there in

2   Chicago.

3      Q.    Okay.  So it is your money but it's

4   stopped?

5      A.    They froze it.  And Allstate makes money

6   off of it, and I don't.

7      Q.    Okay.  Well, are you sure of that?

8      A.    Yeah.

9      Q.    Are you sure it's not earning interest for

10  you?

11     A.    Yeah, it's not.

12     Q.    But it's still your money?

13     A.    I was also supposed to be able to get that

14  to age 55, and now they are making me wait until 65

15  to get it.

16     Q.    Okay.  But it's your money, correct?

17     A.    Not anymore, not until I'm 65.

18     Q.    Well, that --

19     A.    If I live that long.

20     Q.    You understand that federal law has

21  something to do with the rules about people taking

22  out their -- let me finish -- their pension and 401-K

23  money?

24     A.    No.

25           MR. ACKERMAN:  Don't answer any questions

1           with regard to federal laws.

2    BY MS. CESARANO:

3           Q.    Okay.   Is it possible that there are laws

4    that govern pension and retirement benefits?

5                 MR. ACKERMAN:   I'm going to object if she

6           has to speculate.   If you know, you can answer.

7                 THE WITNESS:   Well, I do know that pension

8           benefits and welfare associations are

9           investigating Allstate right now for doing it.

10   BY MS. CESARANO:

11          Q.    Okay.   You know that?

12          A.    Yes, I do know that.

13          Q.    Would that mean that there are laws that

14   apply then?

15                MR. ACKERMAN:   Object to the form.

16                THE WITNESS:   I don't know.

17   BY MS. CESARANO:

18          Q.    Okay.   Once you began your agency in July

19   of 2000 did you continue to receive retirement

20   benefit money from Allstate?

21          A.    After July, 2001?

22          Q.    Yes, 2000.

23          A.    No.

24          Q.    Okay.   So you are not accumulating any

25   retirement benefits from Allstate now?

160

```
 1        A.   Correct.

 2        Q.   Now, in terms of your Social Security

 3   taxes, who pays those do you know?

 4             MR. ACKERMAN:  Objection to form.

 5             THE WITNESS:  ADP.

 6   BY MS. CESARANO:

 7        Q.   Okay.  Well, ADP is just, they administer

 8   the payroll, correct?  Does the money come from the

 9   Zink Agency as far as paying for Social Security

10   benefits and other benefits for you --

11        A.   Yes.

12        Q.   -- and Patty?

13        A.   Yes, I have to pay for everything though.

14   That was another thing Allstate took away.

15        Q.   Including all payroll taxes that are

16   required on wages, correct, your agency pays for the

17   payroll taxes?

18             MR. ACKERMAN:  Object to the form.  For who

19        are we talking about?

20             MS. CESARANO:  For her and Patty.

21   BY MS. CESARANO:

22        Q.   Isn't it true that the agency pays the

23   payroll taxes that are required on all wages paid to

24   you and Patty?

25        A.   Yes.
```

161

1          (The document is marked as Defendant's

2     Exhibit No. 28 for identification.)

3 BY MS. CESARANO:

4     Q.    I'm going to show you what has been marked

5 as Exhibit 28, it is a letter to you dated

6 February 6, 2001 signed by Sandra Sellers.  Do you

7 recall receiving that document?

8          (The witness reviews the document.)

9     A.    Ah huh.

10    Q.    You do?

11    A.    Yes.

12    Q.    And just, you know, look through the

13 packet; does that look like the packet of materials

14 that came with the letter?

15          (The witness reviews the document.)

16    A.    Yes.

17    Q.    Okay.

18    A.    It was the kickoff meeting I did not

19 attend.

20    Q.    Okay.  So you received the materials that

21 were presented at that meeting that you did not

22 attend, correct?

23    A.    Right.

24    Q.    Okay.  And did you look through these

25 materials that you received from Sandra Sellers?

162

1      A.    Yes.

2      Q.    Okay.  And I think you will notice in the

3  materials actually that your name is in here as

4  receiving certain honors and awards?

5      A.    Yes.

6      Q.    Did you see that?

7      A.    Yes.

8      Q.    So in terms of that telephone conversation

9  we talked about before with Helen, you know, where

10  you complained that I didn't get certain awards --

11      A.    Yes.

12      Q.    -- this packet seems to verify that in fact

13  you were, you were recognized in writing as being

14  eligible for the award and having received the award?

15      A.    Well, eligible but did not receive the

16  award.

17      Q.    Okay.  Well, isn't it true that a lot of

18  the people pick up their awards in person?

19      A.    No.

20      Q.    Most of them don't?

21      A.    No.  They give them to you here.

22      Q.    Where is "here"?

23      A.    At the meeting, at this big meeting.

24      Q.    Well, that's what I guess I'm saying.  So

25  if you attended this meeting they gave out these

163

```
 1  awards, correct?

 2       A.   Yes.

 3       Q.   But you didn't attend?

 4       A.   No.

 5       Q.   So if you had been there, you would have

 6  got the award, correct?

 7       A.   Yes.

 8       Q.   Okay.

 9       A.   And that's what she was looking into.

10       Q.   Okay.  Fine.  So at least in part it seems

11  that you didn't physically get the award because you

12  didn't go to this particular meeting, is that right?

13            MR. ACKERMAN:  Objection.

14            THE WITNESS:  No, not necessarily true.  So

15       I didn't go to the meeting, so what, they still

16       can give it to me.

17  BY MS. CESARANO:

18       Q.   I'm not arguing about that.  I'm just

19  saying if you had been then the likelihood is, like

20  everybody else.  You would have got the same award,

21  correct?

22            MR. ACKERMAN:  Object to form.

23            THE WITNESS:  If they were handed out at

24       this meeting.

25  BY MS. CESARANO:
```

164

```
 1       Q.   Okay.  I know you weren't there.  But is it
 2   your understanding that the awards are handed out at
 3   this meeting?
 4            MR. ACKERMAN:  Objection to the form.
 5            MS. CESARANO:  You are objecting to every
 6        single question.
 7            MR. ACKERMAN:  You are asking her to
 8        speculate.  I don't want her to speculate.
 9            MS. CESARANO:  She can say either she
10        doesn't know.  She's not telling me she is
11        speculating.
12            MR. ACKERMAN:  I'm objecting to the form
13        because the question calls for speculation.  I
14        can say that or I can say object to the form.
15            MS. CESARANO:  It is making this longer.
16            MR. ACKERMAN:  I don't think it is.
17            MS. CESARANO:  Yes.
18   BY MS. CESARANO:
19       Q.   Do you know of anyone who did get their
20   award who attended this?
21       A.   At this meeting?
22       Q.   Yes.
23       A.   No.
24       Q.   You don't know of anybody?
25       A.   No.  That's what Helen was checking into.
```

165

1      Q.   Okay.  Did you review these materials after

2  you got them?

3      A.   Yes.

4      Q.   From Sandra?

5      A.   Yes, last year I did.

6      Q.   Sometime after February, 2001 after you

7  received them?

8      A.   Yeah.

9      Q.   Shortly after you received them?

10     A.   Maybe even that day.

11     Q.   What is the number on that, 28?

12     A.   28.

13     Q.   This exhibit, No. 28 mentions some trip in

14  there that you won I think, did you see that?

15     A.   Probably.  I won many trips.

16     Q.   You did, okay.  Like, for example, here is

17  one.

18     A.   I didn't go.

19     Q.   Did you get points instead?

20     A.   Yes, I did.

21     Q.   Okay.

22     A.   That's all I got though.

23     Q.   Okay.

24     A.   I didn't get the plaque and everything that

25  you are supposed to get with that.

166

1       Q.    But if somebody wins a trip, you or anybody

2  else --

3       A.    Yes.

4       Q.    -- then you have the option to get the

5  points instead, correct?

6       A.    But if you look at these people.

7       Q.    First answer my question.  Is that correct?

8       A.    Yes.  But if you look at the people that

9  are there, these people are all friends of Paul and

10  Mike Collette were going to go into an agency.

11  Mary Payne and Mike Collette and her dad are friends,

12  Sam Toludo, they go way, way back, Mike DeRosa used

13  to be friends, they were at this point, I think they

14  were.  Not really quite sure anymore.

15          It had a whole thing to do with Olga.

16  Bob Cavanaugh.  Why would I go on these trips?

17  Tim McGlynn lives right across the street who is

18  drinking buddies with Mike Collette.  Why would I win

19  a trip to Vancouver, British Columbia and go with

20  these people?  I wouldn't.  I took the points

21  instead.

22       Q.    I understand.  You but you could have gone

23  had you wanted to, correct?

24       A.    I could have gone if these people weren't

25  there.

```
 1       Q.   I know.  You had your reasons.

 2       A.   Yes.

 3       Q.   But it was your decision not to go?

 4       A.   Right.

 5       Q.   And when we say "points", what points did

 6  you get instead of getting that trip?

 7       A.   I have no idea.

 8       Q.   Is it a number of points, like they tell

 9  you it is seven points, 20 points?

10       A.   It was a number, but I don't know what it

11  was.

12       Q.   What can you do with the points once you

13  get them, what are they good for?

14       A.   Well, they are good for different things.

15  But I just usually use my T.J. Max.

16       Q.   Okay.  So you can buy what?

17       A.   And maybe Fridays I think you can go to.

18       Q.   So you can buy food at restaurants with

19  them?

20       A.   Yeah.

21       Q.   I don't know if there was another trip in

22  here.  Do you remember if there was another one you

23  won besides the Vancouver trip?

24       A.   I don't know.  I won quite a few things.  I

25  know.  I didn't go to honor ring, that dinner when
```

168

1    they had that because of Mike.  And one of the

2    reasons I didn't want to go to this is because of the

3    restraining order that I had against him.

4           And Mike sat right there with the regional

5    vice-president at this meeting like, you know,

6    nothing happened or nothing had been done wrong, he

7    had done nothing wrong.  That's what I don't need to

8    subject myself to.

9           Yes, there is another trip, Orlando, I

10   didn't go on that one.

11       Q.   And that was your decision not to go on

12   that one?

13       A.   I cannot see sitting in the same room with

14   that man nor some of the people that he associates

15   with.

16       Q.   So that's a, yes, that was your decision?

17       A.   Yes.

18       Q.   Now, let me ask you something.  You

19   mentioned a restraining order which we are going to

20   get to.  Are you saying, are you trying to say that

21   the restraining order would have prohibited

22   Mike Collette from attending these meetings?

23       A.   No.

24       Q.   Okay.  So that part you say is okay?

25       A.   It kept me from going.

169

1      Q.   But that was your decision?

2      A.   No.  Because when I talked to the man from

3   the EEOC who gave me my right to sue he told me

4   because of the restraining order the way they look at

5   it or a way a police officer could look at it too is

6   I should stay away from him as well.

7      Q.   Okay.  So your understanding was you should

8   stay away from Mike Collette, is that how you

9   understood it?

10     A.   Yeah.  But I would anyway.

11     Q.   With or without the order?

12     A.   Yes.

13     Q.   All right.  That's enough of the packet.

14  So the long and the short of it is if there were any

15  trips in there you didn't go on these trips?

16     A.   Right.

17          MS. CESARANO:  Could I get this marked

18     please.

19          (The document is marked as Defendant's

20     Exhibit No. 29 for identification.)

21  BY MS. CESARANO:

22     Q.   I'm going to show you what has been marked

23  for identification as Exhibit 29; do you recognize

24  that as your W-2 Form?

25          (The witness reviews the document.)

170

1      A.    Yeah.

2      Q.    Okay.  For the year what, 2000?

3      A.    What does it say?  I don't see it, do you?

4  Oh, okay, yes, 2000.

5      Q.    Okay.  That's fine.  You have seen that

6  form before, correct?

7      A.    Allstate gives them, yes.

8      Q.    And in fact you provided this to me,

9  correct?

10     A.    Yes.  You asked for it, correct.

11           MS. CESARANO:  No. 30.

12           (The document is marked as Defendant's

13     Exhibit No. 30 for identification.)

14           MR. ACKERMAN:  Just talking about the first

15     page because there are some 1099s attached to

16     this too.

17           MS. CESARANO:  Oh, okay, let me finish that

18     up.

19  BY MS. CESARANO:

20     Q.    Let's go back to Exhibit 29 and let's look

21  at the second page.  Are these your 1099 and W-2

22  forms for the year 2000?

23           (The witness reviews the document.)

24     A.    Yes.

25     Q.    Is that right, these are all tax forms for

171

1   the year 2000, correct, on that exhibit?

2       A.   Yes.   This one is the brokering, the one

3   that we are allowed to broker.   And then this one is

4   the company when Allstate dropped all those

5   homeowners policies in South Florida and made

6   everyone go to Clarendon and Vanguard and Miller's,

7   that's those companies.

8       Q.   So when you say "those", name the company?

9       A.   That's Braishfield Associates.

10      Q.   This is the third page of the exhibit that

11  we are on, correct?

12      A.   Yes.

13      Q.   Okay.   And tell me, so tell me what that

14  form at the top of the page is?

15      A.   Allstate dropped all the homeowners in

16  South Florida, and they made all these other, made

17  all the customers go to another company.

18      Q.   Okay.

19      A.   That they allowed us to broker to so

20  Allstate could still get their commission.   And

21  that's the agency that handled it, Braishfield.

22      Q.   Okay.   So during the year 2000 Braishfield

23  states on this form, tax form that they paid to you

24  personally 1539?

25      A.   Dollars, yes.

172

1      Q.   And 88 cents, correct?

2      A.   Ah huh.

3      Q.   Okay.  And then the form below, Agents Work

4   Comp. associate, this is to Linda Zink in 2000,

5   $710.20; what is that all about?

6      A.   This was an agency that Allstate used to

7   broker with, but they severed their tie with them and

8   that's what they paid them.

9      Q.   In commissions?

10     A.   Ah huh.

11     Q.   So these are just recognition, these

12  two forms are tax reportings for various commissions

13  you earned?

14     A.   Yes.

15     Q.   Okay.  Let's go to the last page.  We have

16  got one here from --

17     A.   There is Miller's.

18     Q.   Miller's Casualty Insurance for the year

19  2000?

20     A.   Yeah.

21     Q.   And that's a 1099 Form, correct?

22     A.   Right.

23     Q.   Is that again commission that you earned

24  during that year --

25     A.   Yes.

173

1        Q.    -- from that insurance company?

2        A.    Yes.   That's, see how Clarendon, Miller,

3    Braishfield, all of those together are from the

4    policies Allstate cancelled.

5        Q.    Okay.   Then the same thing, Clarendon

6    issued you a 1099 to recognize certain commissions

7    they paid to you in the year 2000?

8        A.    Ah huh, yes.

9        Q.    And then just returning to the first page,

10   since this is the year 2000, for part of the year

11   then this is the first part of the year you were

12   treated as an employee for tax purposes, is that

13   correct, and so these are the forms that Allstate

14   issued to you as an individual, correct?

15       A.    They still issue the same thing.

16       Q.    Okay.   But is that in fact correct?

17       A.    Yes.

18       Q.    And then this is now the second page.   Just

19   to go over that just to finish it up, I kind of went

20   out of order, but on the second page are W-2 forms

21   for the year 2000, that, well, the Zink Insurance

22   Agency issued to you as its employee, correct?

23       A.    Yes.

24       Q.    Okay.   And showing you what has been marked

25   for identification as Exhibit 30, these look like

174

1     these are tax forms for the year 2001, correct?

2             (The witness reviews the document.)

3        A.   Yes.

4        Q.   And they are 1099 Form -- no.  Excuse me.

5     They are W-2s, see the W-2.  So these are W-2 forms

6     issued by the Zink Insurance Agency to you as its

7     employee, Linda Zink, correct?

8        A.   Yes.

9        Q.   Okay.  And turning to the second page here,

10    there is a tax form for miscellaneous income here,

11    okay.  And do you know what that's about, the 2001

12    form on that last page?

13            (The witness reviews the document.)

14       A.   Approximately I think that's the last of

15    the stock that Allstate gave us.

16       Q.   Okay.

17       A.   I won't see that again.

18            MS. CESARANO:  Mark this 31.

19            (The document is marked as Defendant's

20       Exhibit No. 31 for identification.)

21    BY MS. CESARANO:

22       Q.   Okay.  I will show you what has been marked

23    for identification as Exhibit 31, it looks like a

24    form issued by the Zink Insurance Agency, Inc.?

25       A.   No.  This is Allstate.

1    Q.   Was it issued?

2    A.   Mails this every month.

3    Q.   Okay.  So this is actually something

4 Allstate issued to the Zink Insurance Agency, Inc.,

5 is that correct?

6    A.   Yeah.  And I gave this to my accountant to

7 show how much I had to pay Allstate to rent a

8 computer.

9    Q.   And was there any particular purpose to

10 show your accountant that particular item?

11    A.   Yeah, it is a deduction.

12    Q.   Okay.  So he needed it to take the

13 deduction?

14    A.   Yes.

15    Q.   Okay.  And if you could, and help me out

16 with this, these are abbreviations, if you could, it

17 says deductions.

18    A.   That's when Allstate paid my health

19 insurance for me.  It says all care, and then that's

20 when they paid my dental.  That's my life insurance

21 that I pay myself, it comes out of my check.  And

22 then auto, that's my auto insurance that I pay to

23 Allstate every single month.

24    Q.   You pay it to Allstate?

25    A.   Ah huh.

176

1      Q.    Okay.

2      A.    And my homeowners insurance premium comes

3  out of my check, it still does.  Nothing has changed

4  on this at all.

5      Q.    Now, when you say "paycheck", this is

6  actually what, the commission check from Allstate

7  with the deductions on it?

8      A.    I guess you can look at it that way.  See

9  where it tells you your earnings, your deductions,

10  your net; then this is what they put in my account.

11      Q.    Right.  But this is to the Zink Agency,

12  correct?

13      A.    Yes.

14      Q.    So it is Allstate paying the Zink Agency

15  commissions, correct?

16      A.    Yes.

17      Q.    And then from the commissions there are all

18  these deductions made?

19      A.    Right.  Except for remember this is when

20  they still paid the dental and the health.

21      Q.    Okay.  There was a time while they still

22  paid it --

23      A.    Yes.

24      Q.    -- at the beginning?

25      A.    Yes.

```
 1       Q.   Correct?
 2       A.   This was my portion.  I had to contribute
 3  to it.
 4       Q.   And then the rest are deductions that they
 5  charged you, for example, the computer --
 6       A.   Yes.
 7       Q.   Et cetera?  Okay.
 8            MR. ACKERMAN:  Can I see it?
 9            MS. CESARANO:  Mark this 32.
10            (The documents are marked as Defendant's
11       Exhibit Nos. 32, 33 and 34 for identification.)
12  BY MS. CESARANO:
13       Q.   This one should be short.  I'm showing you
14  what is identified for the record as Exhibit 32, and
15  are these certain tax forms that were issued to you
16  under the name Linda McTigue during that year from
17  Allstate?
18            (The witness reviews the document.)
19       A.   Yes.
20       Q.   Okay.  And this is for 1998, correct?
21       A.   Yes.
22       Q.   You can look through, they are all 1998
23  forms?
24       A.   Yes.
25       Q.   Okay.  Now, it looks like there are some
```

1    other, let me, I only have one copy, let me take it

2    back for a second.  There is a note here from

3    Clarendon National Insurance issued to Linda McTigue

4    and another one from American Superior Insurance and

5    Florida Select Insurance and FRPC Joint Underwriting

6    Association and Preferred Managing Agency, Inc. and

7    Southern Family Insurance Managers, Inc. and the

8    Miller's Casualty Insurance Company; are those just

9    other agencies, I mean other companies that issued

10   you commission checks?

11       A.   No.  Here, I didn't write for them.

12       Q.   Okay.

13       A.   What happened was Allstate stopped writing

14   homeowners policies in Palm Beach County, practically

15   the whole state.  Then they said we could write

16   through the Florida Joint Underwriting Association.

17   The Florida Joint Underwriting Association took in

18   too many policies, so then they started a takeout

19   program.

20            They then took out their policies with

21   Chase and placed it with these companies, Southern

22   Family, Families, American Superior, and then I got a

23   check from them.  Since then all those companies went

24   under.

25       Q.   So that was something that happened in

179

1   1998?

2       A.   Yes.

3       Q.   That was kind of a bizarre occurrence?

4       A.   Well, not bizarre for Florida; but for

5   other states, yes.

6       Q.   Okay.  And, therefore, those companies

7   needed to pay you the commission?

8       A.   Right.

9       Q.   Because you had originally written the

10  policy?

11      A.   Yes.  That was the agreement the State Of

12  Florida had with them.

13      Q.   Okay.  So this is 33, these are more tax

14  things.  I'm going to show you what has been marked

15  as Exhibit 33, and just page through it.  Tell me

16  first of all what year is that for?

17           (The witness reviews the document.)

18      A.   For 2001.  And this is from Northeast

19  Agencies.  And 2001 Jemco, J E M C O, it could have

20  been a takeout.  Clarendon National, they just pulled

21  out of the State Of Florida.

22           And then somebody probably cancelled their

23  Florida JUA policy.  I was back charged the

24  commission, so that was the money sending them back.

25      Q.   Okay.  And that's the last --

180

1      A.    JUA.

2      Q.    -- the check you are referencing on the

3 last page of the exhibit, correct?

4      A.    Yes.

5      Q.    Okay.  Do these all represent commissions

6 paid to the Zink Insurance Agency during the year

7 2001?

8      A.    Yes.

9      Q.    Okay.  And showing you what has been marked

10 for identification as Exhibit 34, these are tax

11 related documents for the year, what year is it?

12            (The witness reviews the document.)

13      A.    1999.

14      Q.    Okay.  1999.  And this is from Allstate to

15 you personally?

16      A.    Yes.

17      Q.    Okay.  And these are W-2 forms?

18      A.    Yes.

19      Q.    Okay.  And this is while you were an

20 employee of Allstate?

21      A.    Yes.  So you can see I'm paid the same way

22 before and after your conversion date.

23      Q.    Well, the money goes to the Zink Agency

24 after 2000, after July, 2000, isn't that correct?

25      A.    But it is still paid out the same way.

1      Q.   Now, were basically at the time starting

2  July 1, 2000, this changeover date, okay, were you

3  basically told by Allstate that from its position you

4  were going to be treated as an independent

5  contractor?

6      A.   No.

7      Q.   Well, did you read any of these documents

8  that you signed?

9      A.   Yes.

10     Q.   Okay.  Isn't it true that the documents

11  state that Allstate is going to convert you to an

12  independent contractor should you want to continue

13  working for them?

14          MR. ACKERMAN:   Object to the form.

15          THE WITNESS:   Well, nothing has changed

16      before or after, except how I get paid and what

17      taxes and Social Security and the benefits and

18      everything I have to take care of myself.

19          I still write the same policies, I'm still

20      controlled a broker only what they say I can

21      do.

22  BY MS. CESARANO:

23     Q.   But that's really not my question.  Let's

24  go back to my question.  I know that's your

25  position.

1          But my question has to do with Allstate
2    communicated to you that its position was that it was
3    terminating you as an employee --
4        A.   Right.
5        Q.   -- correct?
6        A.   Correct.
7        Q.   And from its point of view you were no
8    longer its employee anymore after July 1, 2000 --
9        A.   Correct.
10       Q.   -- correct?  Okay.  And at your option if
11   you wanted to continue selling Allstate Insurance
12   that you would have to become an independent
13   contractor, again this is their position, is that
14   correct?
15       A.   Yes.
16       Q.   Okay.  And when you signed the papers, you
17   know, isn't it true that again even though you didn't
18   agree with it, you were signing up to be an
19   independent contractor?
20          MR. ACKERMAN:  Object to the form.
21          THE WITNESS:  I was signing up to keep my
22       job.
23   BY MS. CESARANO:
24       Q.   Okay.  And that was as an independent
25   contractor, correct?

183

```
 1              MR. ACKERMAN:  Object to the form.
 2              THE WITNESS:  It was as an Allstate agent.
 3    BY MS. CESARANO:
 4         Q.    Okay.
 5         A.    I never looked at it as being an
 6    independent contractor.
 7         Q.    Well, isn't it true from Allstate's
 8    position at that time, July 1, 2000, it didn't have
 9    any agents that continued to be its employees
10    anymore?
11         A.    That's not true.  There is still one in
12    Tennessee.
13         Q.    There is one person?
14         A.    Ah huh.  One of ten maybe.  There are still
15    some.
16         Q.    There are still some.  But let's go to
17    Florida.  Isn't it true that Allstate's position is
18    that if you were its agent in Florida you were not an
19    employee, rather you were an independent contractor
20    after July 1 of 2000?
21         A.    For tax purposes only, that's what we were
22    told over and over, it is for tax purposes only.
23         Q.    Well, taxes were pretty important.
24         A.    We were still supposed to be treated the
25    same, we were still supposed to be able to write the
```

184

1   same insurance.

2       Q.   I understand your license wasn't affected.

3       A.   Exactly.

4       Q.   Okay.  I understand that.  But again back

5   to my question.  Wasn't it true that Allstate made it

6   clear that if you wanted to continue working for it

7   as selling its insurance products that you had to be

8   an independent contractor and --

9       A.   Yes.

10      Q.   -- sign all these agreements?

11      A.   That's true.

12      Q.   And that's after July 1, 2000?

13      A.   Yes.

14      Q.   Okay.  Now, during the time that you were

15  an employee of Allstate, okay, so we're going back

16  to, you know, ten years ago, whatever --

17      A.   Okay.

18      Q.   -- were you aware that Allstate had a

19  written policy prohibiting sexual harassment?

20      A.   No.

21      Q.   Okay.  Did you understand that human

22  resources as a department of the company was against

23  sexual harassment?

24           MR. ACKERMAN:  Object to the form.

25           THE WITNESS:  I didn't know I could go to

1      human resources.

2   BY MS. CESARANO:

3      Q.   You didn't know that?

4      A.   No.

5      Q.   But did you know that there was a part of

6   human resources that would consider and investigate

7   claims of sexual harassment?

8      A.   No.

9      Q.   Okay.  At no time did you know that?

10     A.   No.

11     Q.   Okay.

12     A.   I did not know.  I had somebody tell me

13  that to go to human resources.

14     Q.   Somebody told you to go to human resources?

15     A.   (Witness nods head.)

16     Q.   When was that?

17     A.   When I filed my restraining order.

18     Q.   Okay.  So when was that?

19     A.   November of 2000, October, November.

20     Q.   Okay.

21          MS. CESARANO:  Mark this 35 I think.

22          (The document is marked as Defendant's

23     Exhibit No. 35 for identification.)

24  BY MS. CESARANO:

25     Q.   Let me show you what has been marked as

186

1    Exhibit 35.  Do you want to take a look through that

2    policy.  And it purports to be entitled "Maintaining

3    An Environment Free Of Sexual Harassment" published

4    by Allstate?

5                (The witness reviews the document.)

6         Q.    Have you seen that before?

7         A.    No, I haven't.  At least I don't think I

8    have.  I saw --

9         Q.    Well, you gave that to me in this case

10   during discovery.

11        A.    I gave it to you?

12        Q.    Yes.

13        A.    I thought it was a book.

14        Q.    Well, it was a folded up booklet, but I had

15   to Xerox it.  It is a folding booklet.

16        A.    I had a book this thick (Indicating).

17        Q.    I'm going to show you some other policies

18   also.

19        A.    Okay.

20        Q.    But what I'm telling you is I received this

21   document from your attorney, which he, you know, from

22   you --

23        A.    Right.

24        Q.    -- from your side of the case, you gave it

25   to me.  So have you seen it before?

1      A.   I guess so.  I just don't recall this

2   specific one.

3      Q.   Okay.  And like I say, it was folded like

4   in three parts that way lengthwise (Demonstrating).

5      A.   Okay.

6      Q.   So if it looks funny, so with that in mind

7   do you want to look at it again and if it were folded

8   differently would you recognize it?

9      A.   Probably.  When I was always referring to

10   anything it was a book.

11      Q.   Okay.  Then we will get to that.  There are

12   more policies.

13      A.   Okay.

14      Q.   Okay.  But I'm saying I got that from you.

15      A.   Okay.

16      Q.   Okay.  Now, this policy was in effect in

17   approximately 1998, does that ring a bell for you?

18          MR. ACKERMAN:  Object to the form.

19          THE WITNESS:  No.  If I gave it to you,

20      then I had to go on line and print it.

21   BY MS. CESARANO:

22      Q.   Well, it was a folded up brochure, so it

23   wouldn't have come from on line.

24      A.   Well, where did I get it?

25      Q.   Okay.  But you don't know, is that right,

1    you don't know where you got it?

2        A.   At this time I cannot recall.

3        Q.   Okay.  That's fine.  Put this here.

4             MS. CESARANO:  Can I get this marked as the

5        next exhibit.

6             (The document is marked as Defendant's

7        Exhibit No. 35 for identification.)

8    BY MS. CESARANO:

9        Q.   I want you to take a look at what has been

10   marked for identification as Exhibit 36.  It purports

11   to be a human resources policies and procedures

12   pamphlet.

13            (The witness reviews the document.)

14       A.   Okay.

15       Q.   Do you want to look through that and see if

16   you recognize that document?

17       A.   I recognize the cover.

18       Q.   The cover?

19       A.   Ah huh.

20       Q.   The little logo with the State Of Florida?

21       A.   Well, human resources, Florida region

22   policies and procedures.

23       Q.   Okay.

24       A.   But I don't remember all the content.

25       Q.   Do you remember reading the very first

1  paragraph of this booklet and pamphlet that says, "It

2  is Allstate's policy to maintain a working

3  environment free from discrimination and sexual

4  advances or harassment which may affect an employee's

5  terms or conditions of employment, the harassment of

6  any person regardless of whether he/she is an

7  Allstate employee is prohibited."

8      A.   Yes, I read it in a book.

9      Q.   Okay.

10     A.   I did.  Because I remember when I got that

11  letter saying I'm an independent contractor.  I said

12  so it doesn't matter who you are, if you are sexually

13  harassed, you are sexually harassed, it's prohibited

14  by Allstate, it says so right here what you just

15  read.

16     Q.   Okay.

17     A.   So I remember that.

18     Q.   Okay.  Now, this policy was effective in

19  19, around 1997, but do you recall that?

20         MR. ACKERMAN:  Object to the form.

21         THE WITNESS:  No.

22  BY MS. CESARANO:

23     Q.   Do you recall this policy, when you saw it

24  for the first time?

25     A.   Not at all, not ever.

190

1      Q.   You didn't ever see it?

2      A.   No.  I'm not ever recalling.  It's like we

3   didn't have a meeting on it or anything.

4      Q.   You don't think there was a meeting?

5      A.   No.

6           MR. ACKERMAN:  Can we take a short bathroom

7      break?

8           MS. CESARANO:  Sure.

9           THE VIDEOGRAPHER:  The time is

10      approximately 2:58 P.M.  We are going off the

11      video record.

12           (A short recess is taken.)

13           THE VIDEOGRAPHER:  The time is

14      approximately 3:08 P.M.  We are back on the

15      video record.

16           (The document is marked as Defendant's

17      Exhibit No. 37 for identification.)

18   BY MS. CESARANO:

19      Q.   Okay.  Showing you what has been marked for

20   identification as Exhibit No. 37, it purports to be a

21   human resources booklet.  Have you seen, do you want

22   to look through that, have you seen that before?

23           (The witness reviews the document.)

24      A.   I don't think so.  I don't recall.

25      Q.   Okay.

191

1          A.    This one I remember more than this.

2          Q.    When you say "this" one you are indicating

3   36 you remember more than you remember 37, correct?

4          A.    Yes.   When was this given to us?

5          Q.    My understanding is that that was published

6   in 1998, approximately 1998 I think.

7          A.    Well, we received so much material in the

8   mail, so much.

9          Q.    Okay.   Now, this is a local human resource,

10  this is Florida, correct?

11         A.    I think.

12         Q.    The local, by the region?

13         A.    It says WW.   Where does it say the region?

14  Oh, Florida region.   I guess so.

15         Q.    Okay.

16         A.    Yes.

17         Q.    Okay.   And in fact it's the updated booklet

18  for 36, does that refresh your memory --

19         A.    No.

20         Q.    -- that 37 updates 36?

21         A.    No.

22         Q.    Okay.   Do you recall that human resources

23  in the Florida region puts out a, each year puts out

24  a little pamphlet similar to that every single year?

25         A.    No.

1    Q.   You don't remember that?

2    A.   No, not at all.

3    Q.   Okay.  Now, normally when you were, let's

4    say back in '97, '98, if there was something put out

5    by human resources, what would be the normal way you

6    would receive it?

7    A.   I'm not sure.  But it would be either,

8    inner, most likely inner office mail which came by

9    the courier or through the mail.

10   Q.   Would they mail things to your house

11   sometimes or your home?

12   A.   No.

13   Q.   No.  So you would get it at work?

14   A.   Yes.

15   Q.   So the bottom line is you don't recall this

16   Exhibit No. 37?

17   A.   My secretary could have received it and put

18   it on the counter, and no one may have looked at it.

19       (The document is marked as Defendant's

20       Exhibit No. 38 for identification.)

21   BY MS. CESARANO:

22   Q.   Do you recall, I'm showing you what has

23   been marked for identification as Exhibit 38, and it

24   purports to be a human resource policy guide for

25   Allstate employees.  Do you recall receiving that in

193

```
1    the mail from corporate headquarters?  And this may
2    be just a portion.
3              (The witness reviews the document.)
4        A.   No.
5        Q.   You don't remember, it's a much bigger
6    booklet, but you don't remember receiving, you can
7    see the table of contents --
8        A.   No.
9        Q.   -- on Page 1?
10       A.   No.
11       Q.   Okay.  Now, it is my understanding that
12   corporate headquarters mailed that to every employee
13   at their home in 1998.  So I want, you know, just
14   look through it carefully to make sure that nothing
15   jumps out and refreshes your memory.
16             (The witness reviews the document.)
17       A.   Nothing.
18       Q.   Nothing.  You haven't seen it before?
19       A.   No.
20       Q.   Okay.  Why don't you add that to the pile.
21   Now, did you ever attend any meetings or conferences
22   or training, anything at all conducted by Allstate
23   that the topic of sexual harassment came up?
24       A.   Never.
25       Q.   Absolutely never?
```

194

1      A.   Absolutely never.

2      Q.   So the whole time you worked at Allstate

3  you have never heard any, anybody mention sexual

4  harassment?

5      A.   Never.

6      Q.   Okay.  Now, does human resources in Florida

7  region from time to time conduct training seminars?

8      A.   No.

9      Q.   They don't?

10      A.   (Witness shakes head.)

11      Q.   Okay.  When you, are there any annual

12  meetings that you might have occasion to go to that

13  Allstate conducts from corporate headquarters?

14      A.   About sexual harassment?

15      Q.   No, no.  This is just a general question.

16  Do you have, are there ever any meetings, just

17  general meetings that you go to that are arranged by

18  corporate headquarters?

19      A.   No.

20      Q.   Okay.  Have you ever gone to any meetings

21  whatsoever while you were an Allstate employee?

22      A.   A kickoff meeting, underwriting meetings

23  and claims meetings.

24      Q.   What's a kickoff meeting?

25      A.   Like the one where they just showed who was

1    in the top in all the agencies for life insurance and

2    all that.

3         Q.   Okay.

4         A.   And they tell you what your goals are that

5    if you make it, this is the next trip you are going

6    to win if you sell so much life insurance.

7         Q.   How often are the kickoff meetings?

8         A.   Once a year.

9         Q.   Just once?

10        A.   Yes, in January for the, to kickoff.

11        Q.   For the coming year?

12        A.   Yes.

13        Q.   And at any of those meetings did the topic

14   of dos and don'ts of sexual harassment ever come up?

15        A.   No.

16        Q.   What other kinds of meetings did you

17   mention that you attend?

18        A.   Claims.

19        Q.   How often are those meetings?

20        A.   I think once every two years maybe.

21        Q.   And who conducts the claims meetings?

22        A.   The claims, usually it was the claims

23   manager out in Melbourne.

24        Q.   Who was that?

25        A.   I don't know.

196

1    Q.   Okay.  The claims meetings you mentioned,
2  when is the last one you went to?
3    A.   Let's see, I don't know.  I don't know when
4  they had had the last claims meeting.
5    Q.   So it has been quite sometime?
6    A.   Yes.  Everything is via email.
7    Q.   Okay.
8    A.   Because of the email.
9    Q.   I see.  When you were, well, does Allstate
10 maintain its personnel policies and procedures, its
11 human resources policies and procedures on the
12 computer?
13   A.   Wait.  Say that again.  Does Allstate what?
14   Q.   Okay.  Can you access Allstate's human
15 resources policies and procedures, like, you know,
16 your employee manual or policies?
17   A.   They just started that.
18   Q.   They did?
19   A.   They just started putting something up
20 there.
21   Q.   So that if you wanted to you could go on
22 the computer and read the policy?
23   A.   I believe so.
24   Q.   And when do you think they started that?
25   A.   It was after I filed this lawsuit.

1      Q.   Well, when?

2      A.   That's when we discovered it.

3      Q.   Give me a date as to when you believe that

4  you first saw something?

5      A.   I don't know.  Olga might know.

6           MR. ACKERMAN:  She is asking you what you

7      know.  So if you know, you know; if you don't,

8      you don't.

9           THE WITNESS:  No, then I don't know.

10 BY MS. CESARANO:

11     Q.   Okay.  So at some point Allstate put

12 their --

13     A.   I think so.  I mean I didn't say I saw it.

14 There are a few categories now where I think you can

15 go there.

16     Q.   So you haven't gone there to look at those

17 web sites?

18     A.   No, I have had no occasion to.

19     Q.   And by the way, you mentioned just now when

20 I filed my lawsuit.  Just so I'm clear do you mean

21 the complaint in this case in court, or do you mean

22 your EEOC charge?

23     A.   The court case.

24     Q.   Okay.  All right.  During your time when

25 you were employed as a we will call it employee at

198

1    Allstate, in other words, prior to July 1, 2000, did

2    you ever see any posters posted at the work place?

3         A.   No.

4         Q.   Okay.  Did you ever see --

5         A.   We were never given any either.

6         Q.   Okay.  But what I'm talking about just so I

7    want to describe it, sometimes in a break room or a

8    lunch room there might be a poster saying, If you

9    suffer a Workers' Comp. injury call this number, or,

10   If, you know, you have a family medical leave act

11   question, here is the phone number?

12        A.   The only thing that the State Of Florida

13   requires you to post is your Workers' Comp. poster,

14   that's it.

15        Q.   Well, I would beg to differ with you on

16   that.

17        A.   Well, that's all they sent me, and mail it

18   once a year.

19        Q.   Well, at the locations where you have been

20   when you were employed by Allstate, let's just go at

21   the times you were employed by Allstate, okay.  Did

22   you ever see any posters that talked about sexual

23   harassment is against Allstate's policies --

24        A.   No.

25        Q.   -- or call an 800 number?

199

```
 1              MR. ACKERMAN:  Let her finish.
 2              THE WITNESS:  No.
 3   BY MS. CESARANO:
 4        Q.   No.  Okay.  Did you ever see an 800 number?
 5        A.   No, no numbers posted.
 6        Q.   Okay.  And just to finish out this whole
 7   thing, did you ever see anything, whether it was a
 8   memo, a phone message, anything at all in writing
 9   from Allstate about sexual harassment?
10        A.   Just that manual that I found.
11        Q.   Okay.  So tell me which exhibit so I'm --
12        A.   It's not there.
13        Q.   None of these, none of these, none of these
14   sexual harassment policies?
15        A.   No.
16        Q.   I thought you said one of them you thought
17   you saw palm trees?
18        A.   I said I saw a manual about this thick
19   (Indicating).
20        Q.   I thought you said you recognized the logo
21   on Exhibit No. 36?
22        A.   Yes, that I recognized.
23        Q.   Okay.  So that's the only one of those
24   documents that you have seen before?
25        A.   Yes.
```

200

1    Q.    Okay.

2    A.    That's it.

3    Q.    Now, let me ask you a little bit different

4   question.  Okay.  While you were an employee at

5   Allstate did you know that if you were sexually

6   harassed that that would be wrong?

7    A.    No.  It wasn't until I talked to

8   Hugh Hopson that I even knew you could go to human

9   resources.

10   Q.    Okay.  And what date was that about?  I

11  mean I know you don't have the exact calendar date

12  but --

13   A.    I don't know.

14   Q.    Can you place it in relationship to

15  something, was it before you filed your EEOC charge?

16   A.    Yes.

17   Q.    Okay.  Was he the first person you

18  discussed the sexual harassment with?

19   A.    As far as Allstate goes?

20   Q.    Yes.  Collette.

21   A.    No.  The first person was my manager.

22   Q.    And who was that?

23   A.    John Armellino.

24   Q.    He was the very first person?

25   A.    Ah huh.

201

1    Q.   Okay.  And do you remember when that
2  happened?
3    A.   We had a district meeting in North Palm
4  Beach.  And before that meeting I went to the police
5  department and filed it.  Then I went to the meeting.
6    Q.   Okay.  You filed what?
7    A.   The restraining order.
8    Q.   Okay.
9    A.   Then I went to the meeting and I saw John.
10 And I said John, I just have to tell you something
11 because I'm sure you are going to hear it through the
12 rumor mill.  I said, I filed a restraining order
13 against Mike Collette.  He said, You did?  He goes,
14 Okay, he goes, You have to call human resources.
15       So after the meeting I went to my car and
16 called human resources.
17    Q.   Did he tell you why you should call human
18 resources?
19    A.   That that was the procedure I had to
20 follow.
21    Q.   Okay.  Did he use the word it's harassment?
22    A.   No.  I never used the word harassment.
23    Q.   No.  Did he, John?
24    A.   No.
25    Q.   Okay.  You just said I have got a

202

1    restraining or I'm getting a restraining order?

2        A.   Right.

3        Q.   Had you already got the order or were you

4    just filing for the order?

5        A.   I think it was filed, and we had to go to

6    court.

7        Q.   Okay.

8        A.   Because that's when Sandra said, I want,

9    fax a copy of it to her.

10           MS. CESARANO:  Can I get these marked.  I'm

11           going to make this a composite exhibit, it would

12           be faster.

13           MR. ACKERMAN:  39.

14           MS. CESARANO:  Let me make these a

15           composite, 39.

16           (The documents are marked as Defendant's

17           Exhibit Nos. 39A, 39B, 39C for identification.)

18           MS. CESARANO:  And if you could you will

19           see how they separate with A, B, C.  And this

20           will be 40.

21           (The document is marked as Defendant's

22           Exhibit No. 40 for identification.)

23   BY MS. CESARANO:

24       Q.   Okay.  Showing you what has been marked as

25   Exhibit 39A, B and C, are these the documents you

203

1    were talking about that concern the injunction or the

2    restraining order that you got against

3    Michael Collette?

4              (The witness reviews the documents.)

5         A.   Yeah.

6         Q.   Okay.  And then looking at Exhibit No. 40,

7    is that the actual order that the Court issued

8    against Michael Collette?

9              (The witness reviews the document.)

10        A.   Yes.

11        Q.   Okay.  Now, did you attend the hearing?

12        A.   Yes.

13        Q.   And Michael Collette was at the hearing, is

14   that correct?

15        A.   Yes.

16        Q.   Okay.  Was he represented by an attorney?

17        A.   No.

18        Q.   Okay.  Were you represented by an attorney?

19        A.   No.

20        Q.   Okay.  Now, is it true that

21   Michael Collette denied the allegations that you had

22   in here at the hearing, was that his position?

23        A.   I don't remember that.

24        Q.   Did he say something at the hearing?

25        A.   Where do I go pay for this?

204

1      Q.   Okay.  But did he say anything about the

2   allegations themselves?

3      A.   Not that I know of.

4      Q.   Okay.  That's fine.  You don't recall?

5      A.   No.

6      Q.   Okay.  You don't remember if he denied it?

7      A.   No, I don't remember that.

8      Q.   Okay.

9      A.   Does it say that --

10     Q.   No.  I mean they speak for themselves.  I

11  don't know.  They say what they say.

12          Do you remember if the judge asked

13  Mr. Collette at the hearing whether he had any real

14  need to, you know, have contact with you?  And do you

15  remember Michael Collette saying, No, he really

16  didn't?

17     A.   I remember I think he said, From this day

18  forward do you have any need, I think he said it that

19  way, From this day forward.  And that's when he said,

20  Don't write, don't call, don't email her, don't phone

21  her, stay away from her, at least 500 feet away from

22  her home and her business.

23     Q.   Okay.  But the --

24     A.   For life.

25     Q.   But the judge asked him if he had any need

205

```
 1   to have contact with you from that day on, correct?

 2        A.   I don't know if it was those words.

 3        Q.   No.  But something to that effect?

 4        A.   Yes.

 5        Q.   And he said, no?

 6        A.   I don't remember him saying anything.

 7        Q.   Well, wouldn't he have answered the judge?

 8        A.   I don't know.  Because then that's what the

 9   judge said, Don't phone her, don't call her, don't

10   fax, don't write, stay away, blah, blah, blah.  Then

11   he said, You have to pay the $50, and then I remember

12   Mike saying, Where do I go pay it?  That's when I

13   left.

14        Q.   Okay.

15        A.   Then the judge said to me, I have a

16   suggestion for you.  And I said, Yes.  He says, I

17   suggest that you take this up internally with your

18   company.

19        Q.   Okay.

20        A.   I said, I'm in the process of doing that.

21        Q.   Okay.  Has Michael Collette obeyed the

22   order to stay away from you?

23        A.   As far as I know.  He might still be

24   driving by for all I know.

25        Q.   Well, this is as far as you know?
```

206

1        A.    Right.

2        Q.    Okay.  You haven't witnessed any

3   violations, is that right?

4        A.    Right.

5              THE VIDEOGRAPHER:  Five minutes left on the

6        video.

7              MS. CESARANO:  Pardon?

8              THE VIDEOGRAPHER:  Five minutes left on the

9        video.

10             MS. CESARANO:  Could I get these two

11        marked, the next two exhibits.

12             (The documents are marked as Defendant's

13        Exhibit Nos. 41 and 42 for identification.)

14   BY MS. CESARANO:

15        Q.    Showing you what has been marked as

16   Exhibit 41, do you recognize that as your EEOC

17   charge?

18             (The witness reviews the document.)

19        A.    Yes.

20        Q.    And is that your signature on the charge?

21        A.    Yes.

22        Q.    And that's dated June 16, 2001?

23        A.    Correct.

24        Q.    And do you recognize document 42,

25   Exhibit 42?

207

1           (The witness reviews the document.)

2     A.    Yes.

3     Q.    Okay.  And this is the, purports to be the

4  EEOC's dismissal and notice of rights --

5     A.    Yes.

6     Q.    -- in your charge, correct?

7     A.    Yes.

8     Q.    Okay.  Now, it's dated on Exhibit 42,

9  September 4, 2001.  Do you happen to remember when

10  you received it?

11     A.    No.

12     Q.    Okay.  It would have been shortly

13  thereafter?

14     A.    I don't know.

15     Q.    Okay.  You did receive it though?

16     A.    Yes.

17           MS. CESARANO:  Okay.  Why don't you change

18     your tape.

19           THE VIDEOGRAPHER:  The time is

20     approximately 3:28 P.M.  Going off the video

21     record.

22           (A short recess is taken.)

23           THE VIDEOGRAPHER:  The time is

24     approximately 3:30 P.M.  We are back on the

25     video record.

208

```
 1    BY MS. CESARANO:
 2        Q.    Okay.  When did Mr. Collette begin his
 3    harassing behavior toward you?
 4        A.    Like 1998 okay.
 5        Q.    Okay.  And what did he do to harass you?
 6        A.    Well, first it was like a simple
 7    obsession.  He would call me up at my office and sing
 8    to me on the phone, you know, tell dirty jokes.
 9        Q.    Okay.  This is, now, is this during the
10    time that you were going out with him?
11        A.    No.
12        Q.    This is after the time?
13        A.    Yes.
14        Q.    Okay.
15        A.    Like ten years later.
16        Q.    Okay.  So in 1998 was there any particular
17    event that triggered all this after, you know, after
18    ten years?
19        A.    Probably that Susan Myles was gone; he was
20    focusing on her, getting rid of her.
21        Q.    She was already gone?
22        A.    Or she, I think so.
23        Q.    What did --
24        A.    I don't know her exact dates.
25        Q.    Now, were you personally acquainted with
```

209

1   Susan Bowne?

2       A.   No.

3       Q.   You didn't know her at all?

4       A.   No.  I met her like onetime 16 years ago.

5       Q.   Okay.  So is there, well, you know, what do

6   you base, are you just guessing that that may have

7   been what triggered it?

8            MR. ACKERMAN:  Object to form.

9            THE WITNESS:  No.  Because he had called

10       and said that he finally got rid of her.

11   BY MS. CESARANO:

12       Q.   Okay.  When did he tell you that?

13       A.   After another agent had already told me

14   that.

15       Q.   Okay.  But that doesn't answer -- when?

16       A.   It was probably, I'm thinking, that summer,

17   that summer of '98.

18       Q.   Summer of '98.  Okay.  And he said in that

19   first phone call that he finally got rid of her?

20       A.   Yes.

21       Q.   And when he said "got rid of her", was she

22   terminated, did she quit, what happened?

23       A.   She was terminated.  I don't know why.

24       Q.   Okay.

25       A.   I don't know the real reason.  Something to

210

1    do with her support staff.

2        Q.   Okay.  And do you have personal knowledge

3    of the details of Susan Bowne's termination?

4        A.   Only like what Mike has told me.

5        Q.   Okay.  And what did Mike tell you?

6        A.   That, well, first he started like years

7    before.  He said he hated her and he was going to get

8    her.

9        Q.   Okay.  When did he first tell you he hated

10   her?

11       A.   Like 1990.

12       Q.   In 1990?

13       A.   Yes.

14       Q.   Okay.

15       A.   And that's when he began his affair with

16   Susan, Suzanne, Susan Myles's secretary that he took

17   from her.

18       Q.   Okay.  And her last name is what?

19       A.   Paccica.

20       Q.   Can you spell that for the Court Reporter.

21       A.   P A C C I C A.

22       Q.   Okay.  And this Suzanne Paccica used to

23   work as the secretary for Susan Bowne?

24       A.   Yes.

25       Q.   Okay.  Now, you said Mike had,

1  Mike Collette had, what, an affair with Suzanne?

2      A.   Yes.

3      Q.   How do you know that?

4      A.   He told me so.

5      Q.   And during what time period?

6      A.   1990.

7      Q.   1990?

8      A.   Ah huh.

9      Q.   Do you know how long it lasted

10 approximately?

11     A.   No.

12     Q.   Do you believe it was short?

13     A.   No, I don't think it was short.

14     Q.   Do you think it lasted more than a year?

15     A.   I believe so.

16     Q.   Now, you don't have any personal knowledge

17 of whether Suzanne decided to date him and he decided

18 to date her, I mean you don't know personally

19 anything about that, do you?

20     A.   Well, I know Mike kept saying she had

21 bedroom eyes, that's what he would tell me, she has

22 bedroom eyes.

23     Q.   Okay.

24     A.   So I believe he pursued her.

25     Q.   Okay.  But you don't know anything about

212

1    Suzanne and why she was dating him?

2         A.   Well, she was his secretary.

3         Q.   Okay.

4         A.   She was with him all the time.  I believe

5    that they have a baby together.

6         Q.   Do you know that to be true?

7         A.   I believe it's true.

8         Q.   Well, do you have any real evidence of

9    that?

10        A.   No.  But when she is subpoenaed she has to

11   tell the truth.

12        Q.   Okay.  But it's, you're speculating, isn't

13   that true, about the baby?

14        A.   No, I'm not speculating.  I believe because

15   he even told me, he said, I had to go see the baby.

16   I said, What's going on with that?  He said, Well, I

17   have to go see the baby.

18        Q.   When did he tell you that?

19        A.   Probably '91 or '92.

20        Q.   When was the baby born, approximately what

21   year?

22        A.   I can't remember.

23        Q.   Okay.  Was it before 1995?

24        A.   Yes.

25        Q.   Okay.  So this is awhile back?

213

1    A.    Yes.

2    Q.    All right.  Okay.  Let's go back to, you

3  know, the I guess the first thing you told me about,

4  the summer of 1998 you get a telephone call from

5  Michael Collette, and you said he was singing?

6    A.    Yeah, he would always call and sing songs.

7    Q.    What was he singing?

8    A.    Oh, I can't sing but --

9    Q.    Well, do you know the name of the song he

10  was singing?

11    A.    Yeah.  It was a song, it is an oldies, he

12  listened to oldies all the time.  It goes, Listen to

13  the rhythm of the falling rain telling me what a fool

14  I have been.

15    Q.    And he was singing that to you?

16    A.    Ah huh.

17    Q.    Okay.  What did you say and what did he say

18  in this conversation?

19    A.    And I said, Now what?  Because usually he

20  called me when he had, he always had ongoing affairs,

21  and whenever one ended he always called me.  And I

22  would say, Now what, Mike?  You know, and he would

23  say, because I know he was involved with different

24  women because he told me so.

25    Q.    Hadn't an affair just ended?

214

1        A.    Yeah, but I don't know with who.  That one

2    I don't know with who.

3        Q.    Did he say an affair had ended when he

4    called you?

5        A.    No, not that call.

6        Q.    Okay.  What else was said in the

7    conversation, what did he say to harass you?

8        A.    Well, first he started, he always starts

9    out nice.  And then like he would sing a song or

10   whatever, then tell a dirty joke.

11            Then he would tell the scuttlebutt of the

12   district, what agents were doing what, who he wanted

13   to get rid of, that kind of thing.

14            But this call was specifically, I finally

15   got rid of her, which I already had known because

16   another agent had already told me, because Mike had

17   the agent review board all set up to get rid of her.

18   I mean I knew all of this.  I knew he was going to do

19   this.

20            So when it happened I was like, Oh, my God

21   you really did it.  Because he had told me previously

22   years before he was going to get rid of her.  And

23   every single person he has been involved with is gone

24   from the company.

25       Q.    Well, did he date Susan Bowne?

1      A.    He tried to.

2      Q.    And how do you know that?

3      A.    Because she told me.  I found her in

4  discovery.  When Sandra Sellers asked me to get

5  witnesses together I remembered her.

6      Q.    Okay.  But she told you this, correct?

7      A.    Yes.

8      Q.    Okay.  Did Mike ever tell you that he

9  wanted to date Susan?

10     A.    No.  I knew he liked her though.

11     Q.    I thought you just told me he hated

12 certificate since 1990?

13     A.    But he liked her initially.  Because we

14 were at a kickoff meeting in 1990, and he kept going

15 up to her and putting his arm around her, warming up

16 to her and everything.

17           And I walked over and I said, Hello, how is

18 it going.  I say, Oh, are you on to her now?  He

19 said, She is my new star, my new agent.  I said, Oh,

20 that's who he is going after now.  He was talking

21 about working all weekend because he was talking

22 about teaching a new insurance class.  I was like,

23 All right.

24     Q.    Do you have any evidence that Susan Bowne

25 ever dated Michael Collette?

216

1      A.   No.

2      Q.   In fact, they never dated, right?

3      A.   I would hope not.

4      Q.   As far as you know --

5      A.   As far as I know.

6      Q.   -- they did not date?

7      A.   As far as I know.

8      Q.   That's true?

9      A.   Right.

10     Q.   You said he told a dirty joke in this

11  summer of 1998 telephone call; what was the dirty

12  joke?

13     A.   I don't remember his jokes.  He can spit

14  them out like that, he is known for it.  Everybody

15  knows, there is Mike, he has got a joke.

16     Q.   So you don't know what the joke was?

17     A.   No.  There were so many.

18     Q.   Okay.  What else was said during this phone

19  call?

20     A.   I think that was it.

21     Q.   How often did you talk to him around this

22  time period, like, you know, 1998?

23     A.   Well, onetime he had called, and it was

24  around, it was '98, and we were working on a

25  Christmas party.  And the agents were, all had

```
 1   teams.  And the manager I had at that time was trying
 2   to get rid of this agent, he didn't like her, and
 3   Mike was helping her.
 4       Q.   Who was that?
 5       A.   Hillary Barletta.
 6       Q.   And who was the manager?
 7       A.   Frank Foley.  But Allstate fired him a
 8   couple years ago.
 9       Q.   Okay.  Do you know for a fact that Allstate
10   fired him?
11       A.   Yes.
12       Q.   So if he quit you'd be surprised to hear
13   that?
14       A.   Shocked.
15       Q.   Okay.  I just, you know, I'm trying to
16   separate what you know versus what's rumor.
17       A.   Okay.  So I got a phone call and it was
18   Mike and he goes, You have to do me a favor.  I said,
19   What?  He says, Do not help her.  I said, Why, we're
20   going to win.  He said, No, don't help her, Brian is
21   trying to get rid of her, we're going to get rid of
22   her.
23       Q.   And this was speaking about?
24       A.   Hillary.  He didn't want her numbers to be
25   good at all.
```

218

1     Q.   How could you help her or hurt her?

2     A.   Well, I can't hurt Hillary.  But help her,

3 I always helped her.  I helped her write policies, I

4 helped her write commercial risks.

5     Q.   When you say helped her, would you get part

6 of the commission and she would get part of the

7 commission?

8     A.   No.

9     Q.   How would that work?

10    A.   I would, after I was finished at work I

11 would go up to her office and help her.

12    Q.   Just do the paperwork you mean?

13    A.   No.  Like help her, show her, how to talk

14 to people on the telephone, how to make sales.

15    Q.   So train her?

16    A.   Yeah, kind of keep her being positive.

17    Q.   Okay?

18    A.   You know, don't let them get you down.

19    Q.   Now, when are you talking about this

20 telephone call, you know, what was harassing about

21 it?

22    A.   Which call?

23    Q.   Well, the second one, you said that it was

24 after the Christmas party or before the Christmas

25 party?

```
 1        A.   Before the Christmas party.

 2        Q.   Is that what you told me before?

 3        A.   That one, the one about Hillary?

 4        Q.   1998, yes.

 5        A.   Well, that one maybe it wasn't as harassing

 6   toward me as it was towards Hillary.

 7        Q.   So there was nothing harassing toward you

 8   in that telephone call?

 9        A.   I'm sure he got a joke in, a dirty joke of

10   some sort.

11        Q.   But he was actually asking for your help,

12   right?

13        A.   He was asking for my help to get rid of

14   Hillary.

15        Q.   Okay.  But would it be fair to say that

16   that particular call was not a harassing call about

17   you?

18        A.   I guess you could.

19        Q.   Okay.  Now, I'm just going to go, before we

20   go on about the sexual harassment, which we will

21   continue.  Now, isn't it true that, you know, going

22   back I guess ten years or so you dated Mike Collette?

23        A.   It was 13 years ago.

24        Q.   When did you first date Mike Collette?

25        A.   I was an agent in the Sears store on
```

220

1    North Lake Boulevard.

2         Q.    What year?

3         A.    In 1988 I think it was.

4         Q.    1988, okay.

5         A.    '88 or '89.  And he came to my house.  He

6    had looked up my records and found out where I lived.

7         Q.    Were you single at the time?

8         A.    Yes.

9         Q.    Okay.  And so he came to your house?

10        A.    Yes.

11        Q.    And what happened?

12        A.    Oh, he just came over.  And he just said,

13   Oh, I was in the neighborhood, how are you doing?  I

14   am like, How did you find my house?  He either said

15   he called the booth and they told him, or he looked

16   in my records, one of the two.

17             He always looked up every single paycheck I

18   made, he knew every single paycheck I was getting

19   before I got it, everything.  He knew all my life

20   numbers, my family history because he told it to me.

21   I asked him, I said, Where did you get that from?  He

22   said, I read your file.

23             So I think maybe we went to lunch and got a

24   sub or something.  And then a couple times he would

25   take my out to eat, you know, lunch because, you

221

1    know, when you worked at the booth in the Sears store

2    you had rotating hours, it wasn't 9:00 to 5:00.

3         Q.   Okay.  And so at approximately how long

4    after you met him did you start like dating him?

5         A.   Well, I first met him in training class

6    when I was first hired in '86, and that's when he

7    would sit in the back of the room and throw spit

8    balls at me.  And I was really afraid of him.

9              I had said to Chris McIntyre, Why does he

10   keep doing that?  You know, because here you are in a

11   big room learning insurance for the first time, I

12   mean it's scary.

13             Then he told me he didn't bother me because

14   he saw me talking to, and I think it was somebody

15   just asking for directions, on the way from the

16   training room to the hotel where Allstate put us up,

17   he was sitting at the bar with the HR rep, and --

18        Q.   This is back in '86?

19        A.   Yeah, he kept watching me.  He had told me

20   that, I always watched you, I always watched you,

21   blah, blah, blah, he goes, but you were married.  And

22   I go, I wasn't married.  He said, Yeah, you were

23   talking to some man.

24             And I think it was a man that had asked me

25   for directions, which I wasn't from the area.  I

222

1    remember saying, I'm not from here, and I had just a

2    small nothing conversation.  So since he saw me

3    talking to someone he thought that was my husband

4    meeting me after class, when in fact we would just go

5    back to the room and do some homework, Chris and I

6    would.

7        Q.   So you didn't really start dating him until

8    1988 or '89?

9        A.   '88 or '89, '89.

10       Q.   It was '89, okay.

11       A.   Then that's when he told me he was getting

12   divorced, he never wore his wedding ring, and that he

13   was going to move up to Stuart and become the manager

14   in steward.  And he knew I wanted to open up my own

15   office, so he was going to help me do that.

16            And he kept reminding me I saved your job,

17   I saved your job for you.

18       Q.   How did he save your job?

19       A.   In 19, in the fall of '88, I think it was

20   fall of '88 -- you were supposed to sell so much life

21   insurance to customers, and if you didn't sell that

22   life insurance they fired you.

23            Well, the manager who is no longer with the

24   company, Brian Felty, no, John Felty never gave me

25   nor another agent our statements that were generated

223

1  by the computer showing where we stood with our life

2  insurance numbers, our sales.

3          So one day I come home from work and there

4  was a letter saying that I was going to be

5  terminated.  I was like, Wow, just blew my mind away,

6  you know, because I worked hard.

7      Q.   Right.  It just said you are terminated

8  because you didn't reach your quota?

9      A.   It was called advance notice of

10  termination, they called it the ANT letter, okay, but

11  ANT letters, don't quote me, either went out 30, 60

12  or 90 days ahead of time.  I was given the letter

13  two weeks, maybe ten days to two weeks before that

14  date was to take effect.

15          So I had no chance to, unless I had got on

16  a plane with ten life insurance apps., went up to

17  Chicago and said, Here, issue these, to make it.

18      Q.   Let me ask you something.  The letter that

19  you got, do you still have it?

20      A.   I don't know.  But human resources should

21  have it in my file.

22      Q.   And my question to you is in the ANT letter

23  does it tell you why you are being terminated?

24      A.   It just says, You have not met your life

25  insurance requirement, it tells you that.

224

1      Q.   Okay.  So how did Collette save your job?

2      A.   So then what happened was, I'm at the Sears

3   store working one day, and he came to the Sears

4   store.  I thought, Oh, God, because, you know, he is

5   way up in the company, he is powerful, this is it,

6   just fire me right here in front of everybody.

7      Q.   This is after you got the ANT letter?

8      A.   Yeah.  So I was like all right, just remain

9   calm.  And he was with another manager, I think his

10   name was Ben Ogle who is long gone too, he's gone.

11   And then they just stood around and watched all of

12   us.  I thought all right, my shift was over, I went

13   home.  I thought phew.

14         My friend was a Prudential agent, and he

15   was like No. 1 in sales.  And he said, Well, come to

16   my office, and he goes, I'm going to see if I can get

17   somebody on the phone, maybe you can get a job with

18   Prudential.  I said, Okay.

19         And so I went over to his office, and he

20   was so busy.  So I ended up just sitting at an extra

21   desk.  And I called over to the booth.  And one of

22   the agents that answered the phone, I don't remember

23   who it is, said, Mike Collette called you.  And I

24   went, Oh, God, all right, so I called.

25         He says, Well, I want to meet with you.  I

1  said, Okay.  And he goes, I really don't think you

2  should lose your job.  I said, Okay.  And he goes,

3  Where are you right now?  I said, I'm at a friend of

4  mine's office, he is a Prudential agent.

5           And he said, Well, when are you supposed to

6  work at the booth?  I said, Well, I was supposed to

7  be there an hour ago.  He goes, Go there and act like

8  you still have your job.  I said, Okay.

9           So I went I think dressed the way I was,

10  and without a suit on, and went over to the Sears

11  store and stood there and worked.

12           But meanwhile of course every agent in the

13  booth is undermining you because as the customers

14  were walking in asking for me they would say, She is

15  not going to be here anymore, I will write your

16  policy, you know, that kind of thing.  So I had to

17  deal with all of that.  And then I went home.

18           So a couple of days later the phone rings

19  again, and it is Mike.  He called me at my house and

20  he goes, I need to have you come to One Park Place

21  where the Florida region office is and meet with

22  myself and Darryl Stark.  And Darryl Stark was the

23  new territorial agency manager that took Andy Steel's

24  place.  They let Andy Steel go from what I have been

25  told for sexual harassment too.

226

1          So I go down there, and I get into the

2     elevator.  And there is another agent standing

3     there.  He goes, Hey, I got to thank you.  I go, For

4     what?  He goes, you know, You are saving our jobs.  I

5     go, How?  And he goes, I don't know, he goes, But

6     they called me and they called you.  I go, Really?

7     And he goes, already I have been working for Krumb

8     And Foster for two weeks.  I go, Okay.

9          So I get in there, and of course I'm all

10    nervous and everything.  And they said, Mike goes,

11    Come here, I want to talk to you, come into my

12    office.  So I went into his office, and he goes,

13    Hey.  And I go, Yeah.

14         And he goes, Don't get upset, don't cry or

15    anything, I'm going to save your job.  I called the

16    company and I told them you are going to sue.  I

17    said, Sue, what would I sue for?  I couldn't even

18    think of what I would sue for.  And I said, Okay.

19         And then he turned to me and he goes, You

20    know we came over to the booth and saw you the other

21    day, you looked too good to fire.  I was like, Okay.

22    At that time I took it as a compliment, I'm going to

23    have my job, I'm by myself, I'm happy with that.

24         They put us into a room, and they asked us

25    all of the questions about this manager and all of

227

1    the things that he did wrong.

2        Q.    Your manager?

3        A.    Yeah.

4        Q.    Okay.

5        A.    And then they got rid of him.

6        Q.    And who was that do you know?

7        A.    Brian, wait, John Felty.

8        Q.    Okay.  So that's --

9        A.    That was it.  So now I go back to work.

10   And he kind of like fell off the face of the earth, I

11   hadn't seen him or anything.

12       Q.    So for a time you had no further dealings

13   with Collette?

14       A.    None whatsoever at all.

15       Q.    And would it be fair to say going back to

16   that time period you were grateful to him way back

17   then?

18       A.    Yes.

19       Q.    Okay.

20       A.    I guess you could say that.  I was still

21   more in fear because I know that powers he has.

22       Q.    Okay.

23       A.    Okay.  So then there was a meeting

24   someplace about like buy/sell agreements, and Mike

25   conducted the life insurance, he conducted all those

228

```
 1   training meetings, you know.
 2       Q.   What time period are we?
 3       A.   March of '89.
 4       Q.   Okay.
 5       A.   Around there.
 6       Q.   Okay.
 7       A.   And there was a big meeting there.  He saw
 8   me at that meeting.  He said, Can I take you to lunch
 9   one day?  I said, Sure.  And, you know, see how you
10   are doing and everything, because it was after all
11   this happened.  I said, Sure.
12            And we never went to lunch because my car
13   broke down, and I had to get a tow truck and come
14   back up to the Sears store and work.  So then I
15   didn't see him then.
16            Then around June I think it was is when he
17   came to my house.
18       Q.   So this is June of '89?
19       A.   Yeah.
20       Q.   Okay.
21       A.   So I was involved with him from June to
22   September, like three months.
23       Q.   Of 1989?
24       A.   Right.
25       Q.   So you only went out with him during that
```

229

1   three months?

2       A.    Yeah.   I told him I didn't want anything to

3   do with him because what happened was I knew he liked

4   Sherry Aylette, he told me he liked the underwriter,

5   our underwriter from our territory.   And I know he

6   was seeing her because they both stayed at the same

7   hotel.   And apparently he had some sort of

8   altercation with her.

9       Q.    And give me her name again, Sherry?

10      A.    A Y L E T T E.

11      Q.    Okay.

12      A.    She ended up leaving.   He said he hated her

13  guts.   He called her all sorts of four-letter words.

14  And she left this area and went up to Orlando and

15  worked for an agent up there.

16      Q.    You are saying he dated her?

17      A.    Well, I think, well, this is what she told

18  me happened.   That he left her a note at the hotel

19  and said, Come to my room.   So when she got to this

20  room he had all this wine and cheese and everything

21  all spread out, and said, Come on, something like,

22  This little party is for us, something along those

23  lines.

24      Q.    Okay.   But you didn't see any of this

25  yourself?

230

```
 1        A.    No.  Sherry told me.

 2        Q.    Okay.

 3        A.    It's probably on his expense account.

 4        Q.    Then what happen, did they sleep together?

 5        A.    She said she left.  She didn't want

 6   anything to do with him.

 7        Q.    Okay.

 8        A.    So okay.

 9        Q.    So as far as you know they didn't date?

10        A.    As far as I know.

11        Q.    All right.  Going back to you, let's go

12   back to this June to September, 1989, okay; did you

13   have a sexual relationship with Michael Collette from

14   that time?

15        A.    From June to September.

16        Q.    Okay.  And this is in '89?

17        A.    Yeah.  Because then in November I was still

18   in the Sears store working.  And it was a Saturday,

19   it was right before I opened up my office.  Because

20   remember he helped me open up my office, he got the

21   exception for me to open up my office.

22        Q.    Okay.  You will have to tell me about that;

23   when did that happen?

24        A.    Like in September, October.

25        Q.    Of '89?
```

```
 1        A.    Yeah, that same time.

 2        Q.    So --

 3        A.    He was, he knew the whole system, how to --

 4        Q.    So he used his power to help you get your

 5   own agency?

 6        A.    Right.  Because when I was an agent I was

 7   an agent in Palm Beach County, and I wasn't supposed

 8   to open in Martin County, it was out of district or

 9   out of my area.  He said, Don't worry, just stick

10   with me, and I will get it for you.

11        Q.    So he got that approved?

12        A.    Yeah.  That's why I said, he always made me

13   feel like I owed him, owed him for my job, I owed him

14   for my office, I always owed, you know what I mean,

15   owed.

16        Q.    Now, did you and he go visit your parents

17   in New York --

18        A.    Yes.

19        Q.    -- during that time period?

20        A.    My sister had a baby in July, and in August

21   I said, I'm leaving, I have to go for a couple of

22   days up to see my sister, she had a baby.  Oh, yeah,

23   when are you going?  I told him I was going.  How did

24   you know that?

25        Q.    I'm the one that gets to ask the
```

1    questions.

2          A.    So then I get a phone call.  Oh, God here

3    is another thing too.  I know he was involved too

4    with the girl, a short girl, dark hair that arranged

5    all our trips that we won, like when we went to

6    Vegas, like the trip to Vegas she was there.

7          Q.    Now, is this during this time period, '89?

8          A.    Yes.  Maybe it was in -- oh, God, I wasn't

9    involved with him.  I remember seeing him on that

10   trip.

11         Q.    Collette?

12         A.    Yeah, he was there.

13         Q.    Which trip?

14         A.    The trip I won, let's see, probably '88 or

15   '89 he was there.

16         Q.    But that's before you were dating him?

17         A.    Ah huh.  Because what happened was the

18   friend of mine that was working with me, I told her,

19   I said, Just help me sell at much life as you can, I

20   will take you because the guy that I was dating ran a

21   restaurant, he couldn't take any time off.

22               So we went to Vegas, and he was there.  And

23   what happened was they made a mistake with our hotel

24   room or something.  So I turned to this one lady, and

25   I said to her, and I go, It is freezing out there, I

233

1  cannot believe we have to walk across the street with

2  our luggage, they did this to the hotel, they put us

3  in MGM versus something else.

4  　　　　　She looked at me, she goes, I will take

5  care of it for you.  And then we started talking.

6  And with that Mike came over, and she said, Oh, you

7  must know this is Linda, and then he said this is

8  whatever that girl's name.  Then she walked away.

9  　　　　　They were talking or whatever, and then he

10 came over to me and said, She said that you were a

11 very determined woman, that you did not want to walk

12 across the street with your luggage in the cold, blah

13 blah, blah.  He goes, you know, She really likes me.

14 I said, Okay.  And that was like in '88.

15 　　　　　And then when I was involved with him he

16 told me that he had dated her.  And that when he

17 moved his office from Coral Springs, when Allstate

18 moved him from Coral Springs to Stuart or were going

19 to move him to Stuart they stopped using her travel

20 agency to handle the big promotional trips for

21 Allstate, then he wasn't involved with her anymore.

22 　　　　Q.   Okay.  So she was the travel agent, she

23 didn't work for Allstate directly?

24 　　　　A.   I don't know that part.  I don't know how

25 Allstate worked that.  I don't know if they were like

234

1   an Allstate -- I don't know.

2       Q.    So going back to you.   This trip to

3   New York, you sister had a baby.

4       A.    Oh, yeah, so then I told him that when I

5   was leaving.   So then the next day he comes over to

6   my house and he goes, I'm going to Buffalo with you.

7   I said, What?   He says, Yeah, I told everybody I'm

8   taking my life insurance road show to Buffalo.

9            I said, Okay, who is everybody?   He said,

10  Well, my next door neighbor I play baseball with, and

11  he was going on about other people.   I said, All

12  right.   And that girl, she arranged the ticket.

13      Q.    Okay.

14      A.    The girl that --

15      Q.    But anyway so he went with you to Buffalo?

16      A.    And Allstate bought the ticket.

17      Q.    Okay.   And did he meet your parents?

18      A.    Yes, and my grandmother.

19      Q.    Did he meet your sister?

20      A.    Yes.

21      Q.    Did he see the baby?

22      A.    He was there at church for the christening,

23  yeah.

24      Q.    Okay.   And how long did you and he stay in

25  Buffalo?

235

1     A.   Well, we went to Canada onetime, the falls,

2  probably four, five days.

3     Q.   Okay.  And did you sleep together in the

4  same hotel room during that trip?

5     A.   We stayed at my sister's house.

6     Q.   The whole time?

7     A.   Yeah.  Didn't get a hotel room.

8     Q.   Okay.  Did you sleep with him there?

9     A.   Yes.

10     Q.   Okay.  Now, what, the relationship that you

11  had with him was, at anytime between June and

12  September, '89 did he ever stay at your place or did

13  you ever live together during that time?

14     A.   Sometimes he would stay at my place if he

15  had a company meeting where it was closer for him to

16  get to from mine.  I lived in Jupiter.

17     Q.   Okay.

18     A.   And see that's what made me put it together

19  when he told me that when he was going to get the

20  exception for me to have my agency open in Martin

21  County versus Palm Beach County, he said one of the

22  things Allstate came back and told him was that I had

23  to have a residence in Martin County.

24     Q.   And at the time where were you living?

25     A.   In Jupiter.

236

```
 1      Q.    Okay.

 2      A.    In Palm Beach County.

 3      Q.    Okay.

 4      A.    So I said, You got to be kidding me.

 5  Because this was in November, and I'm trying to open

 6  January 1.  And I didn't get that approval letter

 7  yet.

 8      Q.    Okay.

 9      A.    Okay.  But keep in mind I didn't know that

10  that wasn't the truth until now, and that he knew he

11  was moving up to the Stuart area, and then I would be

12  in Hobe Sound versus Jupiter.  If you know the

13  geography, Jupiter, Hobe Sound, Stuart.  So I did, I

14  found a place to rent and a roommate.

15      Q.    Okay.  So you did comply with that

16  requirement or whatever?

17      A.    He came to the house and saw it, met my

18  roommate.

19      Q.    Okay.  Now, so it would be fair to say that

20  during that time period the relationship between you

21  and he was consensual, is that right?

22      A.    Yes.

23      Q.    Okay.  Why did it end?

24      A.    Well, because, one, I was opening up my own

25  office, and I wanted to be, I wanted to give it my
```

1   all, this was my chance.  And I knew that I was going

2   to have to work, you know, ten, 12 hours a day, which

3   I did everyday seven days of the week, which I did.

4           And he was like upset because I was working

5   at the Sears store in November.  And then I looked up

6   the elevator one Saturday and there he was.  He

7   bought a watch for me, he brought me a watch.  And he

8   goes, Here, I want to give this to you like a piece

9   offering, he didn't want any trouble is how he put

10  it.

11      Q.   When did he give that to you?

12      A.   For my birthday in November, '89.

13      Q.   Okay.  Now, were you still dating him or

14  seeing him at all at that point?

15      A.   No.  I might have seen him like maybe he

16  called me the week between Christmas and New Years

17  because he was at home watching his kids.  And

18  then --

19      Q.   Again, '89, the end of the year?

20      A.   '89.  Then I saw him like one last time in

21  '90 probably like January or February, somewhere

22  then.  I don't have the exact date.

23      Q.   Did you have a sexual relationship at that

24  time in January, February, 1990?

25      A.   I don't remember that.  I went to his hotel

238

1   room in Boca because they had him stay in Boca,

2   Allstate paid for his room in Boca.  And I went down

3   there.  I didn't want to be there, but I knew, you

4   know, sometimes you just have to talk to Mike to

5   just, you know, so no trouble starts.  I thought,

6   Okay, I will go.

7          Then there was some baseball game on that

8   he was watching because it was Nolan Ryan was making

9   his big hit or whatever.  And that's when I said I

10  don't care about this, I'm going home.  He said, No,

11  you can stay here, you can stay here.  I will leave

12  so early for the meeting.  None of the Allstate

13  people will know you here.  I said, That's okay.  And

14  I went back to my place where I had a roommate.  I

15  lived in Hobe Sound.

16         And then he, by then he was up to, who

17  knows, Suzanne.

18     Q.   So you believe he was starting to date

19  Suzanne then?

20     A.   Yes.

21     Q.   In 1989 or '90?

22     A.   Yes.

23     Q.   So who broke it off, who broke it off, who

24  from who?

25     A.   It went back and forth.  I think when I had

239

1    my first opening party when I gave, I did Child Find

2    with Martin County Sheriff's Department, and I had

3    like kids come to the office and get fingerprinted

4    and their picture taken and raffle off a bicycle and

5    all that other stuff.  I had that at my office like

6    an opening.

7         And that's when a girlfriend of mine turned

8    to me, she said, I got to tell you something, you are

9    going to die when you hear this.  I go, What?  She

10   goes, Mike Collette just moved to Vero Beach and

11   bought a house with his wife.  And I said, What?  And

12   I couldn't even stand, oh, my God you have to be

13   kidding me, all of this time I have been lied to.

14        So that was kind of the thing that made me

15   realize wait a minute, this is not what I am being

16   told it is.

17       Q.   Had he told you he was going to leave his

18   wife?

19       A.   Oh, yeah.  He even told that to Sherry.  He

20   told it to my friend Jan Gardner, he told

21   Jan Gardner, I didn't even know this until years

22   later, I'm going to marry her.  He told my mother

23   that.  He even showed my mother picture a picture in

24   a magazine of an engagement ring.

25       Q.   So from what you understood he was planning

240

1    to leave his wife and marry you?

2        A.   As far as I was concerned he didn't even

3    have a wife.  I mean it's like you how some men are,

4    they have another life, and the other life was his

5    wife in another town, you know.  Because remember

6    Allstate paid for him this entire time.  He never

7    lived at home.  He was living in Indian River

8    Plantation for like six months.

9        Q.   So let me ask you then during the time you

10   were dating him you are saying he was not living at

11   home with his wife?

12       A.   Correct.

13       Q.   That whole time?

14       A.   That whole entire time.  He wasn't living

15   at home, he didn't wear a wedding ring or anything.

16       Q.   You said onetime he called you and he said

17   he was baby-sitting the kids; was that at his wife's

18   house?

19       A.   I don't know.  I said that, I wondered, it

20   must have been.

21       Q.   Okay.  In fact talking you mentioned Jan

22   and Gardner Brown?

23       A.   Right.

24       Q.   And they were mutual friends of yours and

25   his?

1      A.    What happened was is Jan, when I opened up

2   my office they told me that I had to have a license,

3   they made all these different things I had to do,

4   which I found out weren't true.  But they said I had

5   to have licensed support staff.

6           Well, Jan used to work with me as an

7   Allstate agent.  But she left the company to have a

8   baby, and she could not stand the North Lake store,

9   it was a bad neighborhood.

10          So because she lived in Tequesta and I

11  lived in Hobe Sound she came to work for me a couple

12  days a week.  And when I had my opening Child Find I

13  was supposed to have gotten from my manager like $200

14  to go toward some of the cost of it, and I never got

15  it.

16          So when I called to the new person, I

17  forgot what his title was, Wally Munoez.  He goes, I

18  will bring you the money, I will give it to you, I

19  will cover whatever you need for that.  And he

20  brought all these Allstate balloons because he was

21  good at doing stuff like that, all of the balloons

22  and coloring books and all that stuff.

23      Q.    Who brought that?

24      A.    He took Mike's place, new sales development

25  manager, that's what they do, that was his job, that

242

1   was his job.

2       Q.   When was this opening?

3       A.   January of, it was either January, February

4   of 1990 because I opened up my office January 1,

5   1990.

6       Q.   Okay.

7       A.   And Jan, Gardner was there to help me.  And

8   he was there.  He said to Jan, Why don't you become

9   an agent?  She said, No, way I'm not going to do it.

10  But then I kept saying, Well, I'll do it.  Then they

11  said, You can't because you don't have a four-year

12  degree.

13          And so Jan said, No way I want to be an

14  agent again.  And at that Gardner had interviewed

15  with my manager, and my manager said, No, you don't

16  have a four-year degree, you cannot become an

17  Allstate agent.

18          So with that Mike called me up, because he

19  heard the whole thing, how ever he found out.  Maybe

20  Brian must have told him, I believe Linda had

21  somebody, blah, blah, blah.

22          And then Mike had called me up and he said,

23  I will tell you what, he goes, Why don't you have

24  them call me.  I said, All right.  And so he hired

25  them.

243

```
 1        Q.    Now, did you think that was bad that he
 2   hired them?
 3        A.    No.
 4        Q.    Okay.  So that was okay with you?
 5        A.    Yeah.  I mean I was mad at first I didn't
 6   have the support staff walked out the door and became
 7   an agent, you know, but she was my best friend.
 8        Q.    Okay.  So she got the job?
 9        A.    Okay.  So now --
10        Q.    Let me ask you a question about that
11   because this is why I brought them up, because I
12   don't want to go into too much detail with them.  But
13   you were friendly with them both, correct?
14        A.    Oh, yeah.
15        Q.    And Mike was also friendly with them both?
16        A.    Yes.
17        Q.    This is with Jan, Gardner Brown?
18        A.    Right.
19        Q.    So did you ever have occasion to go to
20   dinner at their house with Mike?
21        A.    Never.
22        Q.    You didn't?
23        A.    No.  Surprisingly for them living as close
24   as they did I never saw them.
25        Q.    You never went to their house for dinner?
```

244

1          A.    I used to stay overnight at their house all

2    the time.   Their little boy was like my Godson, and

3    he never came over.

4          Q.    Okay.

5          A.    Because he was involved with Suzanne.

6          Q.    Well, before that did the four of you ever

7    go to dinner to socialize?

8          A.    Oh, when they moved to Tequesta?   That's

9    when we went to their house, I took Mike there to

10   meet them so he knew who they were to become agents.

11   Because he didn't know who they were when I said I

12   have Jan, Gardner Brown, Jan works for me.

13         Q.    I see.   So you did stay for dinner there?

14         A.    Yeah, we went there.   I said, Okay, let's

15   go to this house where they live.   Then they did all

16   their talking about how to get hired and all that

17   stuff.

18         Q.    Okay.   Let's go back to this sexual

19   harassment.   I mean I want to get your listing of

20   different events that happened where Mike Collette

21   was harassing you.   Okay.   So basically let's finish

22   off.

23         So basically you have this relationship

24   with him, but after 1990 it was over, would that be

25   fair to say?

245

1     A.   Oh, yeah.

2     Q.   Did you ever date him after that in 1991,

3  '92, '93?

4     A.   No.  I was married in '92.

5     Q.   Okay.  And then when was your divorce?

6     A.   Let's see, August of '99.

7     Q.   Okay.  Now, between '92 and '99 during that

8  time did you date anybody else, you know, other

9  than your husband?

10    A.   No.  I was married.

11    Q.   You didn't have any affairs, nothing?

12    A.   Nothing.

13    Q.   Okay.  And then after you divorced in

14  August of '99, well, before that, I should back up.

15  Were you separated, did you live separately before --

16    A.   No.

17    Q.   -- your actual divorce came through?

18    A.   No.  I filed in May, and it was done in

19  August.  It was like the end of May, so it was

20  one month I was like by myself.

21    Q.   Where were you living in '99 when you were

22  still together?

23    A.   My house.

24    Q.   What address was that?

25    A.   At the 8849 Southeast Hawksbill Way.

246

```
1        Q.   The current address?
2        A.   Yes.
3        Q.   Okay.  Then when you were divorced your
4   husband moved out?
5        A.   Yes.
6        Q.   And just to follow up on that, what, do you
7   have contact with him anymore?
8        A.   When I see him at the grocery store.
9        Q.   He is in the area?
10       A.   Ah huh.
11       Q.   Okay.  Did you have any children together?
12       A.   No.
13       Q.   Okay.  And what is his name again?
14       A.   John.
15       Q.   Okay.  And who does he work for?
16       A.   Himself.
17       Q.   What does he do?
18       A.   He is a contractor.
19       Q.   Build buildings, residences?
20       A.   Residential.
21       Q.   Okay.  Does he have a particular name of a
22   company?
23       A.   Yeah.  I think he's up in North Carolina
24   now building.
25       Q.   Okay.  Does he have a company that he owns,
```

247

1   or does he work for another company?

2       A.   He works for himself.  I don't know what he

3   calls it.

4       Q.   Okay.  So now going back to more recently

5   like 1998, you are saying that that's when the sexual

6   harassment starts with Mr. Collette.  And you told me

7   about like one phone call.

8       A.   Well, like in 1998 I told him, I said, you

9   know, Mike, just back off, it is so off-color.

10      Q.   The jokes?

11      A.   Yeah.

12      Q.   But do you remember any of the jokes, can

13  you even say one that you know?

14      A.   No.  But if somebody said a joke he told

15  that one, he told that one, he was good with those

16  little one liners.  He was known for his little

17  one-liner jokes, like little stories.

18      Q.   Can you give any examples?

19      A.   No.

20      Q.   Okay.  So what else did, let's go back to

21  '98; anything else happen in '98 that you found to

22  be harassing?

23      A.   Okay.  1998, I don't remember.  I know he

24  was at a meeting where Olga was sitting behind us.

25  He kept playing with my hair.  I said, Mike, don't do

248

1    that.  It was so condescending.  Like he was trying

2    to, you know, I felt like he was making me feel like,

3    I don't know, like humiliated like, like maybe like

4    he was showing the people around look what I can do

5    to her, kind of that thing.

6         Q.   What was he doing to your hair?

7         A.   He would play with it.

8         Q.   Braid it or what, when you say play with it

9    what are you talking --

10        A.   Play with it, look at your highlights,

11   whatever, you know, that kind of thing.  He would

12   always make remarks like, I always work better on top

13   of you, remarks like that.

14        Q.   When did he say that?

15        A.   He always said that.  One of the last times

16   he said it was the kickoff meeting, last year's

17   kickoff meeting I guess it was.

18        Q.   When was it, that would be in January then,

19   are they always in January?

20        A.   Yes, I believe in January.

21        Q.   So you are placing it what, January of

22   which year?

23        A.   January.  Here are we now in 2002.  2000.

24        Q.   Now, that, January, 2000, that was the last

25   one?

249

1       A.    It was the last one I went to.

2       Q.    Oh, that's the last one you went to.  Oh,

3    okay.  You are sure?

4       A.    Yeah.

5       Q.    You didn't go to the 2001 meeting?

6       A.    That was last year.  I have to think about

7    which year it was.  I get those two meetings mixed

8    up.  Whatever.

9       Q.    Okay.  Well, yeah, the January, 2001 is the

10   one you say you didn't go to, is that right.  And so

11   this would be the year before?

12      A.    Yes.

13      Q.    So January, 2000.  And he said, I always

14   work better on top of you?

15      A.    Yeah.  Then he said another --

16      Q.    What did you say in return to that when he

17   said that?

18      A.    I think I just walked away from him at that

19   time.  See, I think what happened was this little

20   simple obsession that he had, I wasn't reacting to

21   him, and I don't think he liked it.  And this is what

22   brought this behavior on even more and more, more

23   meetings.

24            Then I found out through other people that

25   he was talking about me to them.  He went to up

1   Brenda Bussel and was asking about me because he knew

2   Brenda had come to my office and trained my girls on

3   the computer and asked what name I was using, I think

4   trying to find out if Brenda knew if I was divorced

5   or not.

6          And then one embarrassing thing he did in

7   front of Chuck Roussin, who was like a financial

8   trainer I guess, education manager.

9       Q.   Where was this?

10      A.   For the Florida region.

11      Q.   No.  I meant --

12      A.   We were in a meeting in Port St. Lucie

13  about filling out a U4 card.  And Chuck turned to me

14  and said, Linda, Make sure you get your variable

15  annuity license.  And I said, Okay.  And he goes, All

16  you have to do is just read the book and take the

17  test.  And I said, Oh, what does the book look like?

18  Chuck said, I have it in the car, I will go get it

19  after the meeting, I will show you.

20          And then Mike goes, No, that's all right,

21  Chuck, I'll show her.  I said, That's all right.  He

22  goes, Well, no, I know I have it over there.

23          And when I turned to walk to go sit down in

24  my chair, that's when he turned to me right in front

25  of Chuck, and I know Chuck heard it and kind of went

1   like that like he didn't want to acknowledge, and he

2   goes, You know what, you look good enough to eat.

3   And I know he said it thinking I'm going to say it in

4   front of Chuck anyway, now let's see what reaction

5   I'm going to get out of Chuck, but Chuck didn't want

6   to give a reaction.

7        Q.   Okay.  And what did you say back?

8        A.   Nothing.

9        Q.   Nothing?

10       A.   No.  I went and sat down.

11       Q.   Give me the date again approximately when

12   this was, when did you tell me?

13       A.   It was when they first said that we had to

14   fill out a U4 card.

15       Q.   What is a U4 card?

16       A.   To get your securities license you have to

17   get fingerprinted.

18       Q.   Wasn't Florida one of the more earlier

19   states like --

20       A.   To make you do it, yeah.

21       Q.   You mean early, it was like the kickoff

22   program?

23       A.   Yes.

24       Q.   And Florida was one of the earliest?

25       A.   Earliest, yes.

252

1    Q.   Would this have been maybe '99, late '99?

2    A.   I don't know.  Do you remember it?

3    Q.   Well, that's my understanding.  But I'm

4  asking you.

5    A.   It could have been.

6    Q.   Okay.  This is at least a couple years ago,

7  right?

8    A.   Yes.

9    Q.   So it could have been around that time

10  period?

11    A.   Sure.

12    Q.   Okay.  There was a lot of training going on

13  for financial stuff?

14    A.   Yes.

15    Q.   Okay.  And you remember --

16    A.   It was before I got my variable annuity

17  license, and I got that in November.

18    Q.   Of what year?

19    A.   Of, it wasn't this year, it wasn't last

20  year.  It had to be the year before.  So that puts us

21  at what?  We're in 2002.  So it had to be 2000 then,

22  right, 2000.

23    Q.   Well, we could find out when you got your

24  variable annuity license.

25    A.   It was November, whatever that year.

253

1      Q.   Okay.  What, you say it was before; do you

2   remember how much before this meeting in

3   Port Saint Lucie would have been, like a month or

4   two months?

5      A.   Probably two months.

6      Q.   Okay.  Because the purpose of the meeting

7   was to prepare you to get your license?

8      A.   No.  Just to hand out the fingerprint cards

9   to fill them out.

10     Q.   That was it?

11     A.   Didn't even have enough.

12     Q.   Okay.

13     A.   There wasn't enough materials anyway to

14   pass out.

15     Q.   Okay.  And you say Chuck didn't say

16   anything?

17     A.   No.

18     Q.   He looked like he was trying not to notice?

19     A.   Acknowledge anything.

20     Q.   Okay.  Anything else happen at that

21   meeting?

22     A.   Well, Hopson was in the back of the room, I

23   remember that.  And --

24     Q.   Did you speak with him?

25     A.   Yeah, I said, Hi, to him.  And I remember

254

1    Mike not wanting to sit next to him for some reason.

2    They didn't get along so well.  But I mean I remember

3    sitting in the room, and then Mike like looking over

4    and smiling and winking.

5         Q.   Okay.

6         A.   That kind of thing.

7         Q.   All right.  And moving onto, was that

8    pretty much it for this particular incident?

9         A.   Yes.

10        Q.   Okay.  What else did Mike Collette do, if

11   anything, that you found to be harassing?

12        A.   Well, a lot of times we would have company

13   meeting, and he would always call me up to bait me to

14   like set me up to say something that was either going

15   to get another manager or another agent or somebody

16   in trouble.

17        Q.   Give me an example.

18        A.   Like onetime they passed out a survey.  And

19   the survey went out without the agent's knowing that

20   the survey was about questioning something about

21   them, do you like the service or whatever.

22             And he said, he called me up and he said,

23   You need to bring it up in the meeting, why did they

24   send these surveys out to customers without our

25   agents' knowledge, and, you know, show concern, that

255

```
 1    it wasn't right for the company to do that.
 2            So in the meeting the regional
 3    vice-president is at the meeting and all the
 4    managers, territorial managers, I think Hugh Hopson
 5    was there.  I think that's one of the reasons because
 6    he didn't really like Hugh Hopson.
 7            So I did, I raised my hand and asked, Why
 8    are you sending out these customer surveys without
 9    our knowledge?  Customers are calling and asking us
10    questions about them, so on and so forth, that had to
11    be in 1999, yes, 1999.  My manager at the time Brian
12    Foley turned to me and said, How dare you embarrass
13    me in front of everybody like that.
14            And then that's when I called up Mike and
15    said, Why did you tell me to do that?  Well, I didn't
16    know he was going to yell at you he said.  But he was
17    doing it to make himself look better in front of
18    Brian and in front of Hugh.
19       Q.   Was Collette at this meeting?
20       A.   Yeah.  So then he kept saying he hated
21    Hugh Hopson.  And he got the whole entire district
22    all up in Vero Beach, nobody even called him Hugh.
23    They all called him the big nig, and that's what he
24    would say, Oh, the big nig is coming, I have to go
25    down.
```

256

```
 1            Onetime he called me up, I have to go see
 2    the big nig in Boynton, do you want to go to lunch?
 3    I was like, No, I don't.  I told him, No, I don't
 4    want to go to lunch, I'm busy that day.  He goes, I'm
 5    going to passing through, I'm going to be passing
 6    right by Hobe Sound.  He goes, You know what kind of
 7    lunch I want.  I said, No, Mike.  And that was in,
 8    around the same time, probably around 1999.
 9         Q.   Early or late part?
10         A.   Probably the later part of '99.  It was
11    always something, a call had that had to do with what
12    meeting he was going to or where he was going to.
13    See, I didn't know what he meant by that.
14            So I said to Jan at that time.  I said to
15    her, I go, Why does he call him the big nig?  She
16    goes, Because he's black.  I said, Oh, well, that's
17    because Hopson, as far as I'm concerned my skin is as
18    dark as Hopson's, so I never considered him really
19    black.
20            But Mike just did not like him, and had
21    everybody call him the big nig.  I think Hopson knew
22    it, and Hopson and Chuck actually were preparing
23    something to fire Mike in 2000.
24         Q.   This is Chuck who?
25         A.   Roussin.  But it didn't happen obviously
```

257

1   because they brought Richard Lott here instead.

2       Q.   So in this case, back to you, he wanted to

3   what, take you out to lunch, go out with you?

4       A.   No.  Just go to sleep with me, go to bed,

5   have sex.

6       Q.   Okay.  But you say, no?

7       A.   No, right.

8       Q.   What else can you, you know, if anything,

9   can you think of that was sexual harassment by

10  Collette?

11      A.   Well, a lot of times he would, like we

12  would be at a meeting, and we, everybody would walk

13  over and grab like a cup of coffee or something.  And

14  he said, Oh, you should be just 2 feet shorter, and I

15  would have my dream this morning, because you could

16  be giving me a blow job, and I could put my cup of

17  coffee right on your head all at the same time.

18           And he would say that.  And other agents

19  would be 3, 4 feet away from me.

20      Q.   Where were you when that happened again?

21      A.   This meeting was --

22      Q.   This is a meeting?

23      A.   Yeah.  This meeting was --

24      Q.   Where was it located first of all?

25      A.   In Jensen Beach.  I'm trying to think now.

1     It was either one of the Sheraton meetings or the

2     Indian River Plantation meetings, one of those two.

3          Q.   And was this also in '98 or '99?

4          A.   '98 maybe.  Hopson was there, I know that.

5          Q.   Okay.  So Hopson was still in the region

6     before he went into financial?

7          A.   Oh, yeah.  See, what happened was is Hopson

8     was the territorial agency manager, he was above

9     Mike.

10         Q.   Right.

11         A.   And Mike hated Hugh because Hugh was

12    discriminating against him for being black.  And Hugh

13    said that somebody was sending home office emails

14    about him, and it was Mike.

15              But at the same time Mike was doing it

16    because he knew that Chuck and Hugh Hopson had a

17    package together to get rid of Mike Collette.  They

18    were finally going to terminate him for all the stuff

19    that he did.  Because I even asked Hugh Hopson, Why

20    did you allow all that, or, Why did you allow this

21    when you knew this was happening to me?

22         Q.   Allow what?

23         A.   He knew.  When I called Hugh Hopson and

24    told him what I was doing, that I was finally

25    fighting Mike Collette and I had a restraining order

259

1    against him, and I made an internal investigation

2    with Allstate, he said, he told me, I feel so badly

3    because for so long I knew this was going on, the

4    agents would talk about it all the time, and he goes,

5    I'm just so sorry.

6            I said, Why didn't you ever do anything

7    about it, Hugh?  He says, you know, Home office just

8    gives me so much to do, he goes, I guess my hands

9    were just too tied to do anything, you know.  Now he

10   like tries to help me, if I need help with

11   something.  But he is a compliance person now, so I

12   really don't need him for anything.

13       Q.   When did you have that conversation with

14   Hugh?

15       A.   When I first started meeting with

16   Sandra Sellers when I called him and I told him.   I

17   said, you know, Sandra Sellers said she was going to

18   interview me two months ago.

19           And then a friend of mine is friends with

20   Ed Liddy.  I said, you know what, he always said Ed

21   is so nice, I'm going to send him a letter.  So I

22   sent Ed a letter saying this is what's been happening

23   to me.

24           Ed Liddy then gave it to Tamra Brown, the

25   human resources manager up in Chicago; she contacted

260

1   me and interviewed me over the telephone.

2       Q.   This is at corporate headquarters?

3       A.   Yes.

4       Q.   Now, let me ask you a question.  Did Tamra

5   interview prior to Sandra Sellers interviewing you?

6       A.   Yes.

7       Q.   She did.

8       A.   Ah huh.

9       Q.   So your interview with Sandra Sellers was

10  December 21 of 2000, does that sound right?

11      A.   It was.

12      Q.   You were tape-recorded?

13      A.   Okay.  I thought it was a little later, but

14  okay.

15      Q.   The transcript date, does that sound about

16  right?

17      A.   Okay.  Yes.

18      Q.   End of the year?

19      A.   I don't know about that.  I thought she

20  didn't interview me until like January or February.

21      Q.   Okay.  Well, it was whatever it is.

22      A.   Whenever that transcript date is, that has

23  to be maybe with Tamra.

24      Q.   Oh, your transcript was with Tamra, the

25  tape-recording?

261

1    A.   It must be.

2    Q.   A very long tape-recording?

3    A.   Well, I have a tape-recording that Sandra

4   gave to me of she and I.   But it was my understanding

5   that --

6    Q.   Well, back up then.   There were

7   two tape-recordings?

8    A.   I have two tapes.

9    Q.   Okay, okay.

10    A.   So I just thought that I didn't, I thought

11   that November came, I did the restraining order.   She

12   said she was going to be here in two days to

13   interview me; she wasn't.

14    Q.   This is Sandra?

15    A.   Yes.   December came and maybe January came,

16   that's when Tamra Brown got involved.

17    Q.   Okay.

18    A.   Then Sandra interviewed me in February, I

19   think in January or February.

20    Q.   Okay, okay.   You know, maybe I'm wrong.

21    A.   It wasn't December.

22    Q.   But Tamra interviewed you first?

23    A.   Yes.

24    Q.   Okay.   Now, did you talk on the telephone

25   with Sandra Sellers about your complaints before the

262

1  lengthy interview?

2      A.   Yes.

3      Q.   Okay.  And so which came, what was the very

4  first complaint that you made, the very first person

5  that you spoke to and said, Look, I have got a

6  problem with Michael Collette?

7      A.   Sandra Sellers.

8      Q.   Okay.  And when was that?

9      A.   October of '99.

10     Q.   Okay.  Was it about the time that you were

11 filing the restraining order against Collette?

12     A.   Yes.

13     Q.   Okay.  Had you already filed --

14     A.   No.

15     Q.   -- the legal paperwork?

16     A.   No.

17     Q.   Was it just before then?

18     A.   Yeah.  Then that's when she said, Oh, you

19 have to fax it to me, you have to call me after you

20 get out of court, that's what she said.

21     Q.   But if you were going to fax something to

22 Sandra, you must have had a document to fax her?

23     A.   Yeah.

24     Q.   Was that the petition for restraining

25 order?

263

1      A.    Right, that's it.

2      Q.    Okay.  And she asked for that, and you did

3  fax it to her?

4      A.    Yes.

5      Q.    Okay.  And did, now at that point --

6      A.    And she said, Good luck in court, after you

7  go to court call me.

8      Q.    Okay.

9      A.    And I did.

10      Q.    Now, at that very first conversation you

11  had with Sandra Sellers were you mainly focusing on

12  the restraining order that you were going to get --

13      A.    Yeah.

14      Q.    -- for Collette?

15      A.    (Witness nods head.)

16      Q.    Did you ask her in that conversation to do

17  a sexual harassment investigation?

18      A.    No, never.

19      Q.    Okay.

20      A.    She is the one that said, I have to

21  interview you.  I said, Oh, okay.  And then a

22  couple --

23      Q.    So you didn't ask her to --

24      A.    No.  I didn't even know you had to be

25  interviewed.  I didn't know how that worked.

264

1          See Hopson always told me there is an open

2    door process.  But because of Mike Collette being

3    friends with Richard Lott, who lives across the

4    street from the two agents that work up the street

5    from me, and Richard Lott was brought hereby

6    Phil Lawson, the RVP whose wife was head of human

7    resources, where Richard Lott was and introduced him

8    to Phil, there is no open door process for me.

9          Q.   But you knew, so Hugh Hopson told you there

10   was in fact --

11         A.   Yeah.

12         Q.   -- an open door policy that the company

13   had?

14         A.   Right.  He said, Good luck.  He said, I

15   don't blame you.  He goes, You may have to call

16   Chicago because he knew, he knew, my God, who is this

17   girl going to call?

18         Q.   When did you have that conversation with

19   Hugh, what was happening?

20         A.   Nothing was happening, that was the whole

21   thing.

22         Q.   Before the injunction papers or the

23   restraining order?

24         A.   No.  I didn't talk to Hopson until after

25   that.

1    Q.   After the restraining order?

2    A.   Yeah.  And then --

3    Q.   About when though, a month, two months?

4    A.   Maybe January.

5    Q.   Okay.

6    A.   And then that's when --

7    Q.   That would be 2001?

8    A.   2000, 2001, whatever, right after I filed

9  the restraining order.

10   Q.   Okay.

11   A.   So that was filed in November of 2000.

12   Q.   Okay.  November of 2000?

13   A.   Right.  So then I talked to Hugh.

14   Q.   After that?

15   A.   Probably January, 2001.

16   Q.   And that's when he said, Well, there is an

17  open door policy?

18   A.   Yes.

19   Q.   He talked to you --

20   A.   I told him I had talked to Sandra Sellers,

21  and he said, That's good, you are talking to somebody

22  that's very good, she cares, that kind of thing.  But

23  I never really heard from her.

24        And so then that's when I thought my

25  friend --

266

1    Q.   And she just for the record then, she is

2  located in the Clearwater, Saint Pete --

3    A.   Yeah, Saint Petersburg.

4    Q.   Tampa?

5    A.   She is on the other coast.

6    Q.   She is in that office, right?

7    A.   Yes.

8    Q.   And then you are on the other coast?

9    A.   Right.

10    Q.   Did she say when you first spoke with her

11  she wanted to interview you?

12    A.   She said, I have to interview you, I will

13  be there in two days.  I said, Okay.

14    Q.   So she would have to travel to where you

15  are located?

16    A.   But I found out she did travel to where I

17  was located.  Because she met Richard Lott in

18  Sebastian about the whole thing, because Pat Padudo

19  who was the financial specialist for the whole area.

20  I didn't use him at all, had said he heard that's

21  where Richard was going that day.

22    Q.   Okay.

23    A.   But she didn't come to see me.

24    Q.   But she is in human resources.

25    A.   Right.

267

1      Q.   You don't know what requirements are on

2  human resources as to who they are supposed to

3  inform?

4      A.   Right.

5      Q.   It could be that Collette, tell your boss?

6      A.   Right.  But she said in two days.  So mean

7  while a month goes by, another month goes by.

8           And a friend of mine, he dad is friends

9  with Ed Liddy, they were on the Sears board together

10 along with the other CEO Mr. Teluride who golfs with

11 another friend of mine.  And I said, you know, we

12 know Ed, Linda, whatever help you need he'll help

13 you, write a letter, so I wrote the letter.

14          And that's when ED gave the letter to

15 Tamra Brown.

16     Q.   And when was that, when was the first time

17 that you spoke with Tamra?

18     A.   Well, I wrote the letter to Ed Liddy in

19 December.  And then she called probably a couple of

20 days after that I imagine.

21     Q.   So she called very shortly after you wrote

22 the first letter to corporate headquarters?

23     A.   Yes.

24     Q.   Okay.  Just one second.  I'm just checking

25 on the date of the transcript.  I have it as

1    12/21/2000 for the transcript that was made of your

2    interview of Sandra Sellers and Olga Otero; does that

3    not sound right?

4        A.    That doesn't sound right for some reason.

5        Q.    Okay.  It is on the transcript.

6            MR. ACKERMAN:  Object to the form.

7    BY MS. CESARANO:

8        Q.    Okay.  We can check that later, okay.  So

9    then what happened?  So you talked to Tamra, and what

10   was your conversation with Tamra?

11       A.    I don't really remember the entire

12   conversation.  But I had changed my phone number, I

13   gave her a new cell phone number because all of a

14   sudden all of these people that I didn't talk to in

15   years were all calling me, and they were all Mike's

16   friends asking me, Hey, what's going on, what's new?

17           You know, and one of the agents that called

18   and asked me that was an agent that two months

19   previously was talking to me about opening up an

20   agency with Mike Collette.  So I mean it doesn't take

21   much to put two and two together at that time.

22           And I asked him not to call me anymore, and

23   he didn't.  I asked him or his wife, Please don't

24   call me anymore.

25           And then after he went to court, after Mike

```
1    was in court the same time I was to get the

2    restraining order three days after that Jan showed up

3    in my office.

4        Q.   Which is Jan Brown?

5        A.   Yeah, who was no longer working for

6    Allstate, she quit.  And said to me, You know, last

7    time I talked to Mike, and I looked at her, I don't

8    think she meant to say that part, Your numbers are

9    really good, how are you doing?  I came to see the

10   office.  I have been in this office a year now, now

11   you want to come and see it.  You know it just didn't

12   all add up.  And I just said, Well, Jan, I'm sorry, I

13   have to go to an appointment.

14       Q.   Okay.

15       A.   Just walk out to her car.

16       Q.   By the way, any other harassing actions?  I

17   want to make sure that I finished that up.

18       A.   Let's see.

19       Q.   With Collette?

20       A.   Well, I know at one of the kickoff meetings

21   I told him to leave me alone, and he still kept

22   grabbing me, that's when he hurt me physically.

23       Q.   When did he, when did that happen?

24       A.   He was mad because I would not sit with

25   him.  And I said, I don't want to sit with you.
```

270

```
 1        Q.    Did he try to save you a seat or something?
 2        A.    Oh, yeah.  He sent Jan and Paul over to the
 3  table where I was sitting and said, Mike wants you to
 4  come back and sit over there with us.  So he saved a
 5  seat with me.
 6              I said, No, I'm not going, I'm sitting with
 7  Nick DeRosa.
 8        Q.    And this kickoff meeting was the January,
 9  2001 one?
10        A.    I guess it was, yeah, January, 2000 it had
11  to be.
12        Q.    That was the last one you attended?
13        A.    Yes.
14        Q.    That one, okay.
15        A.    It had to be.  That's when all broke out
16  against Nick DeRosa, because Nick DeRosa was sitting
17  with me, Mike went after him.  Anytime anybody sat
18  with me Mike would go after that person.
19        Q.    When you say go after to him, at the
20  meeting?
21        A.    No.  What he did is he tried to sabotage
22  the agency that Nick DeRosa was trying to buy.  He
23  was trying to buy an agency from two agents that he
24  was once their manager as well as worked in the
25  office with them and worked out an agreement to buy
```

271

1  their agency, and he tried to sabotage that.

2      Q.   Do you have personal knowledge of that?

3      A.   Yes, I do.

4      Q.   What is that?

5      A.   Well, I was at the meeting, and I heard the

6  whole discussion that he was having with the manager

7  at that time, that John Armellino and Nick were

8  having, I listened to it.  I was at that district

9  meeting.

10     Q.   You overheard Nick DeRosa and

11 John Armellino discussing this?

12     A.   Right.

13     Q.   Okay.  In other words, that was their

14 opinion that that was happening that Collette was

15 doing that, but you don't have first hand --

16     A.   That is firsthand.  It's right there.  Then

17 at that time Mike had even gotten Olga involved in

18 it.  And from there the RVP got involved in it.

19          Then finally Nick was getting worried, I

20 think he was going to get an attorney and

21 everything.  And that's when John called the regional

22 vice-president saying, What does Mike Collette, an

23 agency manager three or four counties away, have to

24 do with the buy or sale of this agency that was

25 already approved?

272

1     Q.   Did you hear that conversation?

2     A.   Yeah, I was right there, I was there.  I

3 think Tom Brown was sitting there.

4     Q.   But then going, okay,  so that's -- going

5 back to the meeting though.  You were sitting with

6 Nick DeRosa?

7     A.   Right.

8     Q.   Tell me about whatever harassment occurred

9 at the meeting by Collette?

10    A.   That's when he grabbed me.

11    Q.   Tell me about that.

12    A.   Here is what happened.  I said, No, I won't

13 sit there.

14    Q.   Okay.

15    A.   So then they had a break.  I'm sitting at

16 the meeting next to Nick.  Nick and I had a

17 conversation.  And now Mike comes over to the table

18 and just stands there trying to listen to what we

19 say.  I think, Oh God, Poor Nick, because in my mind

20 I knew.  But I didn't know it was going to be that

21 bad, he was going to go after his business.

22        And I sat there and I said, Okay.  And I

23 kept thinking about the Jimmy Buffet song about the

24 sharks swimming around, about the sharks swimming

25 around.  And then I just, I ignored him, I didn't pay

1    any attention to him.

2         So then I went up to go to the bathroom

3    which was totally on the opposite side of the room

4    where Mike was sitting or his little group was or

5    anything.  All of a sudden he comes from nowhere,

6    grabs me from behind and pulls on me and he said, You

7    know, those good numbers you had, he said it again,,

8    You used to work, you worked really good when I was

9    on top of you.  And I said, Let go of me, and then he

10   let go.

11        And then he like stood there and looked at

12   me and said, What's wrong with you, why can't you sit

13   with me?  And see because I had not wanted anything

14   to do with him, pushed him away from me, said, Don't

15   touch me, went back over to where I was, and again he

16   kept watching where I was sitting, that's when I sat

17   back with Nick, that's when Nick got that

18   repercussion.

19        Q.   He grabbed your arm?

20        A.   He grabbed it all right, I mean grabbed,

21   grabbed me.

22        Q.   Show me on your arm where he grabbed you?

23        A.   It was right here, he was where, right

24   here, he grabbed his right arm and grabbed me right

25   here (Indicating) and pulled back on me.

274

1          That's when I thought, Oh, shit, now he's

2    mad, because you don't want to get him mad.  I said,

3    Okay.  And then he goes, What's wrong with you, why

4    can't you sit with me?  See, he didn't like the fact

5    that I embarrassed him because he sent his little

6    group over to get me that came right out and said in

7    front of everybody, Mike wants you to come over and

8    sit there, and I didn't.  So now he was trying to

9    save face in front of all these people.

10         Q.   Okay.  And once you said that then did he

11   go back to his seat and you went back to yours?

12         A.   I don't know.  I sat down.

13         Q.   You went back to your seat though?

14         A.   Yeah.  And then I sat down.  And then --

15         Q.   He went away though?

16         A.   He went away.  But the meeting went on, and

17   I could look over every now and then, and I could see

18   he kept watching me.  I just sat there.

19         So then when I left, getting ready to leave

20   the meeting, Jan goes, What are you going to do now?

21   I turned to her and I said, Let me tell you

22   something, I have had it, and he is going to get in

23   trouble for the way he is talking to me, and I'm not

24   putting up with it anymore.

25         She goes, I don't think he means any harm.

275

```
 1   I said, You are not on the other end of it.  He
 2   doesn't talk to you that way.
 3        Q.   Who were you talking to?
 4        A.   To Jan Brown, that was before she quit.
 5        Q.   Okay.  So she was at this meeting too?
 6        A.   Right.
 7        Q.   And who would have seen what Mike did?
 8        A.   I think this agent saw who is no longer
 9   with the company, Bill Jones who was sitting at my
10   table, but I never talked to him about it.
11        Q.   Did Nick see, Nick DeRosa?
12        A.   I don't know.
13        Q.   Was he in a place where he could view it?
14        A.   Yeah, there were other people around.
15   Somebody probably did see it.  You are talking
16   100-some people there.
17        Q.   Okay.
18        A.   But I, you know, I don't want to make
19   waves, just sit down, I just wanted to sit down and
20   just keep him away from me.
21        Q.   Okay.  And this was again the kickoff
22   meeting that this happened?
23        A.   Yes.
24        Q.   Of 2000, '99, I mean which year?
25        A.   It happened, it was the last kickoff
```

1    meeting I was at, so it had to be 2000.

2        Q.   Okay.  Now, any other incidents that you

3    can recall?

4        A.   Gosh, let's see.  I can't think of anything

5    right now.  I know there is more.

6        Q.   Well, I will give you, in your complaint

7    one of the allegations that is made in Paragraph 10

8    is that, "Collette made sexually discriminating and

9    condescending remarks to you in front of other

10   people, other managers, friends, co-workers."

11       A.   Yeah, they even told me that.

12       Q.   What remarks?

13       A.   Well, other than that she is good enough to

14   eat.

15       Q.   Okay.  That was one you have told us

16   about.

17       A.   That was one.  He would always say, Oh, my

18   name, my name, we're so hot together he would always

19   say, My name is Mike Collette, he would make his name

20   Italian, instead of Mike Collette.

21       Q.   Collette?

22       A.   Collette, like he's Italian, I'm Italian,

23   like we would be so hot together.  And then I found

24   out other agents told me that he would talk about me

25   to them.

1      Q.   And who are those people?

2      A.   Well, Jan Brown was one, Gardner Brown.

3  Oh, let's see, all their support staff, he has always

4  talked to their support staff about me.

5      Q.   Who in particular?

6      A.   Ann Peiffer who I think he tried to have an

7  affair with.  Because one day Jan called me up and

8  said, You have to do a favor for me.  I said, What?

9  She goes, Mike is going to get in trouble because he

10 is talking to Ann the same way he talks to you.  I

11 don't know what is going on, but you have to talk to

12 him and tell him to stop it because he's going to get

13 in trouble.  I never said anything to her.

14     Q.   Okay.  What other individuals that you know

15 of might have heard these remarks or told you they

16 had heard remarks?  I have got Jan Brown,

17 Gardner Brown, Ann Peiffer.

18     A.   I think he said it to my old manager,

19 John Armellino.

20     Q.   Okay.  Anybody else?

21     A.   I think he said it to him and my other

22 manager before that Brian Foley.

23     Q.   Okay.  Brian Foley.

24     A.   I think he even said it to Hopson because

25 Hopson did say, you know, he was always talking about

278

1   me, and he knew that he should have done something --

2       Q.   Okay.

3       A.   -- you know, but didn't.

4       Q.   But did Hugh Hopson indicate to you what he

5   had heard, was he specific?

6       A.   No.

7       Q.   Okay.  Brian Foley, when did he leave the

8   company, what year?

9       A.   I'm not sure.  He wasn't my manager anymore

10  as of December, '98.

11      Q.   All right.  So he wouldn't really have any

12  evidence after December, '98 then; in other words,

13  that would be --

14      A.   Yeah, that's all he would know of.

15      Q.   Okay.  Before December, '98?

16      A.   Right.

17      Q.   After that --

18      A.   He's gone.

19      Q.   -- he's gone?

20      A.   I don't even know where he is.

21      Q.   Okay.  But nothing to do with you after

22  that date?

23      A.   Right.

24      Q.   Okay.  What other potential witnesses are

25  there, other people that may have heard these

1  remarks?

2    A.   Well, Chris McIntyre, but she is afraid to

3  come forward, you know.  It's hard to, to say to some

4  of these women.

5    Q.   Did she tell you that?

6    A.   She told Susan Myles that.

7    Q.   That she was afraid to come forward?

8    A.   Yeah.  All she wants to do is just go to

9  work.

10    Q.   Chris McIntyre, what do you believe she

11  might know, I mean about your case?

12    A.   Everything that Olga told her.

13    Q.   Well, I want, what I'm looking for are

14  people that saw something, that heard, that they were

15  there, not that they heard something.

16    A.   Well, Chris saw how he was to me.

17    Q.   Okay.  That's what I'm asking.  What would

18  she have witnessed?

19    A.   How he would throw spit balls at me.  My

20  gosh the whole table at one meeting, who was sitting

21  there.

22    Q.   Tell me, I know it's kind of juvenile, but

23  what's so sexual harassing about throwing spit balls?

24    A.   That's what he does to get your attention.

25  Then he raises his left eyebrow, you know, like --

280

1      Q.   We are talking little pieces of paper?

2      A.   Yeah, that he would throw at me to get my

3  attention in a meeting while a movie is going, a film

4  strip or something that they are showing, you know.

5      Q.   Like from behind?

6      A.   From behind, or like if you were sitting at

7  the other end of a table like where you are.

8      Q.   He would throw spit balls?

9      A.   Right, like if I was watching like he would

10  throw it to get my attention.

11      Q.   Have you ever seen him throw it at other

12  people too?

13      A.   No.

14      Q.   Just you?

15      A.   Yeah.

16      Q.   Is there a reason why the spit balls?

17      A.   That way he can get my attention.

18      Q.   Okay.

19      A.   Then what he does is he will look at you

20  like this, like he has a way of making his left

21  eyebrow go up, like, you know, he makes this

22  seductive move with his eye like, you know, and he

23  goes with this like his eyes, he bats them.  Or then

24  sometimes he do that, and he will go this like, like

25  that (Demonstrating), like he wants to throw a kiss

281

1    my way or something.

2         Q.    Okay.   How many times have you seen him do

3    that, throw you a kiss?

4         A.    That's probably like three or four times.

5         Q.    Okay.   During what time period, over the

6    course of how many years?

7         A.    From like 1998 until now.   Before that he

8    would usually just try to play with my hair, always

9    give me his like little beeper card with his beeper

10   number on it, and say, Call me, like say call me.

11        Q.    How many times has he played with your

12   hair?

13        A.    Three or four times.

14        Q.    Okay.   And again this would be at a meeting

15   or something?

16        A.    Oh, yeah.   That's why the onetime Olga was

17   sitting right behind us.   I'm like, Don't do that.   I

18   felt like people were watching and you are just

19   degrading me.

20        Q.    When he plays with your hair, how long does

21   it last, like show me what he would do.

22        A.    He would go like this (Demonstrating).

23   First he would start out with, you know, like trying

24   to get my attention that way.   Then more and more his

25   hand would get in there deep.

282

1          And then he would reach over always put his

2     arm around my chair, always, that's how he was at

3     every meeting like I'm his, that's it.

4          Q.   If you sat next to him, he would put his

5     arm behind the back of your chair?

6          A.   He came to me, he would sit with me.

7          Q.   Okay.  But you are saying how many times

8     would you sit together at these meetings?

9          A.   Just about every meeting.

10         Q.   Where he put his arm around the chair;

11    would that happen just about every meeting?

12         A.   Ah huh.

13         Q.   When you say every meeting, how many

14    meetings are you talking about?

15         A.   Well, the kickoff meeting every year.

16         Q.   That's once a year.

17         A.   The underwriting guideline changes,

18    whatever, you know, they dream up.

19         Q.   How many times a year did those occur, the

20    underwriting?

21         A.   Well, in the old days before everything was

22    emailed to us, two or three times a year.

23         Q.   In '98 for example?

24         A.   In '98 I probably saw him three or

25    four times at least.

283

1      Q.   Okay.  And you say he would put his arm

2  around the back of the chair?

3      A.   Ah huh.

4      Q.   Sit next to you?

5      A.   Always.

6      Q.   In '98 the same thing --

7      A.   Ah huh.

8      Q.   -- three times or so for underwriting

9  meetings?

10     A.   Yeah, underwriting meetings.  I'm trying to

11  think of what other meetings he had.  The meeting, I

12  think it was like '96 or '97 where they told us we

13  could only write certain houses, 1996 CBS

14  construction or newer.

15     Q.   Would he be doing those sort of things

16  before 1998?

17     A.   Yeah.

18     Q.   He would?

19     A.   Ah huh.

20     Q.   Like what, touch your hair?

21     A.   Yes.

22     Q.   Put his arm around you?

23     A.   Yes.  But not as much though because I was

24  married.

25     Q.   But he would still do it?

284

1      A.   Yeah.  But maybe he would go like this with

2  my hair, Hey how, are you (Demonstrating).  But now

3  it's (Demonstrating), the arm around the chair.

4      Q.   The same with the jokes, he would tell

5  the --

6      A.   He told the jokes to everybody.

7      Q.   All the time?

8      A.   All the time.  He was known for it.

9      Q.   The whole time you knew him?

10     A.   The whole entire time.  He's known for it,

11 everybody knows there is Mike, there is a joke.

12     Q.   Well, was it always a dirty joke, was it

13 sometimes just a regular joke?

14     A.   No.  A lot of times he would fell a lot of

15 black jokes because he hated Hopson so much.  So he'd

16 stand, like he'd say, Here comes the big nig, and

17 then he would turn to the people and he would tell

18 like a racist joke, like a black joke.

19     Q.   Okay.

20     A.   Then he would always say, Sit over there.

21 Like one time I couldn't sit next to him.  He had to

22 sit next to Hopson.  And he goes, Sit over there.  So

23 I was sitting across from him, and he was sitting

24 next to Hopson, Hopson was to his right and he was

25 going at me, he was going (Demonstrating), he was

285

1   like because he hates him so much.

2        Q.   But back to the sexual harassment because

3   that's the focus.  What other sexual type of things

4   would he do in your presence or to you over the

5   course of the time that he knew you?

6        A.   Well, he would like to rub my back all the

7   time.

8        Q.   Okay.  When was the first time that he did

9   that?

10       A.   Let's see, I don't know.  I don't remember.

11       Q.   Would he do that in '98?

12       A.   Oh, yeah, 1998 definitely.  He always had

13  some sort of presence in my life.  It was just when I

14  was married he kind of backed off a little bit.  He

15  would maybe just tell a dirty joke.

16       Q.   Okay.  But once the divorce came through

17  now he stepped up --

18       A.   Yeah, I think he felt like I'm back in.

19  Then he also saw how good my numbers were, because he

20  would always call, always would call.

21       Q.   When you say he rubbed your back, was this

22  at meetings?

23       A.   Meetings or like let's say the meeting was

24  over and everyone was walking to their car, or we had

25  a bathroom break, you know, that kind of thing.

286

1        Q.    Would it be like a shoulder massage or flat

2   hand on the back?  Describe what he is doing.

3        A.    Like rubbing, like going like this with his

4   hand (Demonstrating) like.

5        Q.    Okay.

6        A.    Like a massage up your spine.

7        Q.    Like a massage?

8        A.    Yeah, like up my spine, that kind of thing.

9        Q.    Would you say something to him when he

10  would do that?

11       A.    No.  I usually just pushed him away or

12  would sit like this (Demonstrating).

13       Q.    Would he do that in '98, 1999?

14       A.    He did onetime at a meeting too.  The

15  meeting was down south somewhere.  And I just, I

16  remember standing there, and this underwriter came

17  over to me, and she said, Oh, my God, I haven't seen

18  you in so long, I didn't even recognize you.

19            I said, Yeah, it's me.  And I said, How are

20  you?  And he came right over, and then he even kissed

21  me right in front of her at the meeting.

22       Q.    What meeting was this?

23       A.    It was a meeting where Rose Maloney was

24  there, I hadn't seen her in a long time.  And she and

25  I were having a really long talk.  She was telling me

1    that she had just gotten married.

2         Q.   So what year would that have been?

3         A.   That had to be 19, it had to be 1999.

4         Q.   Do you remember this kind of meeting was

5    early in the year, late in the year?

6         A.   I can think of it.  It's, everybody was

7    there.

8         Q.   What kind of a meeting was that?

9         A.   It was huge.  It was when this man named,

10   it was when Grey Hopkins came from Braishfield and

11   introduced brokering with Braishfield and introduced

12   brokering with Braishfield, it was that meeting.  It

13   was huge.

14        Q.   Where was it located?

15        A.   In South Florida someplace.

16        Q.   You don't remember what city or hotel?

17        A.   Big conference room.  But I remember

18   driving far to it.  I don't think it was at Doral,

19   but it was something like that.

20        Q.   Do you think it was in '99?

21        A.   All the underwriters were there, everybody

22   was there, yeah.

23        Q.   You think it was '99 though?

24        A.   Ah huh.

25        Q.   Okay.  And he kissed you, but it was just

288

1    like a quick kiss?

2        A.    No.   It was like (Demonstrating) right on

3    the lips.

4        Q.    It was on the lips?

5        A.    Yeah.

6        Q.    Okay.

7        A.    And then the other girls that he did see

8    there he just gave on the cheek.

9        Q.    But he was kissing other people too?

10       A.    I can tell you when the meeting was.   It

11   was in the beginning of the year, it had to be like

12   February or March, because that's when they had just

13   introduced the new homeowners program.

14       Q.    Okay.  So February, March, '99?

15       A.    Ah huh.

16       Q.    Now, anything else that you can think of

17   that he did, are there other things?

18       A.    Oh, yeah.

19       Q.    There are.  Okay.  While you think about

20   that for a minute, one of the questions I have for

21   you is when these kinds of things were happening to

22   you and you didn't like them, did you ever complain

23   officially to Allstate, to anyone at Allstate about

24   it?

25       A.    No.   It is like I told Hugh Hopson, you

289

1    always think it is going to go away.  When most

2    people have a problem you don't confront it, you just

3    think it is going to go away.

4            And once they moved Hopson, Hopson watched

5    out for me.  Then my manager quit, it's like he's

6    going to go after me now.

7        Q.   Okay.  So because of that you thought it

8    was going to go away, you didn't report it?

9        A.   Right.

10       Q.   Was the first report you made then the time

11   you talked to Sandra where you told her, Hey, I want

12   you to know that I filed a restraining order against

13   Collette?

14       A.   Yes, that was the first time.

15       Q.   Okay. And so that would have been

16   approximately say October 25 was the date that you

17   filed your petition of 2001?

18       A.   Yes.

19       Q.   Okay.  And so that same day you talked to

20   Sandra Sellers?

21       A.   Yes, that afternoon.

22       Q.   That afternoon?

23       A.   Yes.

24       Q.   All right.  And she was the first, and then

25   she suggested to you, Well, I want, I will need to,

290

1    is that when she said she wanted to talk to you, or

2    was that a later conversation?

3        A.   She said, I want to interview you, I will

4    be there in two days.

5        Q.   So in that conversation?

6        A.   Yeah.

7        Q.   Okay.  And do you remember that you also

8    talked to Sandra Sellers about a week later when you

9    actually, after the hearing --

10       A.   Right.

11       Q.   -- when you got your order and she called

12   you because you asked her to?

13       A.   Yes.

14       Q.   Tell me about that conversation?

15       A.   I don't really remember it.  I think she

16   had me fax whatever.

17       Q.   The restraining order?

18       A.   I believe so.

19       Q.   Because you got your order on November 1 of

20   2001?

21       A.   Okay.

22            MR. ACKERMAN:  Object to the form.

23       Predicate.

24            MS. CESARANO:  It is right in the exhibit

25       if you want to check the date.

291

1          MR. ACKERMAN:  2000 I think.

2          MS. CESARANO:  Is it 2000?

3          MR. ACKERMAN:  Yes.

4    BY MS. CESARANO:

5          Q.   Okay.  November 1, 2000.

6          A.   Okay.

7          Q.   So that's the date you got the actual order

8    from the judge?

9          A.   Yeah.  I think they give it to you right

10   there.

11         Q.   Yes.  So then did you call Sandra that

12   afternoon?

13         A.   I called her right from my car, they told

14   me to, that morning.

15         Q.   And then you faxed her the order?

16         A.   Yes.

17         Q.   What did you discuss about that, what was

18   your discussion with Sandra at that time, because

19   this is the second phone call?

20         A.   She said she was going to get back to me.

21   That was it, that's it all.

22         Q.   Did you say anything else, did you talk

23   about Collette?

24         A.   She said, Just be careful, that was it, she

25   said, Just be careful.

292

1        Q.   Careful of what?

2        A.   Of him.

3        Q.   Oh, okay.  Did she make any other comment

4    about it?

5        A.   I can't think if she did.

6        Q.   Okay.  But she said then she was going to

7    talk with you again later?

8        A.   Yeah, she was going to come over and

9    interview me.

10       Q.   Okay.

11       A.   That's what she said.

12       Q.   Okay.  Did he say in either one of those

13   conversations that the company took this seriously,

14   and she needed to look into it?

15       A.   No, nothing like that.

16       Q.   You don't remember that?

17       A.   No.  She didn't send a manual, pamphlet,

18   nothing.

19       Q.   Now, when she finally did interview you,

20   were you tape-recorded, do you remember whatever date

21   it was do you remember there came a time when you did

22   sit down with Sandra Sellers and Olga Otero, correct?

23       A.   Yes.

24       Q.   And they asked if they could tape-record

25   what you said?

293

1      A.   Ah huh.

2      Q.   And you agreed, that's okay?

3      A.   Yeah.

4      Q.   And when you told the whole story in that

5  tape-recording, would you say that that was a pretty

6  complete description of the sexual harassment that

7  Collette had done?

8      A.   No, not that day.  Even after I left and

9  days after you think of more things that happened, or

10 somebody says something and it triggers something in

11 your memory.

12     Q.   Okay.  But what was on the transcript,

13 whatever you did say was accurate, is that fair to

14 say?

15     A.   Well, yeah.

16     Q.   Okay.

17     A.   She understood my concern how I had really

18 nobody to go to because Hopson was now gone, and

19 Richard is friends with Mike who is friends with the

20 RVP.  She understands that whole triangle.

21     Q.   Okay.  Then I want to go into more detail,

22 the investigation that took place.  At the end of

23 Allstate's investigation did you receive a letter

24 signed by Sandra Sellers?

25     A.   I don't recall.

294

1      Q.   I'm going to show it to you.

2           MS. CESARANO:  Have this marked.

3           (The document is marked as Defendant's

4      Exhibit No. 43 for identification.)

5  BY MS. CESARANO:

6      Q.   Do you recognize this Exhibit 43 purports

7  to be a letter from Sandra Sellers to you at your

8  home address?

9           (The witness reviews the document.)

10     A.   Yes.

11     Q.   Okay.  Now, did you talk to Sandra Sellers

12 after you received the letter?

13     A.   No.

14     Q.   Okay.  Had you had several conversations

15 with Tamra Brown in corporate headquarters before you

16 received this letter?

17     A.   Yes.

18     Q.   Okay.  Did Tamra Brown send you any letters

19 or documents at the, you know, kind of at the

20 conclusion of the investigation, did you get anything

21 from her personally?

22     A.   Not that I recall.

23     Q.   Okay.  So this was like the official --

24     A.   Yes.

25     Q.   -- answer from Sandra Sellers saying where

295

```
 1    they had come out?
 2         A.    Yes.
 3         Q.    Okay.  I just have a couple of other
 4    documents and finish up.
 5              MS. CESARANO:  What number.
 6              (The document is marked as Defendant's
 7         Exhibit No. 44 for identification.)
 8    BY MS. CESARANO:
 9         Q.    Now, do you recognize the name of, that's
10    "Preparing For The Future"?
11         A.    Ah huh.
12         Q.    You do recognize that phrase?
13         A.    Yes.
14         Q.    Okay.  Was that the phrase that Allstate
15    was using to describe their reorganization program
16    that took effect July 1, 2000?
17         A.    I believe so.
18         Q.    Okay.  I want to show you a document that's
19    marked for identification as Defendant's Exhibit 44,
20    and I want to ask you to turn to the last page and
21    tell me if that is your signature?
22              (The witness reviews the document.)
23         A.    Yes.
24         Q.    Okay.  Did you sign this document on
25    May 20, 2000, is that the date on your signature?
```

296

1        A.   Yes, that is the date.

2        Q.   And you signed this document along with the

3    various other exhibits we also saw in this case that

4    are dated also May 20, 2000?

5        A.   Yes.

6        Q.   And was this when you were with Chip?   I

7    keep forgetting his last name.

8        A.   Chip Cruise, yes.

9            MS. CESARANO:   Okay.   Can we go off the

10           record for a moment.

11           THE VIDEOGRAPHER:   It is approximately

12           5:04 P.M.   We are going off the video record.

13           (Off-the-record discussion.)

14           MR. ACKERMAN:   She is going to read.

15           THE VIDEOGRAPHER:   The time is

16           approximately 5:07 P.M.   Back on the video

17           record.

18           MS. CESARANO:   Okay.   We are going to stop

19           now and continue the deposition at a later time

20           that's mutually agreeable.   And because we

21           previously agreed to try to stop by 5:00 o'clock

22           today.

23           THE VIDEOGRAPHER:   The time is

24           approximately 5:07 P.M.

25           MS. CESARANO:   Yes, I think so, go ahead, I

297

1          will order it.

2                  MR. ACKERMAN:  Yes, please.

3                  MS. CESARANO:  Mini, the works.

4                  MR. ACKERMAN:  I will take the mini with

5          the index.

6                  (The witness is excused.)

7                  (The deposition was concluded at 5:07 P.M.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

298

1                         EXCEPT FOR ANY CORRECTIONS
                         MADE ON THE ERRATA SHEET BY
2                         ME, I CERTIFY THIS IS A TRUE
                         AND ACCURATE TRANSCRIPT.
3                         FURTHER DEPONENT SAYETH NOT.

4

5                         WITNESS' NAME

6  STATE OF FLORIDA    )
                    )   SS:
7  COUNTY OF PALM BEACH)

8

9           Sworn and subscribed to before me this

10 _____ day of _____, 2002.

11 PERSONALLY KNOWN _____ OR I.D. _____

12

13 _____

14                 Notary Public in and for the
                 State of Florida at Large.

15

16 My commission expires: _____

17

18

19

20

21

22

23

24

25

CERTIFICATE OF OATH

STATE OF FLORIDA      )
                      )      SS:
COUNTY OF PALM BEACH)

         I, Coan E. Dow, the undersigned Notary
Public, in and for the State of Florida, hereby
certify that LINDA M. ZINK personally appeared before
me and was duly sworn.

         WITNESS my hand and official seal this
6th day of November, 2002.

_____
Coan E. Dow
Notary Public
Commission No. CC 828168
Commission Expires: 6/5/2003

C E R T I F I C A T E

STATE OF FLORIDA      )
                      )      SS:
COUNTY OF PALM BEACH)

    I, Coan E. Dow, Registered Professional
Reporter, do hereby certify that I was authorized to
and did stenographically report the foregoing
deposition; and that the transcript is a true and
correct transcription of the testimony given by the
witness.

    I further certify that I am not a relative,
employee, attorney or counsel of any of the parties,
nor am I a relative or employee of any of the
parties' attorney or counsel connected with the
action, nor am I financially interested in the
action.

    Dated this 6th day of November, 2002.

_____
Coan E. Dow
Professional Reporter

300

```
 1              E R R A T A   S H E E T

 2    In Re:   Zink vs. Allstate

 3    Case No.   02-14134-CIV-MOORE/LYNCH

 4    DO NOT WRITE ON TRANSCRIPT -- ENTER CHANGES HERE:

 5    PAGE NO.      LINE NO.                    CHANGE

 6    _____/     _____/     _____/

 7    _____/     _____/     _____/

 8    _____/     _____/     _____/

 9    _____/     _____/     _____/

10    _____/     _____/     _____/

11    _____/     _____/     _____/

12    _____/     _____/     _____/

13    _____/     _____/     _____/

14    _____/     _____/     _____/

15    _____/     _____/     _____/

16    _____/     _____/     _____/

17    _____/     _____/     _____/

18    _____/     _____/     _____/

19    _____/     _____/     _____/

20    _____/     _____/     _____/

21    _____/     _____/     _____/

22

23        Under penalties of perjury, I declare that I
      have read my deposition and that it is true and
24    correct subject to any changes in form or substance
      entered here.

25    _____    _____
```

301

                    VERITEXT FLORIDA, LLC
        BENOWITZ - BERMAN - COOK - IVY - MATZ TRAKTMAN
                  Suite 1020 Biscayne Building
                    19 West Flagler Street
                    Miami, Florida  33130
                      (305) 371-1884
                    (305) 377-1100 (Fax)

November 6, 2002

Linda M. Zink
C/O Joseph L. Ackerman, Jr., Esq.
Boose, Casey, Ciklin
515 North Flagler Drive
West Palm Beach, Florida  33401

RE          : Zink vs. Allstate
DEPO OF:    : Linda M. Zink
TAKEN:      : October 30, 2002
NUMBER OF PGS: 299
Available for reading until:  December 6, 2002

Dear Ms. Zink:

This letter is to advise you that the transcript of
your deposition is completed and is awaiting reading
and signing.

Please arrange an appointment to come to our office
at Suite 1020, 19 West Flagler Street, Miami, Florida
to read and sign the transcript.  Our office hours
are 8:30 A.M. to 4:30 P.M., Monday through Friday.
Depending on the length of the transcript, you
should allow yourself sufficient time for review.

If the reading and signing has not been completed
prior to the above-referenced date, we shall conclude
that you have waived the reading and signing of the
deposition transcript.

Your prompt attention to this matter is appreciated.


Sincerely,


Coan E. Dow, R.P.R.
Cc:  Sheila M. Cesarano, Esq.

302

```
                    VERITEXT FLORIDA, LLC
        BENOWITZ - BERMAN - COOK - IVY - MATZ TRAKTMAN
                Suite 1020 Biscayne Building
                   19 West Flagler Street
                    Miami, Florida  33130
                       (305) 371-1884
                    (305) 377-1100 (Fax)
```

November 6, 2002

Sheila M. Cesarano, Esq.
Shutts & Bowen
201 S. Biscayne Boulevard
Miami, Florida  33131

```
RE:          : Zink vs. Allstate
DEPO OF:     : Linda M. Zink
TAKEN:       : October 30, 2002
NUMBER OF PGS: 299
Available for reading until:  December 6, 2001
```

Dear Ms. Cesarano:

The original transcript of the deposition listed above is enclosed for your file.  The witness did not waive reading and signing and was duly notified by letter to come in and read the deposition transcript.

The witness will be provided a copy of their deposition for reading in our office should they come in to review the transcript, and we will forward to you any corrections made by the witness at that time, along with an original signature page to be attached to the original transcript.

Sincerely,


Coan E. Dow, R.P.R.


Cc: Joseph L. Ackerman, Jr., Esq.